Exhibit B

**In The Matter Of:**

*Ervin J. Marshall v.*

*Burlington Northern Santa Fe, LLC; et al.*

---

*Joseph Buelt*

*May 31, 2019*

---

*Midwest Reporters, Inc.*

*800-528-3194*

*www.midwestreporters.net*

*office@midwestreporters.net*

Original File 5-31-19 Joseph Buelt.txt

Min-U-Script® with Word Index

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ERVIN J. MARSHALL,
Plaintiff,
vs. Case No. 2:18-CV-02385-JWL-JPO
BURLINGTON NORTHERN SANTA FE, LLC,
d/b/a BNSF RAILWAY COMPANY,
Defendants.

D E P O S I T I O N

The deposition of JOSEPH BUELT, taken on behalf of the Plaintiff, pursuant to the Federal Code of Civil Procedure and Notice, before:

Sandra K. Powers, C.S.R.

a Certified Shorthand Reporter of Kansas, at 4515 Kansas Avenue, Building 4, Kansas City, Kansas, on the 31st day of May, 2019, starting at the hour of 11:05 a.m.

Page 2

A P P E A R A N C E S

The plaintiff appeared by his counsel, Mr. Aaron C. McKee, of McKee Law, LLC, Attorneys at Law, 222 South Cherry Street, Olathe, Kansas 66061.

The defendant appeared by its counsel, Mr. David C. Vogel, of Constangy, Brooks, Smith & Prophete, Attorneys at Law, 2600 Grand Boulevard, Suite 750, Kansas City, Missouri 64108.

Page 3

I N D E X

| WITNESS | PAGE |
|---|---|
| MR. JOSEPH BUELT: | |
| Direct-examination by Mr. McKee | 4 |
| EXHIBITS: | |
| Buelt Deposition Exhibit No. 26 | 55 |
| Buelt Deposition Exhibit No. 27 | 114 |
| Buelt Deposition Exhibit No. 28 | 142 |
| Buelt Deposition Exhibit No. 29 | 144 |
| Signature of Witness | 164 |
| Correction Page | 165 |
| Certificate of Certified Shorthand Reporter | 166 |

Page 4

P R O C E E D I N G S

Whereupon,

JOSEPH BUELT,

of lawful age, having been first duly sworn on his oath to state the truth, and nothing but the truth, deposes and says:

DIRECT EXAMINATION

BY MR. McKEE:

Q. I guess still good morning. My name is Aaron McKee and I'm an attorney representing Joe Marshall in a lawsuit that he's filed. You understand that?
A. I do.
Q. Okay. Can you please state your name for the record?
A. Joseph Buelt.
Q. And what is your home address?
A.
Q. Okay. Do you have a cell phone?
A. I do.
Q. Is it a company phone?
A. It is a company phone. I don't have it on me.
Q. Okay. That's fine. What is your current position?

A. Manager of Engineering.
Q. Okay. Have you ever participated in a deposition before?
A. Yes, I have.
Q. Okay. Tell me about that.
A. A deposition for a gal at the Taconite facility, had a fire on the dock, asked me to answer questions.
Q. Okay. Any other depositions you've ever been a part of?
A. With BNSF, no. With my previous employer, yes.
Q. Who was your previous employer?
A. Cooper Industries.
Q. When did you start with BNSF?
A. 2011.
Q. And what was the deposition you were a part of prior to BNSF?
A. Those depositions were personal injury, discharge. In other words, a person being discharged from the company for cause.
Q. And you were -- do you recall how many times you were deposed in matters involving people that were discharged?
A. I don't recall the exact number but it

was more than three, less than five.
Q. Okay. And what state were you in?
A. Wisconsin.
Q. Now, were the allegations made about anything that you had done?
A. No.
Q. Okay. Were they for people that were claiming discrimination?
A. No.
Q. Okay. I'm trying to think, were they -- but they were employees or former employees that were suing the company?
A. Yes.
Q. Okay. Were they claiming -- what were they claiming to your recollection?
A. For the most part it was attendance.
Q. Okay. And so was that through the grievance process?
A. It was --
Q. I'm just trying to figure out -- because I just want to make sure we're talking about the same thing. I make the assumption that everybody knows what a deposition is and then I realize it's not something that people do every day.
A. No.

Q. So you and I very well may have a different understanding of it. What I'm thinking about is -- you're saying that it was attendance related and so was it some type of a process that was internal in which somebody was trying to challenge their termination?
A. No, it was external through courts.
Q. Okay. And so they were claiming that for some reason they were wrongfully terminated?
A. Yes.
Q. Okay. And were you any of those individuals' manager?
A. Was I their direct supervisor?
Q. Yes.
A. Yes.
Q. Okay. Do you remember the names of those people?
A. No.
Q. Do you recall when the last one was?
A. No.
Q. Do you recall any more about what they claimed?
A. No.
Q. Do you recall what happened to those lawsuits? Did they go to trial?

A. No.
Q. Okay. What happened, do you know?
A. They were dismissed.
Q. Okay. When you say they were dismissed, the court ruled on them and dismissed them?
A. That's my understanding, yes.
Q. Okay. Do you recall why?
A. No, I don't know.
Q. Okay. And you say you don't recall when the last one was?
A. No.
Q. Okay. Now, at some point you transferred to Kansas City while working for BNSF?
A. Correct.
Q. Approximately when was that?
A. 2015, May, June. May was when I took the position. When I transferred here was October, when I moved down here.
Q. Okay. And why were you transferred to Kansas City? Was it voluntary?
A. I requested it.
Q. Okay. And why did you request a transfer to Kansas City?
A. I wanted to do something different.
Q. Okay. Had you ever lived in Kansas City?

A. No.
Q. Have any family in Kansas City?
A. No.
Q. It was you saw an open position and decided to bid for it?
A. It was the type of work that I had wanted to do.
Q. Okay, all right. And so when did you actually start working in Kansas City? It sounds like you moved here a few months after you started.
A. Took the position in May of 2015. I moved myself and my family here October of 2015. I was working out of this office June of 2015 but this was my headquarters when we moved here.
Q. Okay. Now, do you recall when you started to work with Joe Marshall?
A. Yes.
Q. Okay. Tell me about that, when that was, approximately.
A. Approximately June of 2015.
Q. Okay. It's my understanding that Joe Marshall was working in a different department or group prior to being assigned to you; is that right?

A. I don't have any understanding -- knowledge of that, but I was told that, yes.
Q. Okay. So -- and what was your title again?
A. Title is Manager of Engineering.
Q. Okay. So when you started in June of 2015, that was as part of the Facilities group?
A. I'm in the Facilities group, yes.
Q. Okay. And when you started did you -- do you recall who you managed?
A. I do.
Q. Okay. Who did you manage?
A. Derek Brown and Bruce Stuff.
Q. And what about Joe Marshall?
A. I was told about him in June, that he was going to be joining my group.
Q. Okay.
A. When I started it was just those two, but he was added.
Q. Okay, all right. And who told you that Joe Marshall was going to be added to your group?
A. Dwayne Curbow, my direct supervisor.
Q. Did Mr. Curbow tell you why Joe Marshall was going to be joining the Facilities group?
A. No.

Q. Did you ask Dwayne Curbow why Joe Marshall was joining the Facilities group?
A. I think I told him something like this, "Thanks for the opportunity. I look forward to dealing with it."
Q. And so did you -- when did you learn about what Joe Marshall did as far as his job duties?
A. When I met with Joe, June or July. I don't remember if it was June or July of 2015 and asked him, "Joe, what do you do?" He went through what he did.
Q. Okay. So prior to June of 2015 was the Facilities group handling scales?
A. I don't know that. I was told no, but I don't know that for sure. They may have in the past but I don't know the complete history.
Q. Okay. Did you have a background in scales?
A. I have a basic understanding of what scales do. I had no understanding of what a railroad scale does, is or was.
Q. Okay. So help me understand, what was it that Joe Marshall was going to do or what was your understanding as to what Joe Marshall was going to

do when he was transferred into the Facilities group?
A. He was going to manage the scale -- manage the scales and operate and maintain the scales across the system.
Q. Okay. And are those scales nationwide?
A. They're scales -- yeah, I don't think nationwide. On our system, our system isn't nationwide, but...
Q. Okay. Did Joe Marshall have some kind of territory that he covered?
A. The system.
Q. Okay. So is that anywhere that a scale is on the system?
A. Anywhere a railroad scale is on the system, yes, that is BNSF owned, not necessarily customer owned.
Q. Were there any other people that were in the Facilities group that had knowledge of working with scales?
A. Not to my knowledge.
Q. Okay.
A. They may have but I didn't ask them.
Q. Okay. So at some point in June, 2015, you meet Joe Marshall?

Page 13

A. Yes.
Q. Okay. Do you recall that first time you met with him?
A. Yes.
Q. Tell me what you recall.
A. I recall meeting him at the North Town Yard at the scale. We met, introduced myself. I didn't know who he was, I had to find out who he was first. You know, I didn't even know -- wouldn't recognize him and he didn't recognize me either so we had to introduce ourselves. Asked him to go through what is a railroad scale for me, just show me what it is so I can get a basic understanding of what it is. They were doing a project at that time of doing the approach, I believe at that time on that scale, so he was overseeing that project at the scale, and then we went through his PMP, midyear PMP that Madlyn had written.
Q. Okay.
A. And needed to be completed sometime during that period.
Q. And at some point it seems like you and Joe Marshall began to disagree. Does that --
A. At that meeting?

Page 14

Q. No, no, I'm not saying at that meeting. I'm saying at some point you and Joe Marshall began having some problems working together; is that fair to say?
A. There was some discussions, yeah.
Q. Okay. Tell me about that.
MR. VOGEL: Object to the form of the question as vague and overly broad. You can answer if you can. You can answer.
A. Well, I was going to say, it's -- the process that BNSF Railway wanted to take the position that Joe was in was different than what Joe Marshall -- the position was headed before that, so the direction that position was going in was going to change, and change is hard for everybody.
Q. Okay. And how was the direction of Joe Marshall's position going to change?
A. It was going to go from us having the institutional knowledge in-house to having the institutional knowledge as being a contractor or consultant, moving towards that.
Q. Okay.
A. Because we used to at one time have multiple people that did scales, or scale

Page 15

inspectors, and we were down to one at the time, and we were either going to train people to be scale inspectors or we were going to have to hire people to do that, that had the institutional knowledge to do that. The decision was made that, you know, if and when Joe left the position we were going to move to that role, that model, but somebody still needed to manage that program from a BNSF standpoint.
Q. Okay. And you said if and when Joe Marshall were to leave that position. What did you mean by that?
A. Means that on the railroad, or most large companies, positions get put on a bulletin and people have the ability to post for them and they can move from this job to that job. Like when I moved from Superior down here, I requested it. If you're approved for it you get to move.
Q. Okay. Do you recall ever having a conversation in which Joe Marshall told you that he was planning to retire when he was sixty?
A. No. I recall a conversation, I says, "Do you have a retirement plan, Joe?" I don't remember exactly what he said. I don't recall him saying "I have a plan to retire when I'm sixty,"

Page 16

or sixty-five or sixty-two or anything.
Q. Tell me more about what you recall of that conversation.
A. As I said, I don't recall him saying that he was going to retire at a specific age.
Q. Okay. Did Joe Marshall ever tell you that he was considering retiring when he worked for you at the Facilities group?
A. When we have somebody who's close to retirement we kind of ask them, "Do you have an exit plan, a retirement plan? Do you have a date?" So we can plan how quickly we need to plan to replace them or replace their skill set, so, yeah, I suppose I did ask him that. Do I remember exactly when he said he was going to retire? I don't remember.
Q. Okay. Do you recall if Joe Marshall told you -- well, strike that.
So you say you asked Joe Marshall if he had an exit plan. What did Joe Marshall tell you in response?
A. I don't remember exactly what he said. My response is we'll support him where -- what he wants to do. We'll support him, you know, how long he wants to be here. You know, this here

process that we're going through, we needed his support to move towards that model and it wasn't going to happen overnight. We needed his support.
Q. Okay. So would that conversation have been around the time that Joe Marshall joined the Facilities group?
A. I don't remember. I don't remember when that conversation exactly happened.
Q. Okay. Do you recall if Joe Marshall gave you any indication that he intended to retire when he was sixty?
A. I don't recall.
Q. So is it fair to say that you did not know if Joe Marshall was going to retire at the age of sixty?
A. That's his decision. I don't know.
Q. Okay. Did you have any reason to believe that Joe Marshall was going to retire at the age of sixty?
A. I do not have reason to believe that he was going to retire, no.
Q. Okay. Let's do this, let's go ahead and start with Exhibit 25 that's sitting in front of you. I'm going to have you review that.
A. Okay.

Q. Are you familiar with it?
A. Well, it's my PMP from 2015.
Q. Okay. Have you seen that recently?
A. My attorney showed it to me just a few minutes ago, the first time I seen it since 2015, I think, maybe 2016.
Q. Okay. Do you want an opportunity to look through it?
A. We can go on.
Q. Okay. If we look on the last page it appears that it was electronically signed by you on January 22nd, 2016. Does that appear right to you?
A. That would be the right time frame, yes.
Q. Okay. Now, let's flip back to the first page.
A. (Witness Complies). Yes.
Q. I want to look down at the part that says "Appraisal by Joseph Buelt," midway down.
A. Yeah.
Q. And I want to go to the end.
A. Yep.
Q. Five lines up it says "My biggest leadership issue..." Do you see that?
A. Yes.

Q. It says "My biggest leadership issue is my dealings with Joe Marshall." Did I read that correctly?
A. Yes.
Q. Tell me, why was Joe Marshall your biggest leadership issue in January of 2016?
A. If you read the rest of the paragraph it goes on to say, you know, transitioning, you know, to deal with accountability of his job, utilizing him fully, what he's doing. Felt he was underutilized.
Q. Okay. So you're saying that Joe Marshall felt he was underutilized?
A. No, I felt he was underutilized.
Q. Okay. And so why did you believe that Joe Marshall was underutilized as of January of 2016?
A. I felt that there was opportunity for Joe to do more for the BNSF railroad.
Q. Okay. Tell me why you believed there was more that Joe Marshall could do.
A. To transition the scale program from where it is -- where it was at the time to where we wanted it to go to.
Q. Okay. So give me some specific examples

of how you believed Joe Marshall was being underutilized.
A. Underutilized by taking the travel knowledge that he had and putting that in place so that a consultant/contractor could operate and maintain their scales going forward.
Q. And if Joe Marshall's job was to work with the scales, why was -- or were his job duties being transitioned to a contractor?
A. His job duties included other duties as assigned by his supervisor, and that's the process of getting -- the process of reducing what Joe's doing on the scale to a consultant or contractor, something that was going to happen over years, so you need to change the skill set of what he's doing to documenting what he's doing and putting it on paper so we can have a contractor/consultant do it.
Q. When you started the position in Kansas City did someone tell you that you needed to begin transitioning out the scale program to contractors?
A. I was informed that -- after I asked the question, you know, where's the scale program going, because there was only one of Joe and his

tribal knowledge, the skill set he had was very unique. How are we going to back fill that if Joe transitions to a new position or retires or moves onto whatever he wants to do? How are we going to back fill that? How are we going to take care of that?
Q. Okay.
A. So I was told that we're not going to back fill that -- we're not going to train somebody to do that, we're going to hire somebody from the outside.
Q. And were you told approximately how long it was going to take to transition into having someone from the outside handle the job duties of Joe Marshall?
A. When I was told that I was told to figure that out, how long it was going to take, because I didn't know that and neither did they.
Q. Okay. And what did you determine was going to be an appropriate amount of time to transition Joe Marshall's job duties to a contractor?
A. I never had a date or time frame that was set up when Joe left the position. I was kind of forced to scramble to get things going.

Q. So when did you learn that Joe Marshall had decided to retire?
A. I didn't know he decided to retire. I was told that he was leaving his position. He was going back to the ranks.
Q. Okay. When did you learn that?
A. 2016. I don't remember the date.
Q. Okay. Now, is that the first time that you heard anything about Joe Marshall leaving his position with scales?
A. Oh, when he presented that, that was the first, yeah.
Q. All right. Now, let's look at the document. In the second line, the very end of the second line it starts out with the word "The..." Do you see that?
A. Yep.
Q. Says "The process of getting him over the methods of the past will take an (sic) transparent process and allowing Joe to come to grips with where the job was going." Did I read that correctly?
A. Yes.
Q. Okay. Do you recall if prior to this time in January of 2016 Joe Marshall had indicated

to you that he intended to retire at the age of sixty?
A. I don't recall. I don't remember him saying anything.
Q. Okay. All right. So tell me, this comment here that you made, what was Joe to come to grips with?
A. The grips of the process going from what he's been doing to where the scale program was going to end up being three, five years down the road.
Q. Okay. And so is it fair to say that essentially Joe Marshall was being asked to put together a description of his job so that somebody else could perform it?
A. He was being asked to put together the skill set of his job that was going to be needed for BNSF going forward that was going to be contracted out.
Q. Okay. And when did you begin talking to contractors that were going to start dealing with the scales?
A. 2016 sometime. I don't remember.
Q. Okay. Was that before or after you heard that Joe Marshall was returning to the craft?

A. Before.
Q. Okay.
A. We started this shortly -- in 2016 started this process.
Q. Okay. Did you ever sit down with Joe Marshall and tell him that BNSF was transitioning his job duties to a contractor?
A. I told him that's where it was going to go, yeah.
Q. And do you recall what Mr. Marshall said to you about that?
A. I don't recall exactly.
Q. Did he seem to be unhappy about it?
A. He wasn't pleased.
Q. Okay. Do you recall anything else?
A. I don't recall exactly.
Q. Okay. Do you ever recall having any meetings with Joe Marshall in which Mr. Marshall was loud?
A. Oh, yeah.
Q. Okay. Tell me about that.
A. Yes, Joe got agitated, raised his voice.
Q. Okay. Do you recall ever raising your voice to Mr. Marshall?
A. I may have.

Q. Okay. Do you recall Mr. Marshall ever cussing at you?
A. I do.
Q. Tell me about that.
A. He told me I was fucking with him.
Q. Okay. Why did he think that?
A. I don't know.
Q. Did you ask him to explain?
A. I did not.
Q. Why not?
A. Because when somebody's in that state you just let it lie and come back another day.
Q. Did you on another day ask Mr. Marshall why he had said that he believed you were fucking with him?
A. I just let it lay.
Q. Okay. Why didn't you ever talk to him about it?
A. Because we were going through a transition and when you have change there's hurt feelings. Sometimes hurt feelings -- you don't need to dwell on the hurt feelings, you need to just try to continue to move the ball to where you want it to go.
Q. But wouldn't you agree as a manager that

part of managing people includes explaining why things are happening?
A. I do.
Q. So tell me, did you -- strike that.
Don't you think as part of being a manager it includes understanding what the employees have to say?
A. Yes.
Q. Okay. Let's look back at the first page again. Right below where it says "Appraisal by Joseph --" how do you properly say your later nature?
A. Buelt, as in Buelt a home.
Q. I apologize because I will get it wrong.
A. It's fine.
Q. I will do my best. It says in the first line, "As I transition into my new role I have been open to employees by listening to their concerns, needs and challenges to get a better understanding of what support they need."
A. Uh-huh.
Q. Did I read that correctly?
A. Yes.
Q. Okay. Tell me, when did you listen to Joe Marshall's concerns, needs and challenges to

get a better understanding of the support he needed?
A. I'm trying to understand what you're asking. I sat down with him multiple times to let him express himself and ask him what he did and how he does it.
Q. Okay. I understand that. But you said that you recall Joe Marshall make a comment that he felt that you were just fucking with him but that you didn't follow up with him about that. Wouldn't you agree with me that Joe Marshall was expressing that he was concerned about something?
A. And he expressed how he was concerned and I heard it.
Q. Okay. Tell me what he expressed about his concerns.
A. He expressed that he didn't see how it needed to change from where it was, the scale process and program, to where the BNSF Railway wanted it to go. If and when Joe transitioned to a new role we needed to have somebody to replace that skill set.
Q. Okay. And who was it that told you that you needed to be -- that -- strike that.
Who was it that told you that you needed

to have a plan in place for if Joe Marshall were to leave that position?
A. My direct supervisor, Dwayne Curbow.
Q. Okay. Do you know who -- do you know, did Dwayne Curbow -- was that a directive from someone above him or do you know?
A. I don't know for sure.
Q. Do you suspect?
A. I do.
Q. Okay. What do you suspect?
A. I suspect that that was escalated up to Dwayne's boss, Craig Rasmussen, and Craig said "We're not going to back fill that position, we're going to get another strategy. What is that strategy?" And then we had to go back with another strategy.
Q. Okay. And when did you learn that you were not going to back fill Joe Marshall's position?
A. Early 2016.
Q. Okay. And that was prior to Joe Marshall saying that he was going to retire at sixty; is that fair to say?
A. Before I was made aware of it, yes.
Q. Okay. Now, let's look at the second

Page 29

page.
A. (Witness Complies).
Q. At the top it says "Appraisal by Dwayne Curbow."
A. Yeah.
Q. About three lines from the bottom, starts out with "You had kept your focus..." Actually I want to go to the one below that, starts out with "...traits..." Do you see that, "...traits listed above..."?
A. I'm trying to find it here. You're looking where it says "Appraisal by Dwayne Curbow"?
Q. Here's what I'll have you do, read to yourself -- just read to yourself that --
A. There's no trait in there that I've seen. I'm trying to look for it.
Q. That's fine, just be easier if I just have you read it.
A. (Witness Complies). Yep. Oh, there's traits, I see it.
Q. I'll start above that. It says "You have hit every one of the leadership traits listed above, especially the demonstration of 'Resilience and Manage Conflict' with Joe Marshall." Did I

Page 30

read that correctly?
A. Yeah.
Q. Tell me about that sentence. Why did you write that?
A. I didn't write it, Dwayne wrote that.
Q. I'm sorry, written by Dwayne, you're right. Do you know why Dwayne wrote that as part of your appraisal in January of 2016?
A. I don't recall.
Q. Okay. Were you having some kind of conflict with Joe Marshall around that time?
A. I don't recall. I mean...
Q. Then it goes on to say, "Like you have previously said, it is not all his fault the way he is." Do you recall ever making a comment like that?
A. I do.
Q. Tell me about it.
A. In a discussion with Dwayne I said Joe was a product of the environment that he was in. To transition from that environment where you're just taking care of scales to being a manager of a program -- rather than to just running a program, to manage a program and to establish a program, that's different from what Joe had been doing for

Page 31

his career.
Q. Did you ever put together some type of written document, direction, e-mail, that explained or showed Mr. Marshall how his job duties were going to change over time?
A. I did not. I don't recall.
Q. Okay.
A. I don't recall. If I did I don't recall it.
Q. Okay. Do you recall at some point making a decision that Andrew Bartell would take some of Joe Marshall's job duties?
A. That happened when Joe turned in his notice that he was going back to the ranks.
Q. Do you recall ever making any type of a comment to Mr. Marshall that you wanted him to put together his job so an employee that was in his or her twenties could do it?
A. I recall telling him that I needed to have the job set up so that a college graduate could come in and be able to manage the program with little assistance. If that's somebody in their twenties...
Q. Okay. And when did you tell that to Joe Marshall?

Page 32

A. When we were setting up the program.
Q. So that would have been in 2015?
A. I believe so -- 2016, I believe it was. I don't think it was 2015. I don't know. I don't have the exact date.
Q. Okay. Let me try to clarify. When you said set up the program, that would have been when Joe was starting in the Facilities group; is that what you're talking about? I just want to clarify.
A. No, when we made the decision that we weren't going to develop the institutional knowledge in-house, we were going to transition and hire that out, I told him that whoever is going to manage that program is going to be somebody who's going to have -- be right out of college because it's going to be a -- you know, a Grade 28 or 27 position that's going to be filling that role.
Q. Why is that?
A. Because it's what we want somebody to start out with, you know, managing something that's set up, that's routine, learn project management skills on that.
Q. So is it fair to say that the job that

Joe Marshall had been working in was going to be significantly reduced?
A. From the BNSF standpoint we were going from having the person with the tribal knowledge and all the skill set to manage and fix a scale -- we weren't going to have that anymore, to having it purchased outside and managing that program. It's going to change, so in reducing -- the same work needs to be done, it's just who's going to do it.
Q. Okay. Do you recall ever telling Mr. Marshall that he didn't have enough work to do?
A. I told Joe that there was an opportunity for him to take on more workload, yes.
Q. Tell me why you thought that.
A. Because he had a limited amount of time or need to be spending on scales. There's not a hundred of these, there's, I think, nine of them, approximately, that there's filler time he could be doing some other things.
Q. Now, at some point you learned that Joe Marshall had a company truck, right?
A. Joe told me that, yes.
Q. Okay. And then you went and looked into why -- to find out why Joe Marshall had a company

truck; is that right?
A. I asked my direct supervisor, "Were you aware that Joe had a company vehicle?" He said he was not, so I asked "Should he have a company vehicle?" He said he would check and get back to me.
Q. Okay. And when you say your direct supervisor, is that Dwayne Curbow?
A. Dwayne Curbow, yes.
Q. Okay. Now, if Mr. Marshall would have continued to perform the job the way that he had been prior to working -- or being transferred to the Facilities group he would have still needed his truck, can we agree?
A. No.
Q. Okay. Explain that to me.
A. It's a system job. You don't drive your truck from Kansas City to Pasco, Washington, you get in an airplane and fly there. You don't need a truck for that.
Q. Okay. Do you know how long Joe Marshall had had that company truck before you took it away?
A. I did not take it away and I don't know how long he has it -- or had it.

Q. Okay. Did you talk to any of Mr. Marshall's prior managers or supervisors to learn more about his job in scales?
A. I did.
Q. Who did you talk to?
A. Madlyn.
Q. And how many times do you recall talking to Madlyn? Is that Madlyn Guarino?
A. Yes. I was trying to figure out how to say her name. Her name is like mine.
Q. I'm not sure I'm saying it right.
A. I don't either.
Q. I just figure if I say it with confidence I might be able to fool people.
A. Twice that I recall, yeah.
Q. Okay. Did you ever talk to her about problems you thought you were having with Joe Marshall?
A. Yes.
Q. What do you recall talking to Madlyn Guarino about Joe Marshall and the problems you were having with him?
A. She said "Joe's head strong" and I think that's all she said.
Q. Do you recall if Madlyn Guarino told you,

you know, anything about how she believed Joe Marshall had performed his job?
A. Other than the PMP that she had written at midyear, no.
Q. Okay. She evaluated him as being a good employee, didn't she?
A. I don't recall what the actual ratings were. I'd have to go look it up.
Q. Okay. Let's flip -- in Exhibit No. 25, let's flip over to Page 5.
A. (Witness Complies).
Q. Do you see midway down it says "Appraisal by Dwayne R. Curbow"?
A. Yeah.
Q. Do me a favor, read those photographs. You don't have to read them out loud, read them to yourself, and let me know when you've completed them.
A. (Witness Complies). Yep.
Q. Do you see that last sentence? It says "Helping the younger people in the group will only help them in the long run with future projects and positions." Did I read that correctly?
A. Word for word.
Q. Okay. What did that mean?

Ervin J. Marshall v.
Burlington Northern Santa Fe, LLC; et al.

Joseph Buelt
May 31, 2019

Page 37

A. To Dwayne, I don't know. He wrote it.
Q. Okay. Well, tell me how you received this document from Dwayne Curbow. Did he give it to you in person?
A. Yes.
Q. Okay. So did you sit and talk about this document at some point with Mr. Curbow?
A. Yes.
Q. Okay. And did you ask questions?
A. I don't recall if I asked questions.
Q. Okay. Did you ask any questions about this comment, helping the younger people in the group?
A. I don't recall.
Q. What do you recall about that comment?
A. Specifically about that comment, I don't recall anything.
Q. Okay. Do you recall anybody ever telling you that you needed to focus on the younger people in the group?
A. No.
Q. Okay. Do you remember if Dwayne Curbow or anybody else said that BNSF wanted to get some younger people?
A. No.

Page 38

Q. Okay. Let's flip the page to Page 6 of 8.
A. (Witness Complies).
Q. I'm going to have you go down and see about midway, says "Appraisal by Dwayne R. Curbow." Do you see that?
A. I do.
Q. Now, the first sentence, it says "I look forward seeing you work with Derek, Terry, Bruce and Andrew and developing them for advancement within BNSF." Did I read that correctly?
A. Yes.
Q. Okay. Do you recall having any conversation about this with Dwayne Curbow?
A. I don't recall a specific conversation about that.
Q. Okay. When you say "about that" --
A. About advance -- "I will look forward seeing you work with Derek, Terry, Bruce, Andrew and developing them for advancement within BNSF."
Q. Okay. Now, Joe Marshall was a part of your group at that point, wasn't he?
A. Yes.
Q. So can you explain to me why Joe Marshall wasn't included among the list of names there?

Page 39

A. I do not.
Q. Do you think it was because you were transitioning Mr. Marshall's position out to contractors?
A. No.
Q. Okay. Why do you say that?
A. Because I don't know what Dwayne intended for that or said about that. I don't know what he was thinking.
Q. Okay. When you read that what did you think?
A. Help my team to develop so they can advance within BNSF.
Q. Okay. But does it seem odd to you that one of your team members, Mr. Marshall, was not mentioned?
MR. VOGEL: Object to the form to the extent it misrepresents the document in its entirety. You can answer.
THE WITNESS: You said I can answer?
MR. VOGEL: You can answer.
A. Okay, it may be odd but I can't respond to what Dwayne wrote. He wrote it.
Q. Okay. Let's look above that where it says "Appraisal by Joseph Buelt."

Page 40

A. Yep.
Q. Do you see that?
A. Yes.
Q. The paragraph -- the second paragraph starts out "I'm helping Ervin Marshall..."
A. Yeah.
Q. Tell me -- says "I'm helping Ervin Marshall to transition to a new role as a member of the Facility's group."
A. Yeah.
Q. What new role were you transitioning Ervin Marshall into?
A. The new role where he transitioned out of Heavy Bridge into the Facilities group, which is the -- the Facilities group is part of Bridge, we're just not Heavy Bridge, we're Facilities, which is part of Structures, part of Bridges.
Q. Okay. Was it also that -- well, first, when Mr. Marshall joined the Facilities group his job was going to change significantly; is that fair to say?
A. When he first came, no, it would be the same.
Q. Okay.
A. When he first came. It was after the

Min-U-Script® Midwest Reporters, Inc.
www.midwestreporters.net (10) Pages 37 - 40

Page 41

fact we were going through what happens if Joe decides to leave the company, where does it leave the company? As managers we have to plan for five, ten, fifteen, twenty years down the road.
Q. Okay. And at that time were you planning for any other employees in the Facilities group to leave?
A. I was planning how Derek was going -- if he was going to leave and move on to a new role, how was he going to do that? I was using Bruce Stuff as being the model, how we set up all his projects so if somebody came in they knew exactly where to find all of his projects, all the documents for those projects, so, yes, I was trying to transition Derek into that, Terry into that.
Q. So why not just let Joe Marshall continue to do the job that he had been doing for a number of years?
A. At the end when he wanted to leave, the BNSF would have been there without support for an integral part of our system, which is our scales, and without support of them they will not be able to function going off into the future.
Q. Okay. But then why not have somebody

Page 42

assigned to work with Mr. Marshall to learn his position so that he could continue doing his job?
A. We asked that question. We were told that was not an option. We needed to find where we were going to take that institutional knowledge and hire it on the outside, just like we do with a lot of the institutional knowledge for fueling, lot of the institutional knowledge for some of our building structures. We don't have architects, we hire architects.
Q. Okay. Who did you talk to about having somebody work with Mr. Marshall to learn the job of scales?
A. Dwayne Curbow.
Q. Okay. And was it Dwayne Curbow that said it couldn't be done or did he talk to someone else?
A. He got back to me and told me that we were doing that.
Q. Did he tell you why?
A. Well, my question was to bring somebody on to put with Joe because I said it was going to take three to five years for them to learn what Joe knows at a minimum, it's like an apprenticeship program, and I was told no, not

Page 43

doing that.
Q. Did they -- were you told why you weren't going to do it that way?
A. It didn't fit the model that BNSF wanted to move forward with.
Q. Tell me what the model was that BNSF wanted to move forward with.
A. Model is exempt employees, if they want to advance their career, somebody else coming in can learn that role pretty quickly and be in that role and support the transportation of goods and services -- goods across our system for a profit, until they transition to a new role.
Q. Okay. And so when you were asking for somebody to work along with Joe Marshall to learn about what he did with the scales, it was your -- well, what you envisioned is it would take three to five years?
A. A normal apprenticeship program is, you know, three to five years, depending upon what discipline.
Q. So when do you think you asked Dwayne Curbow for somebody to work as -- I'm going to use your word, I know it's not a full apprentice program, but pseudo apprentice?

Page 44

A. 2016, 2015, somewhere in there.
Q. But it was before you heard that Joe Marshall was going to retire or going to the craft, right?
A. Absolutely.
Q. Okay. So at that point is it fair to say that, you know, you envisioned that Mr. Marshall was going to stick around for another three to five years?
A. I was hoping.
Q. Did you ever tell Mr. Marshall that?
A. I told him, I says "This is going to take awhile. I want you to work here as long as you want to work here, but," I says, "we need to have you here to help transition. You're a key part of transitioning this. You have a lot of tribal knowledge that nobody else has here at BNSF."
Q. Okay. I want to look back at this Page 6. Under that Appraisal by Dwayne Curbow, the second paragraph, it starts out with "Joe..."
A. Yep.
Q. It says "Joe, I do like the way you lead your employees and feel you will be successful in coaching Joe Marshall to become a valued part to the Facilities team." Did I read that right?

A. Yeah.
Q. Okay. So is it fair to say that at least as of January 22nd, 2016, that you hadn't heard anything about Joe Marshall planning to return to the craft, retire, leave BNSF; is that fair to say?
A. I would -- yes.
Q. Okay. Now I want to look at Page 7 of 8.
A. (Witness Complies).
Q. Underneath Appraisal by Dwayne R. Curbow, right in the middle, do you see that?
A. I see it, yeah.
Q. And the first comment says "Joe, it's going to be a new railroad for you moving forward, so enjoy." What did that mean?
A. It means that -- I was transitioning from Allouez -- remember, this is my 2015 appraisal. I was transitioning from Allouez, which is northern Wisconsin and a self-contained facility, to being on the system.
Q. Okay. Let me ask this, because --
A. That's how I took it.
Q. Okay. Is -- it says Allouez?
A. Allouez.
Q. I'll be honest, I wasn't sure how to

pronounce it so I wasn't going to.
A. Okay.
Q. But it seemed -- just in reading through documents it seemed like it was quite a bit different job or environment, or maybe both, that you had in Allouez than you were going to have at Kansas City?
A. Correct.
Q. Because it seems like I read that there were labor issues?
A. Yes.
Q. Things like that that were somewhat troublesome or difficult to deal with?
A. Yes.
Q. And so you think part of -- when he said it would be a new railroad, almost kind of like a fresh start because it was going to be a different situation?
A. Every new job you take is a new fresh start. I mean...
Q. Okay. And then the second line from the bottom in the middle, it says "I really look forward to your leadership with Derek, Terry, Andrew and Bruce." Do you see that?
A. Yes.

Q. Did you discuss that comment with Dwayne Curbow?
A. We probably did but I don't recall the specifics of it.
Q. Do you recall why Joe Marshall's name was left out of that group?
A. I do not know.
Q. Do you believe it was because Dwayne Curbow had a plan to transition Mr. Marshall out of the Facilities group?
A. I do not know that.
Q. Okay. Do you recall ever telling anyone that you believed that Joe Marshall fits all the descriptors of someone with workplace violence?
A. I told that to Dwayne Curbow.
Q. Okay. When did you tell that to Dwayne Curbow?
A. I believe after the day when Joe blew up at me and told me that I'm fucking with him.
Q. Okay. And --
A. I believe. I don't remember if it was that -- exactly that day but it was something like that.
Q. Did Joe Marshall ever threaten you?
A. No.

Q. Okay. So why did you believe or start beginning to think about workplace violence when it comes to Mr. Marshall?
A. We had an incident that occurred on our system with -- where we had an event of workplace violence and we were asked to assess what was going on in our environment to ensure that we were taking all the precautions and looking at and discussing workplace violence in particular, if somebody was -- had the potential to become violent.
Q. Okay. Did you report any other employees other than Mr. Marshall as people that you believed could become violent?
A. At this location, no. At the Allouez Taconite facility, yes.
Q. Okay. Tell me specifically what Joe Marshall did that caused you to believe that he might be capable of workplace violence.
A. He became very agitated in the context of a performance process, become agitated during the context of a business discussion on something that was just business related, moving his job from one point to the next point or something we wanted him to do.

Page 49

Q. Okay. Explain agitated to me. What did you mean by that?
A. Raising his voice, cussing and swearing, becoming very demonstrative.
Q. Okay. Other than Mr. Marshall saying that he thought you were fucking with him what other inappropriate language did Joe Marshall use?
A. I don't recall. I'd have to think hard.
Q. Okay. When did you find out you were going to be deposed in this case?
A. I got an e-mail two months ago, three months ago. I don't remember.
MR. VOGEL: If I can interject, do not disclose the context of any of those. The dates are fine, but --
Q. And the questions that I ask you, I'm not intending to ask you what attorneys -- what you communicated -- the content of your communication to or from your attorneys. I may want to know those answers but I don't -- I'm not intentionally intending to ask you that.
A. Okay.
Q. I'll try to stay away, but it's inevitable I'll ask you what people did you talk to and one of those would be your lawyer, right,

Page 50

so I just want to make clear, I'm not asking you for those conversations. I'm going to ask you like, you know, do you recall how many times you talked with the attorneys for BNSF about the matter involving Joe Marshall?
A. Two, maybe three times. Might have been two phone calls and one face to face.
Q. Okay. Did you meet with BNSF attorneys this week to prepare?
A. Yes, we had.
Q. Okay. Approximately how long did you meet?
A. Two and-a-half hours.
Q. Okay, that's fair. Did you look at some documents?
A. We did.
Q. Do you recall what documents you looked at?
A. Looked at documents, notes I'd taken, handwritten notes, looked at some documents of -- some H.R. documents, PIP, PMP for Joe Marshall.
Q. Okay. And those handwritten notes that you had taken, had you given those to BNSF or BNSF's attorneys before that meeting on Wednesday?
A. I believe they scanned them. They took

Page 51

my ledger and just scanned all the notes that had Joe Marshall in them, but, yeah.
Q. So that was on Wednesday when you gave them to them?
MR. VOGEL: The notes -- just to be clear, if it's okay, the notes that we're discussing have been produced.
MR. McKEE: And I thought they were.
THE WITNESS: Yeah, I was going to say...
MR. McKEE: Let's go off the record real quick.
(WHEREUPON an off the record discussion was had, after which the following:)
Q. So when you looked through those documents is it fair -- let me start that over. So you got contacted two to three months ago about a lawsuit that had been filed and that we were seeking to take your deposition. I would assume at that point did you start thinking about what had happened with Joe Marshall in 2015, 2016?
A. No.
Q. Okay. Why not?
A. Because I've got too much other stuff to

Page 52

do.
Q. Okay. When you were looking through documents preparing for your deposition did you find any other examples of Joe Marshall cussing or using inappropriate language towards you?
A. I don't recall. There might be.
Q. Okay. But as you sit here today the only inappropriate language you recall Joe Marshall making was in a statement, something along the lines of "You're fucking with me"?
A. Yeah.
Q. Okay. And when you say demonstrative, what do you mean by that?
A. Becoming very loud, physically -- either standing up or coming across on the table or sometimes pounding -- hitting his fists on the table.
Q. Okay. How long did that meeting last?
A. It was on multiple occasions that occurred, it wasn't just in one.
Q. Okay. So can you tell me anybody else that you believe witnessed this behavior from Joe Marshall?
A. I can't answer who all witnessed it.
Q. Well, when you had -- when you had

Page 53

somebody in your office that you believed was capable of workplace violence and he was getting agitated, did you call somebody into your office?
A. No.
Q. Why not?
A. I wasn't that threatened. It was just that we were asked if we thought anybody we worked with was capable of workplace violence.
Q. Okay. Do you recall having a meeting with Mr. Marshall in which you had Derek Brown sit in so he could be a witness?
A. I had Derek Brown sit in as a learning experience, yes.
Q. As well as to be a witness?
A. To witness the process, yeah.
Q. And are you aware that Derek Brown was asked by Human Resources as to how Joe Marshall behaved during that meeting?
A. I was not aware of that.
Q. Do you recall that meeting in which Derek Brown sat in on?
A. I recall the context of it, yeah.
Q. Do you believe that Mr. Marshall displayed any of these behaviors as being agitated, cussing or swearing or being

Page 54

demonstrative in the meeting with Derek Brown?
A. I believe so.
Q. Now, when you were talking to Mr. Marshall during these meetings and you believe he was getting agitated, did you ever ask him to leave?
A. I don't remember.
Q. Do you recall in prior evaluations or discussions you had with a supervisor or manager in Allouez being told that your physical stature could be used for and against you?
A. Yes.
Q. Tell me about those discussions.
A. I'm six foot four, three hundred pounds.
Q. Okay.
A. That can be intimidating, it can be imposing. It could be used as saying "Well, I don't want to talk to him because --" so I have to watch what I say too, you know.
Q. And I agree. Even in casual conversations and so on, I mean, the way we say it, if there's somebody that's in front of me that's six foot five, human nature is I may not run my mouth the same way.
A. Yeah.

Page 55

Q. So conversations like that; is that fair?
A. Yeah, yeah.
Q. Okay. But is it also fair to say that, you know, because -- I think you said it, but you didn't ever feel threatened by Joe Marshall, did you?
A. No.
Q. Okay. I will -- I mean, it does sound like -- is it fair to say that it seemed like neither you nor Joe Marshall cared for the other? You guys didn't get along very well or see eye to eye; is that fair?
A. I think we had a difference of opinion on where the roles of his job were going to go. On a personal level, we had some casual conversations that were cordial.
Q. Okay.
A. I considered it business.
Q. Okay. I understand because sometimes in business we have to make decisions that we might prefer not to make. I want to take a look at what I'm going to mark as Exhibit 26. Are you doing okay or do you need a break? That's something I didn't tell you. If you need a break, tell me.
A. I'm good.

Page 56

(WHEREUPON Buelt Deposition Exhibit No. 26 was marked for identification by the Reporter.)
Q. I'm going to hand you what's been marked as Exhibit No. 26. Exhibit No. 26 is a document, it says "Statement of Joe Buelt, Manager Engineering Facilities," dated April 15, 2016; is that right?
A. Yep.
Q. At the bottom it says "BNSF-MARSHALL 001357"; do you see that?
A. Yep.
Q. And the last page, it ends in 001361?
A. 1361, yes.
Q. Now, did you look at this document in preparing for today?
A. I don't remember.
Q. Okay. Well, go ahead and take a minute to look at it. The reason I'm asking you is because I don't know if you read through it previously to remember it or not, so why don't you just take the time you need to review it and let me know when you're done.
A. (Witness Complies). Okay, I'm sorry.
Q. Okay, thank you. You've had an

Page 57

opportunity to read through Exhibit No. 26?
A. I looked through it, yes.
Q. And is that your signature on the bottom of each page?
A. Yes.
Q. Okay. Do you recall who drafted this document? Did you?
A. I did not draft this document. I don't know who drafted this document.
Q. You think it was somebody in H.R.?
A. I think so.
Q. Okay. Now, the first question, "Did you ever tell Mr. Marshall that he needed to structure his job so a twenty-four year old new hire could do it?" And you said "Absolutely not."
A. Yep.
Q. But you agree that you made a comment that he should structure it so that a college grad could do it?
A. Yeah, college kid, yeah.
Q. Why didn't you tell Human Resources that you made that comment?
A. Why didn't I tell them I made that comment?
Q. Yeah. The one --

Page 58

A. College kid?
Q. Yeah.
A. Why did I tell them that?
Q. No, why didn't you?
A. I'm trying to understand your question.
Q. Okay. When I'd asked you earlier about somebody in their twenties and you said, you know, you told him to structure it so a college kid could do it, I'm just wondering why in April of 2016 when you were asked a similar question why you didn't tell the person that you had made the comment about a college kid.
A. The question was if a twenty-four year old could do it. I said a college kid.
Q. Right. But what I'm asking is why didn't you tell Human Resources -- you had made the comment that it wasn't a twenty-four year old. Why didn't you tell Human Resources that you said "No, I didn't say that. I said structure it so a college kid could do it"?
A. Yeah.
Q. Why didn't you tell H.R. that?
A. Isn't that my answer?
Q. Okay. You say "He is the one that brought up that a college kid can do his job."

Page 59

A. Yeah.
Q. So are you saying that Joe Marshall brought that up?
A. I may have thought that then but --
Q. But you believe now you brought it up?
A. Could have been Joe and I repeated it. It's awhile back.
Q. Okay. Can you tell me why you said Joe Marshall plans to retire in September or October?
A. Uh-huh.
Q. Why did you believe that Mr. Marshall planned to retire in September or October on April 15, 2016?
A. What page are we on here?
Q. Still that first paragraph on Page 1.
A. Oh, I took it as, you know, him telling me leave him alone, "I plan on retiring." That's how I took it.
Q. Let's look at -- I'm going to read the entire sentence to you. "Joe Marshall plans to retire in September or October and I've told him that I need to have an understanding of what his job does so when he retires someone can back fill for him. He told me that the first day I met him." Did I read that correctly?

Page 60

A. Yeah, I remembered it at that time. I don't recall it today, saying that.
Q. You don't recall you saying it or you don't recall Joe saying it?
A. I don't recall him saying it, I don't recall me saying it. A lot of things have happened since '16. That's three plus years ago.
Q. Yeah, I understand that. But earlier I'd asked you how you learned or when you learned that Joe -- that Joe Marshall was planning to retire and you said you hadn't, you just found out that he was going back to the craft.
A. Well, that's what he told me he was going to do. I asked him do he plan to retire when he told me that and he says it was none of my business, so okay.
Q. So are you saying that you had that conversation with Mr. Marshall that first day that he started for you?
A. No, had it when he turned in his notice that he was going back to the craft.
Q. Okay. So explain this statement here.
A. Statement that Joe Marshall plans to retire in September, October? Joe may have told me that.

Page 61

Q. Is it possible somebody else told you that Joe Marshall --
A. Could be somebody else told me that, but I don't recall exactly why I would have thought that in April of 2016.
Q. What I want to understand -- and I realize it's been several years ago, but this statement is extremely different than how you've testified today, right? So it's possible that somebody other than Joe Marshall may have said that he planned to retire in September or October?
A. I don't know where I got that in 2016. It was closer to when I first met him. It was closer to when these events were happening.
Q. When did you first meet Joe Marshall? It would have been sometime in June of 2015, wouldn't it?
A. Correct.
Q. And the first conversation that you had with Mr. Marshall about his job would have been sometime in June of 2015?
A. Yes.
Q. Okay. So do you have any notes, e-mails, documents, anything in which you made a note of the first meeting you had with Mr. Marshall where

Page 62

he told you that he planned to retire in September or October?
A. All the notes I have I turned over and I didn't see anything in the review of those.
Q. Okay. And at this point, on April 15, 2016, who did you intend to back fill the position for Joe Marshall?
A. I didn't have a definite plan. I had an idea of what we would do if Joe left.
Q. And was that that Andrew Bartell would back fill Joe Marshall's position?
A. He would take on the role of managing the program but it would be a consultant/contractor.
Q. Okay. When did you go to -- well, first, at some point did you work with Andrew Bartell to try to get him paid more money to do some of Joe Marshall's job duties?
A. I floated the idea of changing it but it didn't have anything to do with the scale process. It had to do with what Andrew was doing that I thought it should be a different salary band. I was told no.
Q. Okay. Approximately when did that happen?
A. I don't -- well, it was 2016 sometime. I

Page 63

don't remember when.
Q. Did you do that in writing or verbally?
A. I prepared a formal review for H.R. to review his job duties.
Q. Okay. And when you prepared for a deposition did you see those documents again?
A. I didn't.
Q. All right. Is it possible that Dwayne Curbow told you that Joe Marshall was intending to retire in September or October of 2016?
A. I don't recall a conversation with Dwayne on that.
Q. Is it possible that nobody told you that?
A. Somebody probably would have told me that, I wouldn't have just pulled that out of the air.
Q. Let me ask, is there kind of -- or does it happen frequently that once somebody's got thirty years in and they reach the age of sixty and they're eligible to retire, do they typically retire?
A. I have seen very few railroaders work past that date, yes.
Q. Okay.
A. But there have been quite a few that

Page 64

have, and I've had some that worked for me that worked past that date.
Q. Okay. Now, earlier you'd said at some point in 2016 you wanted to set up somebody that would be somewhat of an apprentice to Joe Marshall and you thought that that was going to take three to five years.
A. Uh-huh.
Q. Explain that to me, when you have this statement that you signed in which you claim that Joe Marshall told you he was going to retire sometime in September or October.
A. That discussion happened late 2015, early 2016, about the apprenticeship process. I don't know if Joe told me again at a different time that he was planning to work longer.
Q. Okay. Well, I realize we're kicking a dead horse here but I want to talk about it a little bit more. Again, your statement says "He told me that first day I met him." So that conversation would have occurred before you tried to set up this apprenticeship program?
A. He may have told me that he was planning to retire in 2016, September, October.
Q. Okay. So how was that apprenticeship

Page 65

program that was going to last three to five years going to work if Joe Marshall had already told you he was going to retire within a year or so?
A. I was hoping that Joe would stay around to fill that process, but, again, it was just a floated idea that lasted maybe a day or two and then it was shot down that we're not doing that.
Q. Okay. Do you recall ever telling anyone that you hoped Joe would stay on after he reached the age of sixty?
A. I was hoping that he would stay on long enough to set up the new process that we were going to end up being, because he took all that tribal knowledge with him.
Q. Right. And earlier I believe you testified you thought that would take tree to five years?
A. No, no, that's the apprenticeship program.
Q. Okay.
A. The process of transferring that to somebody who already understood scales, a contractor, I don't know how long that would take. I didn't have the definite time of it.
Q. Now, why did you have to make this

Page 66

statement in April of 2016?
A. I don't recall. I don't know why.
Q. Okay. Do you recall if Joe Marshall had made a complaint that he believed you were treating him inappropriately?
A. I do recall the H.R. Department said that Dwayne and I were treating him inappropriately.
Q. Okay. What do you recall H.R. Department telling you?
A. That he had claimed that we had discriminated against him because of his age. I believe that's what it was.
Q. Okay. Now, we can agree that -- well, first, when do you believe that you had a good understanding of what it was that Joe Marshall did for the company?
A. I didn't say I did.
Q. Did you ever?
A. I don't to this day.
Q. Okay.
A. I don't understand everything about a scale, no.
Q. Okay. And if we go down a little bit further, talks about the company car.
A. Yes.

Page 67

Q. So it appears that you learned Mr. Marshall had a company truck so you went to Dwayne Curbow about it?
A. Uh-huh.
Q. Yes?
A. Then he drug me into Mr. Rasmussen, which I just remembered when I was reading this. I forgot about that process.
Q. Tell me about what you recall about that.
A. Well, we were in Fort Worth and Dwayne found out that Craig Rasmussen was in his office. He said "Let's go talk to Craig about it," so we went in and Dwayne had me tell Craig about Joe having a company truck and asked Craig should he have a company truck.
Q. Now, did you have a company vehicle?
A. No, not in this role. I had one when I was in Allouez, but not in this role.
Q. All right. So do you recall what Craig Rasmussen said?
A. He said we need to take the truck away from Joe and give it to Mike Herzog.
Q. What was Mike Herzog's position?
A. Mike Herzog is a Director of Heavy Bridge or Director of Bridge/Heavy. I don't know what

Page 68

his title is.
Q. Who was it that told Mr. Marshall that he was going to lose his company truck?
A. I was not there. Dwayne took care of that.
Q. Okay. Now, if you were hoping that Joe Marshall was going to stick around for another three to five years why did you care if he had a company truck?
A. I personally? Didn't matter to me, just that it's outside of the norm, it's outside of a policy for somebody who's a system person to have a company vehicle. Other system people -- we don't have company vehicles. Our job is the system. People that are assigned to a territory have a company vehicle and take care of that territory.
Q. Did you talk to any of Mr. Marshall's prior supervisors about why he had a company truck?
A. One of the discussions I had with Madlyn asked about that, yeah.
Q. And why did Madlyn tell you about why Mr. Marshall had a company truck?
A. He came with it when he took the job.

Page 69

She never thought anything of it.
Q. Okay. And so do you have -- did you have an understanding of how long Mr. Marshall had that company truck at that point?
A. I don't know when he first got it, no.
Q. Okay. But it was a several-years-old company truck that he'd been driving for a few years; is that fair to say?
A. It was past its prime.
Q. Okay. Did anybody in the Facilities group complain to you or Dwayne Curbow that Joe Marshall had a company truck?
A. Nobody complained to me personally. I can't answer for Dwayne.
Q. Okay.
A. I don't recall anybody complaining. Obviously --
Q. Did you ever hear that anybody complained that Joe Marshall had a company truck?
A. I don't recall anybody complaining.
Q. Okay. Now, then it goes on and talks about a trip Joe Marshall took to Pasco.
A. Yes.
Q. So tell me about that. What was it that you were unhappy about?

Page 70

A. I wasn't unhappy about it, it was just out of the norm for us to do a four-day trip -- out of the norm to take a four-day trip to Pasco for a one-day visit. That's just...
Q. Now, would Joe also deal with people that worked for other companies?
A. He would work with the scale consultant, System Associates, SAI, maybe Rail Scale, but our dealings with them -- I don't know what our dealings with them were. Very minimal now.
Q. Did you know at that time if Mr. Marshall as part of his job was also managing the relationships that he had with these contractors and so on?
A. The contractors were there for the day that he was supposed to be there and they were going to leave the same --
Q. Okay. How do you know that?
A. I think Joe told me that. They were there for a scale test.
Q. Now, for Mr. Marshall to perform his job, did he have to be in the office to do it?
A. Did Joe need to be in the office to perform his job? We have normal office hours, if he's not in the field he needs to be in the

Page 71

office.
Q. Okay. Now, have you read the rest of this paragraph?
A. I'll scan through it right now, yeah.
Q. Okay. Are you done reading?
A. Yeah.
Q. Okay. Now, here it talks about Derek Brown.
A. Yeah.
Q. And this is the meeting in which you had Derek Brown go in with you to be an observer with Joe Marshall, right?
A. Yep, yes.
Q. Now, why -- in the middle of this paragraph -- just starts "Joe Marshall fits all the descriptors of someone with workplace violence because he can't handle change or confrontation or when people ask him to explain himself."
A. I believe at this time we were being asked that if you have somebody who has those descriptors -- because we had just had in 2015, late 2015, an incident of workplace violence that resulted in a death, that as a manager you were asked to have somebody come with you so that you could diffuse any situation that might lead to an

Page 72

escalation.
Q. Okay. So you said something about reporting if you had any employees that you thought fit that description. Do you recall if you reported --
A. We didn't -- we're not asked to report that. That's not what I said.
Q. Okay. Explain that to me then.
A. We were asked if we had -- Dwayne asked me if I had somebody who might fit that role and I told that to Dwayne.
Q. Okay. Did you tell anybody other than Dwayne Wright?
A. I don't recall if I did or not.
Q. Okay. Do you recall when you told Dwayne Wright -- sorry, I'm getting my plaintiffs mixed up. Do you recall when you told Dwayne Curbow that Joe Marshall fit the -- fit that description?
A. It was when our Safety Department put out a notice about an incident of workplace violence.
Q. So you think it would have been in 2015?
A. Early 2016, late 2015.
Q. Okay. So why is it that you included it within this statement, in this statement of 2016 to Human Resources?

A. I believe that's the reason why I brought Derek with me, to give him some experience of understanding and also for what we were being asked to do --
Q. Okay.
A. -- as managers.
Q. Now, let's look down at the bottom, and there's an issue about going to a restaurant and Joe purportedly said he told the consultant that he was buying. Do you recall that?
A. Yeah.
Q. Why did you feel it was necessary to record something like that to Human Resources?
A. It's just not -- well, I don't know of the context why they asked me this question, but I don't think I reported it to Human Resources until this -- they asked me about it, but the process is when we go traveling and we're there with a consultant, you don't tell the consultant that they got to buy dinner. If the consultant picks up the tab, the consultant picks up the tab.
Q. Do you know if the consultant was somebody that Joe Marshall knew?
A. Probably, probably SAI. Probably, I don't know that for sure, but...

Q. Is it likely that Joe Marshall had some kind of a relationship with the consultant and, you know, they knew each other?
A. I'm sure he did.
Q. Okay. So couldn't have just said jokingly, "Hey, we're going to dinner, you're buying"?
A. Could have been.
Q. Okay.
A. I just wanted to caution him. We were also going through a process where we had multiple people on the railroad who got in trouble for forcing consultants and contractors to do stuff and they lost their positions over that.
Q. Okay. So did you tell Joe Marshall that you thought that was inappropriate or did you just tell Human Resources?
A. I don't recall if I told Joe. I believe I told Joe.
Q. Do you recall preparing for your deposition today seeing any documents indicating that you told Joe Marshall about this situation?
A. I wish I would have saw this document yesterday. I didn't see it, no.
Q. Okay. Then you go on, the next page says

"When he turns in his expense I've had to coach him on some of his reports." Do you see that?
A. Yep.
Q. Do you ever recall documenting in writing that you had to coach Joe Marshall with any of his expense reports?
A. No, I don't recall putting it in writing to him. I don't think it ever escalated to that level where I thought I needed to.
Q. Okay. Now, this PMP, the next paragraph, do you see that?
A. Yeah.
Q. Says that he got an NI on Leadership. What's NI mean?
A. Needs improvement.
Q. Okay. Now, do you remember why you gave Joe Needs Improvement on leadership?
A. He needed to begin to accept the change process and not be demonstrative, obstinate, hard to deal with in the process.
Q. Okay. Do you recall any documents where you said those things about Joe Marshall? Let me ask it differently. In performance reviews of Mr. Marshall did you include those comments?
A. I did not.

Q. Okay. Why not?
A. I wanted Joe to have the opportunity at the midyear PMP, which this was put on, to improve so that the year end PMP he could have On Target or Exceeds, but I needed him to understand that this was something he needed to address.
Q. Okay. But if it wasn't included in his midyear PMP --
A. His year end PMP, I'm sorry. This was on his year end PMP.
Q. I'm going to flip back to the first page again. We talked about the workplace violence and the restaurant issue, and that was when you were asked the question "Did you speak with Mr. Marshall about a travel issue he had in December?" What did Joe Marshall fitting the description with someone with workplace violence have to do with the travel issue that Mr. Marshall had in December?
A. It was a reason why I took Mr. Brown with me for this discussion. It was an explanation of why I took Derek with me.
Q. Do you recall approximately when that conversation was you had with Mr. Marshall and Mr. Brown?

A. I don't remember the exact date but I thought I wrote a note on it.
Q. Okay. Now, let's look on the second page again. Down four paragraphs down in the italics, "Before put him on an NI did you talk to anyone?" Do you see that?
A. Yeah.
Q. And it says you talked to Dwayne "...and he told me he talked to Craig." Do you see that?
A. Yes.
Q. Okay. What did you tell Dwayne?
A. I asked Dwayne -- I asked Dwayne if he approved with me putting Joe with an NI on his Leadership for the year end of 2015. Needed to have his approval and Craig's approval.
Q. And did they give you the approval?
A. Yes.
Q. Now, do you recall that one of the reasons that you said that you gave Mr. Marshall a Needs Improvement on Leadership was because he hadn't taken some kind of leadership training course?
A. Yes.
Q. Okay. Do you recall Mr. Marshall telling you that he had not been required to take a

leadership training course in his position in the past?
A. Yes.
Q. Okay. Now, before you gave him Needs Improvement on Leadership did you ever tell Mr. Marshall that he needed to take this leadership training course?
A. I don't recall if I told him that before that or it was just implied, because we all either need to go through ESLT or to Leaders of Leader or People Leader training or Approaching Others training.
Q. Now, when Mr. Marshall worked for you in the Facilities group he didn't supervise anyone, did he?
A. No, not that I know of.
Q. Okay. Now, did you at some point learn that a -- one of Mr. Marshall's supervisors, and it may have been Madlyn Guarino, tried to get him into a leadership training course and it was full and they said "Well, he doesn't manage anybody so we're not going to put him in it"?
A. I was not aware of that.
Q. Did you ask Madlyn Guarino or any of his other prior supervisors why Mr. Marshall hadn't

taken one of these leadership courses?
A. I had not.
Q. Okay. So did you look into Mr. Marshall's background, you know, his employee or personnel file to see if he had taken any leadership training courses?
A. I went to our H.R. rep, which I don't remember her name at the time, and asked her if Joe should have went to some leadership course and I was told yes.
Q. Did you ask that person if Joe had gone to any of these leadership courses in the past?
A. I asked her to check her record if he had attended and she could not find anything.
Q. Okay. Now, at that point did you consider that maybe nobody had told Mr. Marshall that he was supposed to take some type of leadership training course?
A. It may have occurred, but we have all this Approaching Others training going on on the system, we have ESLT, Engineering Safety Leadership Training, People Leader training. Part of our role also was to ask as exempt officers what are my training needs.
Q. I'm curious, if you believed at this time

that Mr. Marshall was going to be retiring in September or October of 2016 why would it matter if he had taken that leadership training or not?
A. I didn't know he was going to retire at any time or he was going to leave the company or what he was going to do. I don't know that until he actually does that. He's an employee of the company. You need to judge him on what he's doing against the rules and responsibilities and policies of the company.
Q. Okay. But did you -- before you gave Mr. Marshall a Needs Improvement on Leadership did you go sit down -- I say sit down, stand up, on the phone, in any way did you say "Hey, Joe, are you aware you're supposed to take a leadership training course and it appears that your prior supervisors haven't made you do it? We need to get you in that class"?
A. I don't recall having that conversation like you just stated.
Q. Okay. Tell me, did you have any conversation that was even similar to what I just stated?
A. I believe I asked him if he went to a leadership course.

Q. And what did he tell you?
A. I think he told me he wasn't required to.
Q. Okay. And did you say "Well, you know, Joe, I think you are required to go to a leadership course"?
A. All exempt officers are required to go to a leadership course.
Q. Okay. But did you ask him? Because you said that Mr. Marshall said that he wasn't required to go to a leadership course, so did you say, you know, "Joe, I think you're supposed to"? Did you say that to him?
A. I think I told him all exempt officers are supposed to go to a leadership course.
Q. Okay. Then let's look at the next paragraph, says "I tried to make him aware that he was going to get an NI by giving him hints his people leader skills needed to get better and his people skills need to get better - you can't yell at me." What does that mean?
A. By telling him that "You can't yell at me when we're having an interaction." Main reason for the NI was because when I went to react to him and talk to him he started yelling at me. I'm not going to -- shouldn't have to deal with that.

Q. Okay.
A. We're just talking business.
Q. Okay. But then in that first part it says that you were giving him hints. What does that mean?
A. By telling him he can't yell at me. You need to go to leadership class, you need to have respect for others in your approach to the job.
Q. Okay. Can you tell me anybody in which you personally witnessed other than you that Mr. Marshall was disrespectful in your opinion?
A. I thought he was disrespectful to some of the field employees down in Tulsa. That's what I wrote in here.
Q. Okay. Can you tell me the name of anyone that ever told you that Mr. Marshall was disrespectful or inappropriate with them?
A. I don't recall.
Q. Okay.
MR. VOGEL: Can I get up and get a water?
MR. McKEE: Yeah, let's take a break. We've been going a while. Let's take a break.
(WHEREUPON a recess was had, after which the following:)

Q. I want to look at this page we were looking at before we took a break. Midway down it says "Did you try to get him to provide you with a to-do list of his duties?" Do you see that?
A. Yes.
Q. Now, what is a log book?
A. A log of what you're doing, list of steps, you know, what you did that day, process of what you do.
Q. Did you ask anyone else in the Facilities group to keep a log book?
A. In the Facilities group at that time, no.
Q. Okay. Why did you ask Mr. Marshall to keep a log book?
A. Because I wanted to find out what he was doing and what his job was.
Q. Now, didn't you want to know what other people that worked in the Facilities group, what their jobs were?
A. I had an understanding of what they were.
MR. McKEE: We don't have the ones that were actually marked during the deposition at this point, but this is the document that was previously marked as Exhibit 1. Does that sound okay? Off the record real quick.

(WHEREUPON an off the record discussion was had, after which the following:)
Q. Exhibit 1, is that -- does that appear to be a job description for a scale inspector?
A. Job posting, job description, yes.
Q. Okay. Do you recall when you first saw this job description?
A. About, I don't know, five weeks, six weeks after I met Joe up in Minneapolis, I asked for what his job description was.
Q. Okay. And so who did you ask for his -- for Joe Marshall's job description, who did you ask to get it?
A. I asked Dwayne and I believe Dwayne gave me a copy of it.
Q. Okay.
A. I believe, I don't know, because I asked what is his job duties currently, so...
Q. Okay. Now, so would you have gotten this job description before or after Mr. Marshall was transferred into the Facilities group?
A. After. I just said that.
Q. Okay, I'm sorry. How soon after would you have gotten it?

Page 85

A. I requested it sometime after he came in because I was trying to understand what his role and duties were.
Q. Okay. But would it have been in June or July of 2015, you think?
A. Could be, yes.
Q. Okay.
A. I don't remember.
Q. Now, it says here several times forty to sixty percent travel.
A. Yeah.
Q. So was Mr. Marshall no longer going to travel in the position of scale inspector?
A. No, he was going to travel.
Q. Okay. Tell me, how was Mr. Marshall's job going to change from the description that's marked as Exhibit 1?
A. Some of the duties that he was being asked to do here he would not do in the new role, and some of the duties that are here would be expanded to include more of it, such as coordinate and manage contract scale repairs when work cannot be performed by BNSF forces, coordinate scale repairs, so things would be expanded beyond that.
Q. All right. Now, I want to take a look at

Page 86

the second page.
A. Second page of Exhibit 1?
Q. Yeah, Exhibit 1, I'm sorry.
A. Yeah.
Q. Take a look at the second page.
A. (Witness Complies).
Q. "Must have the ability to lift seventy-five pounds"; did I read that right?
A. Yeah.
Q. "Must have the ability to climb through and work within very small confined spaces"; did I read that right?
A. Yeah.
Q. In looking at this job description it appears that in doing his job Mr. Marshall per the job description was required to do manual labor, wasn't he?
A. If I read his job description that's what I would take it as, but the job was -- I don't know when this job description was written. I never seen a date when it was written.
Q. Okay. So why would you have been telling Mr. Marshall that he wasn't to do any manual labor?
A. Because --

Page 87

MR. VOGEL: Object to the form, misstates prior testimony. You may answer.
A. The right to do the work is for the craft employees. Exempt employees, which Mr. Marshall's role was exempt here, should not be doing craft employees' work. The craft employees have a Collective Bargaining Agreement to do that work unless we perform what is called a Contract Notice to say that we're going -- to have somebody else do that work.
Q. Okay. Now, let's look back to the first page.
A. First page of Exhibit 1?
Q. Yes, please. Under Duties, it says "Inspect, repair, test and certify railroad scales." Did I read that right?
A. Yes.
Q. Okay. That first one, it says at the end, "...perform required adjustments and repairs." Do you see that?
A. Yes.
Q. Okay. So can we agree that as part of Mr. Marshall's position working with scales that he was required to do adjustments and repairs to the scales?

Page 88

A. Could be that it was intended that you're supposed to get a BMWE employee, have them make the adjustments and certify that it is adjusted properly.
Q. Okay. Let me -- we'll look at the first word of that sentence. It says perform?
A. Perform, yes.
Q. And then -- so to "Perform electronic diagnostics for solid state components," and then it says again "perform required adjustments and repairs." So that means that he was actually supposed to do the adjustments and the repairs, right?
MR. VOGEL: Object to the form, argumentative. You can answer.
A. That is not how I interpret that.
Q. Okay.
A. I was trying to -- when I was telling him he was not to do work, to not do work that was considered to be BMWE'S work or IBEW's work.
Q. So would you say that it would be -- would have been more accurate if it would have said to coordinate required adjustments and repairs?
A. I didn't write this, not my

Page 89

responsibility to write this. I didn't give him this when it was given to him.
Q. But can we agree that an employee should be evaluated based upon the job description?
MR. VOGEL: Object to the form of the question regarding the term job description. You can answer.
A. Yes.
Q. All right. So with respect to how Mr. Marshall performed his position, did he satisfy the requirements in Exhibit No. 1 when he worked for you?
A. He satisfied the physical application of this, yes.
Q. Okay. Is there any -- anything in the job description that we're looking at, Exhibit No. 1, that Mr. Marshall did not perform up to satisfaction when he worked for you?
A. On the job description I do not take exception to anything that Mr. Marshall did to satisfy the duties that are there.
Q. Okay. Now, did you talk with Madlyn Guarino about Mr. Marshall's prior evaluations, for example, if he had ever been given any prior Needs Improvements?

Page 90

A. I did not.
Q. Did you ever look at any of Mr. Marshall's prior evaluations to determine how he'd performed his job in the past?
A. I did not look at his prior evaluations but I did look at his prior ratings.
Q. Okay. And how were his prior ratings?
A. On Target or Exceeds Target.
Q. Okay. How many years did you look back at ratings for Mr. Marshall?
A. I don't recall how many years.
Q. Was it more than one or two?
A. It's whatever is in the system that's available.
Q. Okay. And the first part of 2015 Mr. Marshall was still working for Madlyn Guarino, right?
A. First part of 2015, still working for Madlyn, yes.
Q. Okay.
A. She wrote the first half of his PMP, yes.
Q. Okay. Can you tell me -- I want you to look at Exhibit 1 again. Is there anything on this job description -- in considering Mr. Marshall's performance when he worked for you, is

Page 91

there anything that he did that you believe listed in this job description that he needed to improve on?
A. The last item says "These general categories do not necessarily constitute an exhaustive list of duties of the position." Some of the duties of the position are that you need to accept change, you need to accept when somebody is giving you feedback and you need to review how you are articulating back to that person.
Q. Okay. Let me ask you, did you reassign a demolition project from Bruce Stuff to Joe Marshall?
A. I reassigned the demolition program to Joe Marshall from Bruce Stuff with the intent that the demolition program is an example of how the scale program is going to want to be emulated after.
Q. Okay. And did you explain that to Mr. Marshall?
A. I explained to him that this was a role that I needed him to take along so that he would have, in my opinion, time to deal with it.
Q. Okay. Did you ask Mr. Marshall if he had the time to deal with it?

Page 92

A. I did not.
Q. Why not?
A. Because I made the observation that I felt he had the time. I went to him and I said "I would like for you to take on demolitions."
Q. And what did Mr. Marshall say to you?
A. I don't recall exactly what he said.
Q. Okay. Was he disrespectful to you at that point?
A. I don't remember -- recall.
Q. Okay. Now, do you recall that you reassigned the demolition program from Bruce Stuff to Mr. Marshall because Mr. Stuff said that he had too much -- too heavy of a workload?
A. At the time I observed -- I don't think Bruce ever admitted or said that he was overtaxed but I could observe that he was swimming in it, so to speak, with too much to do at the time.
Q. Okay. Did you ever look at the scale manual that Mr. Marshall had prepared around 2011?
A. I've looked at it. I don't know if I looked at it then but I've looked at it since multiple times.
Q. Now, why wouldn't you have looked at it back in 2015?

Ervin J. Marshall v.
Burlington Northern Santa Fe, LLC; et al.

Joseph Buelt
May 31, 2019

Page 93

A. I may have, I'm just saying I don't recall. I've looked at it multiple times. I don't know if I looked at it then for the first time or when I looked at it.
Q. Okay. Do you recall Mr. Marshall actually complaining to you in writing and verbally that he was somehow resistant to change?
A. To me personally, I don't remember him, no.
Q. Now, would you agree that -- you know, do you recall Mr. Marshall complaining that he believed that you were being unfair with him? Do you recall that?
A. I don't recall a specific event.
Q. Okay. So are you saying that you don't recall or just a single event?
A. I don't recall a single event.
Q. Okay. Have you seen what's previously been marked as Exhibit No. 8 before?
A. I see it.
Q. Have you -- did you see it when you were preparing for your deposition today?
A. I don't know if we looked at this document or not.
Q. Okay. Tell me, what is Exhibit --

Page 94

A. Yes, we did, we did look at it, yes.
Q. What is Exhibit No. 8?
A. It's the 2015 Performance and Development Review for Ervin J. Marshall, Junior for 2015.
Q. Okay. And it looks like it was given to Mr. Marshall on January 22nd, 2016; is that fair?
A. Yes.
Q. Okay. Now, let's take a look at Leadership Model Rating at the bottom of the first page. "Manager," says "Needs Improvement."
A. Correct.
Q. And that's what you gave Mr. Marshall; is that right?
A. For Leadership Model, yes.
Q. Okay. Now, I want you to go ahead -- you don't need to read it out loud, but if you haven't read what Madlyn Guarino said, if you wouldn't mind reading that now.
A. (Witness Complies). Yes.
Q. Okay. So you had seen the appraisal by Madlyn Guarino before you did the appraisal of Mr. Marshall, right?
A. Correct.
Q. Okay. Now, Ms. Guarino says "You have done a great job with communicating with others in

Page 95

the process of completing your planned 2015 projects and unplanned service interruptions." Did I read that right?
A. Yes.
Q. Okay. So you'd agree with me that Madlyn Guarino thought that Mr. Marshall communicated with people just fine; would you agree with that?
A. That's what Madlyn wrote.
Q. Okay.
A. I don't know what her thoughts were.
Q. Did you ever talk to her about the evaluation that she had given to Mr. Marshall?
A. I talked to Madlyn before I met with Mr. Marshall about her midyear PMP, which that was written at, before I met with Joe in Minneapolis whatever date -- June of 2015.
Q. Okay. Now, are all the reasons that you rated Mr. Marshall Needs Improvement in Leadership, are all of those reasons listed under Appraisal by Joseph Buelt, or are there reasons that you did not include within this appraisal?
A. What I was rating him on is what I wrote here.
Q. Okay. Is there anything as you look at it now that you think should have been included

Page 96

that you did not include?
A. No.
Q. Okay. Let's go to the next section.
A. (Witness Complies). Hard for me to read what that is, but go ahead.
Q. Okay.
MR. VOGEL: I think for the record we can agree it's under the first Individual Business Objectives, Tulsa Scale Renewal.
A. Okay.
Q. And you see that you gave Mr. Marshall a Needs Improvement, right?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Okay. Now, you would have seen Madlyn Guarino's appraisal of Mr. Marshall prior to completing your appraisal, correct?
A. Correct.
Q. Okay. Now, you see at the end she says "You are an asset to this department"; do you see that?
A. Yeah.
Q. So what was it that you believed that Mr. Marshall needed to do because it says Needs

Min-U-Script®
Midwest Reporters, Inc.
www.midwestreporters.net
(24) Pages 93 - 96

Page 97

Improvement?
A. I'm reading what I wrote. Kind of what I just said there, what I wrote.
Q. Let me ask you this: In looking at -- let's first go back to Leadership at the top of the page. Would you agree with me that your appraisal and Madlyn Guarino's appraisal of Mr. Marshall are quite different? You guys had significantly different opinions of Mr. Marshall's job performance?
A. Madlyn may have been evaluating a different process than I was evaluating. I don't know exactly what Madlyn was reviewing. I can only attest to what I am seeing and what I have observed.
Q. Okay. At the time that you gave Mr. Marshall this evaluation you did not understand the position that Mr. Marshall worked in scales, did you?
A. To this day I don't understand everything about scales, no.
Q. Okay. And then, you know, down at the bottom that we already looked at, again, Madlyn Guarino seems to rate Mr. Marshall quite a bit higher than you do; would you agree with that?

Page 98

A. Yes.
Q. Okay. Now, if an employee is given Needs Improvement does that -- does that trigger any kind of corrective action, discipline, anything along those lines?
A. No.
Q. Coaching, counseling, anything?
A. No.
Q. Okay. Does it impact an employee's bonus?
A. On Needs Improvement on either a Business Objective or Leadership Model, it does not.
Q. Does it impact --
A. I was told it does not.
Q. Okay. Do you know if that's true?
A. Well, I haven't personally experienced it, but I researched it through our H.R. Department and asked that question and they told me -- before I did this with Joe, and I did it prior with other individuals and have done it since with other individuals, making sure that the policy doesn't change before I do it, because what I did not want to do is affect his pay or his bonus.
Q. Okay. Who determines the pay increase

Page 99

that's given to somebody at -- when they're evaluated?
A. I don't know that.
Q. Okay. Do you recall Mr. Marshall telling you that it was the lowest bonus -- I'm sorry, that it was the worst review or the worst pay raise he'd ever gotten?
A. Yes, I do recall that.
Q. Okay. So do you think those Needs Improvements might have had some impact on Mr. Marshall's pay?
MR. VOGEL: Objection, lack of foundation, calls for an improper opinion. You can answer.
A. I don't believe it had any impact on it.
Q. Okay. Now, it's fair to say Mr. Marshall was upset about that evaluation and he sent several e-mails expressing his unsatisfaction -- his unhappiness with those e-mails; is that fair to say?
A. Yes.
MR. VOGEL: I think you meant to say his unhappiness with that evaluation.
MR. McKEE: Yes. What did I say?
MR. VOGEL: The e-mails.

Page 100

MR. McKEE: Sorry.
MR. VOGEL: That's okay.
MR. McKEE: Let's locate Exhibit 15.
Q. Exhibit 15 appears to be a Performance Improvement Plan that was given to Joe Marshall.
A. I don't believe that this was ever delivered, but...
Q. Okay. Who drafted this Performance Improvement Plan?
A. It started with me, it went to Dwayne Curbow, it went to H.R. that I know of.
Q. Okay. Now, you've said that this was never delivered, and when I say "this," the Performance Improvement Plan, Exhibit 15. Why was it never delivered?
A. I should say that it was delivered to Joe but it was never put in place. It was never put into effect.
Q. Why was the Performance Improvement Plan never put into effect?
A. I was never told why it was not put into effect.
Q. Okay. So you're saying nobody with Human Resources talked with you about this?
A. I was just told it was not going to go

Page 101

forward.
Q. Okay. You didn't ask why?
A. I did.
Q. And what were you told?
A. "That's our decision."
Q. Okay.
A. "Move on."
Q. All right. And so in the first sentence of it it says "The principal purpose of this Performance Improvement Plan is to improve all aspects of your performance to an on-target level." Did I read that right?
A. Correct.
Q. So if an employee gets a Needs Improvement, then is the employee given one of these Performance Improvement Plans?
A. If the employee gets -- in his overall rating if he would get a Needs Improvement --
Q. Okay.
A. -- in his overall rating he would get a Performance Improvement Plan.
Q. Was Mr. Marshall ever given an overall rating of Needs Improvement by you?
A. I believe that's why this was written for the midyear 2016.

Page 102

Q. Okay. Now, so if somebody were to get a Needs Improvement in a year-end evaluation and then get another Needs Improvement in their next evaluation, does that trigger a PIP?
A. A Needs Improvement on an individual objective would not.
Q. Okay.
A. A Needs Improvement on an overall score would.
Q. Okay. Let's go down, midway down, starts out "Performance Improvement Needed:" Do you see that?
A. Yeah.
Q. Okay. I want to talk about -- we've been talking about it for awhile, but "When communicating with employees you often have loud outbursts with personal attacks towards employees, often involving inappropriate language, including to your direct supervisor and his supervisor." Did I read that correctly?
A. Yes.
Q. Okay. Tell me -- okay. You have down below February 24th, 2016.
A. February 4th, February 24th and --
Q. I'm sorry, February 4th, 2016, 24th and

Page 103

26th, 2016. Are those the only times that you recall Mr. Marshall having some kind of loud outburst?
A. Those are the dates I had documented. There were other dates that I did not document.
Q. Okay. Why not?
A. I didn't feel the need that we needed to document more than that for this document.
Q. Okay. Did you make any notes of these other loud outburst or personal attacks?
A. I don't recall.
Q. Okay.
A. I may or may not have. You have all my notes.
Q. Okay. Now, down there on February 24, 2016, says "...you got in another employee's face..." Who was the employee that you're referring to?
A. I don't recall.
Q. Okay. Who told you --
A. I think it might have been me but I don't recall.
Q. Okay. All right. So if it would have been you -- earlier you said "...including your direct supervisor and his supervisor," and you're

Page 104

talking about you, because you would be the direct supervisor, right?
A. Yes.
Q. And Curbow would be supervisor?
A. Correct.
Q. Okay. So why would you say another employee's face if it was you?
A. I wouldn't. Probably was somebody else. I'd have to research. I don't recall.
Q. Okay. Do you recall if you witnessed that or somebody reported it to you?
A. Don't recall.
Q. Now, on February 26th, it's an issue on this daily log. Did you ever ask Mr. Marshall to see the daily log that you had asked him to prepare?
A. I did.
Q. Okay. And did he show it to you?
A. I recall asking him to bring it to my cubicle, I was in a cubicle at the time, so we could review it.
Q. And so had Mr. Marshall been preparing the daily log as you had instructed him to?
A. He was making an attempt at it.
Q. Okay. And you're sure that you asked him

to see it?
A. I asked him if I could see the daily log.
Q. Okay.
A. What verbiage I actually used, I don't recall what the actual verbiage was.
Q. Okay. Now, can you tell me on the February 26th incident, says he became very agitated, vocal, yelling and swearing. Tell me what he was yelling and swearing.
A. I don't recall verbatim what he was saying, unless I wrote it down in a note.
Q. Okay. But the only thing you recall is him -- the only inappropriate language or swearing that you recall as you sit here today is the comment "Are you fucking with me?"
A. That one sticks with me, yeah.
Q. Okay. But that's the only one that you recall?
A. Yeah.
Q. Okay. Now, next section goes on to say that other people were having to cover work for Mr. Marshall. Can you tell me who was having to cover work for Mr. Marshall?
A. I believe this is after I had asked him to take on the role of managing the demo project

that Bruce was still doing. Bruce Stuff, that is, was still doing what he did before and Joe was not taking on the role that he was supposed to.
Q. And how did you learn that Mr. Marshall wasn't doing what he was supposed to with the demo program?
A. I don't recall how I found that out.
Q. Okay. Now, I want to look at -- we talked about that day log. If you look down below it says "We requested you complete a daily log of activities which you have never completed." Do you see that?
A. Yep.
Q. So when did Mr. Marshall show you his daily log?
A. Might have been after we talked about this, but the daily log, I didn't see a daily log that he filled out. He filled out one electronically and I had given him one manually, but the electric one was fine. I don't know if it was after this or before that, but I did see one.
Q. Okay. Then it goes on, "You've demonstrated difficulty in working a full day when in the office, oftentimes coming in late, taking long lunch breaks or leaving work early. I've

documented this on May 5th, May 6th and June 2nd."
A. Yes.
Q. Did I read that right?
A. Yeah.
Q. Okay. Why were you looking into Mr. Marshall's lunch breaks or when he arrived at work or went home?
A. Because I would go try to find him and he wouldn't be there, so in discussions with Dwayne he says "Well, start documenting when he's here."
Q. Okay. When did you talk with Dwayne about that?
A. Sometime before that.
Q. Okay. Do you recall how much -- was it days, months, weeks?
A. Couldn't have been more than a week or two.
Q. Okay. Now, did you ask Mr. Marshall anything about May 5, 6 or June 2nd?
A. Don't recall if I asked him specifically about those dates.
Q. Did you ask him if maybe he had a doctor's appointment, anything like that?
A. Don't recall.
Q. Okay. What if he would have had a

doctor's appointment?
A. Fine.
Q. Okay. Now, since he was exempt he didn't have to punch a time clock, did he?
A. No.
Q. Okay. So tell me, what were the hours that he was expected to work?
A. Normal office hours are from eight to four thirty. We ask people because we travel extensively that if you need to come in earlier and leave earlier, it's okay, but our expectation is that you work an eight-hour day when you're in the office.
Q. All right. Then on the last page --
A. Page 3?
Q. Yes.
A. Okay.
Q. You say "Satisfactory performance must be achieved by September 9, 2016." Did I read that right?
A. Correct.
Q. And what if Mr. Marshall had not achieved satisfactory performance by September 9 of 2016, what was going to happen?
MR. VOGEL: Object to form, calls for

Page 109

speculation. You can answer.
A. I don't know.
Q. What -- go ahead.
A. We'd have to evaluate what happened, what it is.
Q. Okay. What is the typical procedure if somebody has not completed a PIP satisfactorily?
A. I haven't experienced that yet.
Q. Okay. Now, earlier I think you testified that you had asked what would happen if you gave somebody a Needs Improvement on one of the categories. Did you talk to anybody about what would happen if somebody got a PIP and didn't perform satisfactorily by the time set forth?
A. I did.
Q. And what were you told?
A. If they don't perform satisfactorily we'll evaluate what was their effort at the time.
Q. Okay.
A. And make a decision to move forward with what -- at that time.
Q. And so did you have any plan as to what to do at this time if Mr. Marshall didn't complete it up to your satisfaction?
A. I had every intention of supporting Mr.

Page 110

Marshall to complete the PIP so that he could conform and comply with the expectations of the PIP.
Q. Okay. So then did you begin having biweekly meetings with Mr. Marshall?
A. I believe we did, but I can't say that we made exactly every biweekly meeting because I travel extensively and he traveled extensively. It may have been a phone call, it may have been a face-to-face meeting, but I don't recall if we made every biweekly meeting.
Q. Now, let me --
A. But this was never put in place, you know what I'm saying?
Q. But it was given to Mr. Marshall?
A. It was given to him, yes.
Q. So it's fair to say that Mr. Marshall was made aware of what you thought about his job performance with this PIP, right?
A. I'm assuming he got the hint that yelling and screaming at me is not an acceptable practice.
Q. So you're saying that the only reason he got it was because he was allegedly yelling and screaming at you?
A. That's what drove this whole process,

Page 111

just be civil about the whole process.
Q. Okay. Let's look at the last line where it says "Failure to meet these specified requirements could result in additional disciplinary action up to and including dismissal from your exempt status." Did I read that correctly?
A. Yeah.
Q. We can agree a PIP is considered disciplinary action, right?
MR. VOGEL: Object to form.
THE WITNESS: Can I answer?
MR. VOGEL: Sure.
A. I disagree that it's discipline.
Q. Okay. Can you explain the last sentence? Says "Failure to meet these specified requirements could result in additional disciplinary action..." So if this PIP wasn't considered disciplinary action, what prior disciplinary action had been given to Mr. Marshall?
A. I don't know if there's any, but I think the statement is just a general statement. I don't consider a PIP to be disciplinary. I consider a PIP to be a tool that is used for somebody to correct their behavior so that they

Page 112

don't go down a disciplinary road.
Q. Okay. But that sentence also says if you fail to meet the specified requirements you could end up getting terminated, right?
A. Yes.
Q. Now, at some point you're aware that Mr. Marshall made allegations that you had discriminated against him. Do you recall when you learned that?
A. I believe Dwayne Curbow told me.
Q. Okay.
A. I didn't actually see the document that says that he did until my attorney here --
Q. Okay. Now, as part of -- you became aware -- hold on, you said you didn't --
A. I didn't see the document that said that he claimed that we had discriminated against him.
Q. Okay. Well, you'd been told by Human Resources or Dwayne Curbow or somebody that he alleged age discrimination, right?
A. Yes.
Q. And that was sometime during 2016, right?
A. Yes.
Q. Okay. And Human Resources conducted an investigation, right?

Page 113

A. Correct.
Q. And do you recall that Human Resources looked at the PIP that you had given to Mr. Marshall and decided that it shouldn't be delivered to him or put in place, as you said?
A. That was their decision, yes.
Q. Why was that H.R.'s decision?
MR. VOGEL: Objection to form, calls for speculation.
THE WITNESS: Can I answer?
MR. VOGEL: You can answer, if you know.
A. I don't know why.
Q. Did anybody from Human Resources tell you why the PIP that you had given to Mr. Marshall was not going to be put in place?
MR. VOGEL: Objection to form, asked and answered. You can answer.
A. I didn't give it to Mr. Marshall, the PIP to Mr. Marshall. That was a group process. H.R. never told me why they didn't execute it.
Q. What do you mean it was a group process?
A. I mean, it's H.R., my boss and myself were all there at the same time.
Q. When the PIP was delivered?

Page 114

A. Yes.
Q. Okay.
(WHEREUPON Buelt Deposition Exhibit No. 27 was marked for identification by the Reporter.)
Q. You're being handed what's been marked as Exhibit No. 27. Have you seen Exhibit No. 27 before?
A. No.
Q. Okay. I'll give you an opportunity to read it. Let me know once you're done, please.
A. (Witness Complies). Okay.
Q. And before today have you seen Exhibit No. 27 before?
A. No.
Q. Okay. Were you aware that Derek Brown had been questioned by Human Resources?
A. I was -- I think Derek told me that, yeah.
Q. Would you agree -- first it says "Were you in a meeting between Joe Marshall and Joe Buelt back in December, 2015." Does that refresh your recollection? Do you believe that the meeting was in December of 2015?
A. Okay, yes.

Page 115

Q. Okay. And you see -- it goes on a little further down and it says "He said he was concerned that Joe Marshall would get upset..." Do you see that?
A. What paragraph are you in?
Q. Sorry, the first one.
A. Okay.
Q. Third line down.
A. Yeah.
Q. Okay. Now, if you go down to the fourth bullet point down, "How did Mr. Marshall react to that?" Do you see it?
A. Yeah.
Q. "He got upset..." Do you see that?
A. Yeah.
Q. Okay. So you recall Mr. Marshall got upset?
A. I don't disagree that he got upset, yes.
Q. Okay. Then you say -- next paragraph says "He was raising his voice and getting upset a little bit, but I think that Joe Buelt could have approached the situation better."
A. Yes.
Q. Okay. So do you agree with that statement?

Page 116

A. I agree that Derek had a different opinion but I took his -- and he told me this after that meeting, that -- I remember him telling me that, and I said "Thanks for the feedback."
Q. Okay. What did Derek Brown tell you after that meeting?
A. He said "You might have to tell him what you expect, or ask him why did he make those travel arrangements that way first before criticizing him." I think that's what he said.
Q. Okay. Then you see the last part of the paragraph, "...Marshall saying that he had no direction on tasks in general. It wasn't just travel arrangements that he was saying he had no direction on." Do you see that?
A. Uh-huh.
Q. Yes?
MR. VOGEL: Make sure you say yes instead of --
A. Yes.
Q. Okay. And did you do anything to address that issue with Mr. Marshall?
A. Address that he had no direction on travel expectations?
Q. Well, it says that he was saying he had

no direction -- it wasn't just travel arrangements.
A. Yes.
Q. Okay. So that -- do you recall that Mr. Marshall was telling you in December of 2015 that he believed you weren't giving him any direction on his job?
A. Joe brought that up. I attempted to work through that, yes.
Q. Okay. What did you do to attempt to work through that?
A. In my opinion the first thing I need to do is find out what is his job and then I need to make a better effort to tell him what my expectations are.
Q. I want to go down to the next paragraph, third line down. It's at the far right, starts with the word "Both..."
A. Yeah.
Q. "Both were not handling it well but neither were out of line."
A. Uh-huh.
Q. Do you see that?
A. Yeah.
Q. Do you agree with what Derek Brown says?

A. In that meeting Derek had to say that, that's his opinion.
Q. But did you disagree --
A. I don't disagree with him from this conversation, no.
Q. Okay. Then it goes on to say "Marshall got loud but didn't say anything unprofessional - no threats or name calling from either party. At the end they agreed to disagree." Did I read that right?
A. I -- yes.
Q. Okay. Do you agree with that statement?
A. I agree that that's what Derek wrote at the time and I don't disagree that at that point we agreed to disagree.
Q. But do you agree that Mr. Marshall did not say anything unprofessional?
A. I don't disagree with that, at that meeting.
Q. Okay. Now let's look at the second page.
A. Yeah.
Q. It asks "Have you ever witnessed Mr. Marshall use his temper with anyone or act unprofessional?" And his answer is "No." Do you see that?

A. Yes.
Q. Can you name anyone other than you that has made you aware that has seen Mr. Marshall lose his temper or act unprofessionally?
A. Dwayne Curbow.
Q. Okay. Other than Mr. Curbow and you can you name anyone else?
A. Not off the top of my head.
Q. Okay. So is it fair to say that you're unaware of Mr. Marshall losing his temper or acting unprofessionally with anyone other than you and Mr. Curbow; is that fair to say?
A. It's fair to say.
Q. Let's look at the last paragraph. Have you read that?
A. Yes.
Q. Okay. And it sounds to me like Derek Brown is saying that you give work to people and you may not tell them how they're supposed to do it or what they're supposed to do, right?
A. That is correct.
Q. Okay. Has anybody else ever told you that before?
A. Derek.
Q. Okay. Anybody else told you that?

A. Terry, Terry Pind.
Q. Anybody else?
A. Bruce Stuff.
Q. Okay. When you gave the demo program to Mr. Marshall did you give him any written direction or instructions on what he was supposed to do?
A. I did not.
Q. Okay. Why not?
A. Because I wanted him to take ahold of the program and just run it on his own.
Q. Okay. How was he going to figure out how to do it?
A. Mr. Bruce Stuff would tell him how he was running the program now and just take it from there.
Q. At some point you told Mr. Stuff that he wasn't to work on the demo program though, right?
A. I asked him not to work on demos, to concentrate on his other duties, because his other duties needed to be done.
Q. Okay. And at some point you told Mr. Stuff that he wasn't to do anything on the demo program because it was expected -- you expected Mr. Marshall to do it, right?

Page 121

A. I did tell him that, yes.
Q. Okay. And then you told Mr. Stuff that he wasn't to help Mr. Marshall in any way on a demo program, right?
A. I don't think I told Bruce that.
Q. Okay. What do you remember that you told him?
A. I told him "If Joe comes and asks you for help, provide him the help but have Joe do it."
Q. Other than the three times -- because I didn't ask you earlier, the three times that you noted that Mr. Marshall wasn't in the office or he was in late, he left early or had a long lunch, do you recall any other days in which Mr. Marshall wasn't in the office when you had gone looking for him and you suspected that he wasn't working?
A. I don't recall. I don't recall a document or date, no.
Q. Now, do you recall anybody other than you saying that Mr. Marshall fit the description of somebody that was capable of workplace violence?
A. I do not know or have knowledge of that.
Q. I'm sorry?
A. I don't have knowledge of anybody else saying that.

Page 122

Q. When you talked to Mr. Curbow about it did he -- did Mr. Curbow say anything to you?
A. I'm sure he did but I don't recall what he said exactly.
Q. Okay. Now, at some point did you make a decision that it was time for Mr. Marshall to go?
A. What do you mean by that? Go where?
Q. At some point were you done dealing with Mr. Marshall because he was a difficult employee that you thought was capable of workplace violence and you thought it was time for him to be out of Facilities?
A. No.
Q. Okay. Why not?
A. My objective is to use -- have him do his job.
Q. Okay.
A. Give him an opportunity to do his job.
Q. Did you ever tell Mr. Marshall that you thought he was capable of workplace violence?
A. I don't recall saying that.
Q. Okay. Does BNSF have an EAP program or an Employee Assistance Program?
A. Yes.
Q. Have you ever been trained that if you

Page 123

suspect that an employee, co-worker, subordinate -- you suspect that there is capability of violence or abuse that you're supposed to refer them to the EAP program?
A. I've been through the program, yes.
Q. Okay. Did you ever suggest that Mr. Marshall go to the EAP program because you thought he might need some help?
A. I don't recall if I did or did not.
Q. Is it fair to say you did not?
A. I don't think it's fair to say if I did or did not.
Q. Have you referred -- I'm sorry, did you say you started working for BNSF in 2011?
A. Yes.
Q. In the last eight years have you suggested to any of your subordinates or co-workers that he or she go to the EAP program for assistance?
A. Yes.
Q. Okay. Anyone that you suspected was violent or could be violent that you referred to the EAP program?
A. No.
Q. Did you ever contact Human Resources and

Page 124

tell them "I've got an employee that I think meets the characteristics of somebody that could be violent -- could be capable of workplace violence"?
A. I don't recall doing that, no.
Q. Okay. Now, you know that it's part of BNSF policies that if you suspected that somebody was a danger to himself or others you had an obligation to report it, right?
A. Yes.
Q. Okay. And if a manager suspected that an employee was capable of workplace violence and chose not to report it, that would be a violation of BNSF policy, right?
MR. VOGEL: Objection to form, lack of foundation, improper opinion. You can answer.
A. I don't know if it is or is not.
Q. As to your understanding, as a manager for BNSF that supervises employees do you believe it would be a violation of policy if you failed to report an employee that you suspected to be capable of workplace violence?
MR. VOGEL: Same objections.
A. How do you suspect them to be -- I'm not an expert to say that they're going to do

something. I'm just saying they demonstrate the traits.

Q. Tell me what traits he demonstrated.

MR. VOGEL: Object to form, asked and answered.

THE WITNESS: Do I answer?

MR. VOGEL: You can answer again.

A. When he's yelling at me, I mean, he's just getting...

Q. Would you agree that the reason you made these allegations that Mr. Marshall was capable of workplace violence is because you were trying to discredit the things that he had to say?

MR. VOGEL: Objection to form, argumentative. You can answer.

A. No.

Q. Okay. Were you concerned that Mr. Marshall may have been abusing somebody outside the workplace?

A. No.

Q. Okay. Why not?

A. I have no reason to believe that.

Q. So does BNSF have any type of a mediation or conciliation program in which if you have a problem employee you're able to work together and

try to overcome whatever obstacles there are?

A. A PIP program.

Q. Okay. That PIP program is a disciplinary program, right?

MR. VOGEL: Objection to form, argumentative, mischaracterizes the previous testimony, mischaracterizes the program. You can answer.

A. I don't know if it's considered part of the disciplinary program or not.

Q. Tell me the process for terminating an employee. How does that work, is it progressive discipline?

A. Depends on the -- not necessarily.

Q. Okay. Tell me how the process to terminate an employee typically works.

A. An employee violates a policy, rules violations, and it's investigated, it's reviewed by a group of exempt employees, and H.R. and their manager of that organization makes the decision that that person doesn't work for that organization anymore.

Q. Okay. Is a PIP a part of that process?

A. I don't know if it is or is not.

Q. Have you ever terminated an employee that

worked for you?

A. An exempt employee, no.

Q. Have you ever recommended that an exempt employee be terminated?

A. For BNSF, no.

Q. Okay. Is it fair to say that you were frustrated with Mr. Marshall in 2016?

A. I was frustrated that he was not taking the direction and moving the ball in the direction that BNSF wanted to go.

Q. You've had several years to think about the situation with Mr. Marshall. Is there anything that you would have done differently if you had it to do over again?

A. Convince him to stick around and take care of the scales longer and set up the program.

Q. Okay. Why do you say that?

A. Because it landed in my court to set up the program.

Q. Okay.

A. Ill equipped to do so.

Q. All right. You knew that Mr. Marshall decided to return to the craft based upon the way that you were treating him? That was his allegation, right?

A. That's what he put in his note, yeah.

Q. Okay. Did you ever go to Mr. Marshall and say "Hey, we really need you here, we've gotten off to the wrong start. Let's see if we can make this work"?

A. I didn't use those terms, no.

Q. Okay. Tell me what you did do.

A. "I wish you the best. I wish you'd stick around and complete this process."

Q. And that process was to --

A. Take the scale program from where it was to where it needed to go.

Q. Okay. And that was to be able to train somebody else that could do the position?

A. No, to have a consultant/contractor with a BNSF exempt employee overseeing and managing the process, much like what we do with the BNSF demo program.

Q. Were you upset when Human Resources said that the PIP was not going to be put in place?

A. Upset, no.

Q. That had to frustrate you some, didn't it?

A. No.

Q. Why not?

Page 129

A. Because I've been around the block a few times and if I'm told something's not going to happen it's okay.
Q. Do you recall that Mr. Marshall alleged that you had been dishonest?
A. Yes.
Q. Okay. Wouldn't Human Resources saying that the PIP wasn't going to be put in place support his allegations that you were dishonest?
MR. VOGEL: Objection, lack of foundation, speculation, improper opinion, argumentative.
Q. Did it make you feel that way?
A. No.
Q. Did it make you feel like H.R. was believing what Mr. Marshall had to say over what you had to say?
A. No.
Q. Why not?
A. I never understand why H.R. does what they do so I just stopped trying to figure them out a long time ago.
Q. Have you ever had a situation in which you wanted -- or you delivered a PIP to an employee that subsequently wasn't put in place

Page 130

based upon a complaint by that employee?
A. No.
Q. Do you recall anyone ever saying with BNSF that they wanted to have younger employees?
A. No.
Q. Have you had anybody make any other complaints about you at any point that you were treating an employee unfairly?
A. Not that I'm aware of.
Q. Okay. Were you counseled or coached or disciplined for issues with Mr. Marshall?
A. No.
Q. Okay.
MR. McKEE: Let's take a break.
(WHEREUPON a recess was had, after which the following:)
Q. I will tell you honestly because I took Mr. Stuff's deposition this morning that I can't remember if I asked you this question on Exhibit No. 25, so if you don't mind taking a look at that.
A. Yes.
Q. On Page 5 --
A. Okay.
Q. -- the last paragraph under Appraisal by

Page 131

Dwayne Curbow, starts with "The sharing of your knowledge..." Do you see that? The last sentence, it says "Helping the younger people in the group will only help them in the long run with future projects and positions."
A. Okay.
Q. Did you discuss that comment with Mr. Curbow?
A. I don't recall specifically.
Q. Did this seem to be an odd or strange comment to have your manager put into an evaluation for you?
A. I don't have any comment. I don't know what...
Q. I mean, did -- can you understand how if somebody -- well, strike that.
Who are the younger people in the group that Mr. Curbow was talking about in that sentence?
MR. VOGEL: Object to form, speculation, lack of foundation. You can answer.
A. I can only assume it's Derek and Andrew, but...
Q. Okay. Andrew, is that Andrew Bartell?
A. Yes.

Page 132

Q. Okay. Do you recall approximately when Bartell started to do some of the work involving scales?
A. I don't recall the exact date, no.
Q. Was it before Mr. Marshall left?
A. I believe, yes.
Q. Okay. When did you -- or did you ever hear that they were going to eliminate Mr. Marshall's position?
A. Yes.
Q. When did you learn that BNSF was going to eliminate Mr. Marshall's position?
A. When I requested if we could train somebody in as being the scale inspector to gain the tribal knowledge. The job was not going to be back filled.
Q. Okay. And so you understood that to mean they were going to eliminate the position of Mr. Marshall?
A. That position of scale inspector, yes. The job title was going to go away.
Q. Okay. Did you ever tell Mr. Marshall that that position was going to go away?
A. I believe I did.
Q. Okay. When do you think you told him

Ervin J. Marshall v. Burlington Northern Santa Fe, LLC; et al.

Joseph Buelt May 31, 2019

Page 133

that?
A. I believe I told him that when we were setting up the process of going from the scale inspector, what he was doing, to what the new rule -- new vision would be for being a consultant/contractor managed by an exempt employee who also had to do other work.
Q. And do you recall approximately what date that was?
A. Don't recall.
Q. Do you think that was in 2015?
A. I don't know if it was 2015 or if it was 2016.
Q. What do you recall Mr. Marshall saying when you told him that his position was going to be eliminated?
A. I don't recall exactly what he said.
Q. Well, what do you recall about what he said?
A. I thought he says "They can't even pick somebody --" I don't remember what he said, I don't remember.
Q. Well, you said there were certain things like, you know, when he said "You're fucking with me," that that was memorable, and you said that he

Page 134

would get loud and have outbursts and was difficult. Now, when you told him, being Mr. Marshall, that his job was being eliminated are you saying that you don't remember how he responded?
A. I didn't say his job was going to be eliminated. When he left the position we weren't going to back fill it. The position would be eliminated when he left.
Q. Okay.
A. Also told him he could stay in the position for as long as he wanted to as far as -- I was under the understanding that there was no date picked out that it needed to end by.
Q. Okay. Do you recall ever seeing any documents that say Mr. Marshall could stay in that job as long as he wanted?
A. I do not.
Q. Now, if Mr. Marshall was to be putting together some kind of an explanation on how a college kid could do his job, how was it that Mr. Marshall could have stayed in his job as long as he wanted? There was some kind of an expiration date, wasn't there?
A. I just didn't know what it was. Somebody

Page 135

probably had an idea but it wasn't expressed to me.
Q. Okay. Who do you think may have an idea as to the expiration date?
A. I'm not going to speculate who had that. I don't know. Somebody may have but I was not made privy to that.
Q. Who was Dwayne Curbow's boss?
A. Craig Rasmussen.
Q. Who was Craig Rasmussen's boss?
A. Steve -- I believe it was Steve Anderson at the time. I don't know who the vice-president was at the time, but I believe it was Steve Anderson.
Q. Okay. Do you think one of those individuals may have had an expiration date on Mr. Marshall's job?
A. I don't know. They would evaluate it and let me know when they made that decision if and when they did.
Q. Did you help Mr. Marshall look for any other positions within BNSF?
A. I don't recall doing that.
Q. Is that something that as a manager you've done, is recommend or assist employees in

Page 136

finding other positions?
A. Yes.
Q. Okay. Did you assist Bartell in finding another position?
A. Yes.
Q. Okay. And Bartell, was his position eliminated?
A. Yes.
Q. Okay. And what did you do to help him locate another position?
A. Gave him avenues where I thought he'd be successful.
Q. Okay. Did you at some point then tell Bartell that his position was going to be eliminated?
A. Yes.
Q. Do you recall approximately when you told Bartell?
A. I don't recall.
Q. All right. Is there anybody else that you recall assisting in finding another position?
A. Derek Brown.
Q. Okay. Tell me what you did to assist Derek Brown.
A. Derek needed to do some work in the

Min-U-Script® Midwest Reporters, Inc. www.midwestreporters.net (34) Pages 133 - 136

Page 137

bridge world, as a bridge engineer making repairs to bridges to further his career, so I strongly suggested to him to move into a role that would help him further his career.
Q. Okay.
A. That was a bridge -- it was actually a lateral move for him.
Q. Okay. So did you make any suggestions to Mr. Marshall about a job that he could transition into?
A. I don't recall if I did or did not.
Q. Now, was there anything that Mr. Marshall did well when he worked for you?
A. Yes.
Q. Okay. What did he do well?
A. He was very technically expert at what made a scale work, how to troubleshoot a scale if and when it wasn't working correctly.
Q. Earlier we talked a little bit about an exit plan. Is an exit plan something that you talk to all your employees about?
A. An exit plan as far as if they leave their position, if their role that they're doing does not have -- if they exit, whoever comes into that needs to have a way of being able to pick up

Page 138

the pieces so BNSF can continue on its business. As an exempt employee part of your role is to make sure that that transition works because at BNSF, I don't know what the average is, but we change positions pretty quickly.
Q. Okay. As part of an exit plan -- well, strike that.
So do you have an exit plan with all of the employees that work for you?
A. Working on getting it. I'm almost there.
Q. Okay. In 2015, 2016, did you have exit plans for Derek Brown or Andrew Bartell?
A. No.
Q. Why not?
A. Because it wasn't developed. They were working on them.
Q. What does that mean?
A. They're working on putting together -- if I leave this job, the next person coming in, if I'm not around how are they going to be able to carry on with the projects, know who to call, what to do, you know, if a problem comes up who can I call, list of contractors, list of contacts or consultants, those types of things.
Q. Would a daily log have helped put that

Page 139

together?
A. It would help put that together. That's a basis where -- you can start with that and you can pull that up and look at the process and say "Who do you see all the time?" Or what I did on that date to help.
Q. But you did not ask Andrew Bartell to do a daily log, did you?
A. No.
Q. You didn't ask Derek Brown to do a daily log, did you?
A. No.
Q. Why not?
A. Because they were progressing towards doing -- putting together a process where they could -- a person coming in could pick up the pieces and move forward.
Q. I may just be slow here but what I don't understand is if Joe Marshall's position was going to be eliminated there wouldn't be anybody that was coming in to pick up the pieces, would there?
A. There's a role that needs to be filled that is still part of the role that he was going to manage, the managing of those scales.
Q. Okay. Who manages the scales now?

Page 140

A. Unfortunately I do.
Q. Okay. Why do you say unfortunately?
A. Because I'm trying to find somebody else who will take them.
Q. Okay. And so what have you done to try to get somebody to take the scales?
A. Well, get my boss to say it should go to somebody else. He's the one that told me it needs to be with me.
Q. Did he tell you why you should have that responsibility?
A. The reason is so you understand it, you set up the plan for it. I've not completely developed -- done developing the plan that I asked Joe to start with. I'm still in the process of setting that up, it's still -- almost there.
Q. Okay. So are you paid anything additional to do that?
A. No.
Q. So why haven't they been assigned to some kind of contractor?
A. They are working with a contractor but the program is not completely set up. In other words, you need to have contracts set up, system checks and balances, who follows up on the

process, ordering material, material logs, things of that nature.

Q. Okay. Like I said, I'm probably slow here. I also don't entirely understand obviously your day-to-day function, so is it -- was it intended that Mr. Marshall, he was doing the day-to-day, what would you say, maintenance on the scales but now that day-to-day maintenance is being done by contractors or union workers?

A. No, the Schedule BMWE employees were doing the work when Joe was there and was expected to do it. The direction that they were getting is now -- the support they're getting, instead of calling Joe for support they've got a contractor/ consultant to call who has tribal knowledge of those scales. The maintenance of the scale still falls on the locals.

Q. Okay. How much time do they -- percent of time of your job duties are taken up by dealing with scales?

A. Right now?

Q. Yeah.

A. Five percent.

Q. Okay. Now, were you ever sent or suggested that you take any additional training

due to any issues that you had with Mr. Marshall?

A. No.

Q. Okay. One of the things -- and I've asked you several times, but can you think of anyone -- because I may want to talk to the person, anybody other than you and Mr. Curbow that Joe had gotten loud with or said anything inappropriate to?

A. Not that I know of.

Q. Okay. Do you believe that Mr. Marshall was insubordinate with you?

A. I do not believe he was.

Q. Okay. Why do you say that?

A. Because when I asked him directly to do something he would do it.

Q. Okay.

(WHEREUPON Buelt Deposition Exhibit No. 28 was marked for identification by the Reporter.)

Q. Have you seen 28 before today?

A. No.

Q. Anything you read in here that you disagree with?

A. I would take exception to some of it but, no, I don't disagree with it.

Q. What do you specifically take exception to?

A. Coaching and counseling for both Mr. Buelt and Mr. Marshall. I was never coached and counseled on the process.

Q. Okay. Did anybody tell you that H.R. recommended that you be coached or counseled?

A. No.

Q. Now, coaching and counseling is a part of training; would you agree with that?

A. Absolutely.

Q. And I don't mean this to come off as being disingenuous or cynical, which we do sound a lot as attorneys, but this "Coaching and Counseling for Mr. Buelt: Providing clear and concise feedback to his employees, written and verbally," do you agree that if somebody would have told you that it would have been -- or it would have been nice to have somebody tell you that as just a part of training?

A. I would like for some details, yeah.

Q. You know, if somebody said to actively listen to employee concerns, you know, just as a manager wouldn't you have appreciated somebody telling you that so you could at least look into

it?

A. Absolutely.

Q. Or "Providing specific detail for projects, either verbally or in writing, when requested," has anybody ever told you that?

A. No, none of this has been referred.

Q. Last one, "Setting clear expectations of employee duties and hold employees accountable for their completion," has anybody ever told you anything like that?

A. Not specifically, no.

Q. Anything similar?

A. All this is just general management things that we get on a regular basis.

Q. Okay. So like I said, I'm looking at this and if coaching and counseling isn't part of discipline, it's to help you do your job better. It would have been nice obviously for someone to tell you this; wouldn't you agree with that?

A. Uh-huh.

MR. VOGEL: Make sure you answer verbally. Yes?

A. Yes. I'm sorry.

(WHEREUPON Buelt Deposition Exhibit No. 29 was marked for

Page 145

identification by the Reporter.)
Q. What's marked as Exhibit 29, these are handwritten notes by you?
A. Yes.
Q. And are these -- well, first, is this your handwriting on these documents?
A. Yes.
Q. Okay. And do these appear to be an accurate copy of the -- of your notes that you were taking?
A. Yes.
Q. And I think I've got thirteen pages. Does that appear right? I just want to make sure I've got all of them.
A. Yeah, there was thirteen when I printed it out. I agree there's thirteen of them.
Q. Do you believe this is all the handwritten notes that you had concerning Joe Marshall?
A. Yes.
Q. And there's some areas here where it looks like a piece of paper is covering something up throughout. Do you see those?
A. Yes.
Q. Do you know -- well, is this some kind of

Page 146

a log that you keep?
A. It's my ledger, yes.
Q. Okay. When you say ledger --
A. Book I just write stuff in, if I go someplace or -- it has everything in there from this to I'm taking notes on a conference call about dimensions of a project or need to follow up on something.
Q. Okay.
A. It's a running log.
Q. Okay. Well, I was going to ask if it's -- we talked about a daily log, if that's what this would be?
A. That's what this is.
Q. Okay. So --
A. I don't write in it every day, but most days.
Q. Okay. You still do that now?
A. Yeah.
Q. Okay. It's interesting, just kind of an aside, but I saw in one of your evaluations and I saw it later that you put the word communication three times.
A. Communicate, communicate, communicate, yeah.

Page 147

Q. Just to emphasize it?
A. To emphasize it, yes. It's also one of our leadership modeling.
Q. Okay. I just was curious. Everything says communicate, communicate, communicate.
A. Yeah.
Q. Is that something that you were trained on doing or something you came up with?
A. It's part of the BNSF model.
Q. Okay.
A. Leadership model.
Q. And these notes about Mr. Marshall, like this first page, does it say June 14th or 19th?
A. Well, I don't know. I would say that's a 14 but could have been a 19. I'd have to look at the page before and after.
Q. Okay. Do you know if that was '16 or '15?
A. Again, I'd have to look in my log to see because I'm shocked -- I would say that's probably '16.
Q. Okay. That was kind of what I assumed, but do you want to look through and see if that happens to help refresh your recollection?
A. If it was '16 or '15?

Page 148

Q. Yes.
A. Do you want me to go get my log?
Q. Well, can you tell by looking at it, by reading through it?
A. I think it's '16, but...
Q. And it appears that it's going backwards in date order?
A. Yeah.
Q. But I just want to make sure because I will tell you recently I was looking at things that had dates and so on and a year was off. So I just want to make sure.
MR. VOGEL: Can we go off the record for half second?
(WHEREUPON an off the record discussion was had, after which the following:)
Q. Since this is a copy of the ledger and you don't have the original with you, it appears there's page numbers up in the corner?
A. Yes.
Q. So the book that you write in, does it have pre-numbered pages?
A. Yes.
Q. Okay. So then you'd do it in date order

Page 149

so it would make sense that 103 was in 2016?
A. Yes.
Q. Okay. All right, thanks, that helps me clarify it. And these blank areas, I don't think I actually let you answer, do you know, would that be for other employees that you were discussing?
A. It was put on by somebody else. There was something else when they made copies they decided that wasn't pertinent to this process.
Q. Your log, you would take notes in your log about other employees as well?
A. Other employees, other situations, yes.
Q. Okay. I just wanted to make sure of that. Do you know -- it appears that the first notes that we have are dated November 9, 2015?
A. Yep.
Q. Would you have been keeping a log prior to November 9, 2015?
A. Yes.
Q. And do you still have that log?
A. Yes.
Q. Do you think it might have any notes of Joe Marshall, or did you look through it already?
A. I looked through it and I believe somebody -- whoever you had for H.R. looked

Page 150

through it too and made these copies.
Q. Okay. Do you know why you wouldn't have been taking any notes on Mr. Marshall prior to November 9th, 2015?
A. I don't know why I did not write notes about him.
Q. I'm curious, when's the last time you read through these?
A. Wednesday when he sent them to me in the afternoon, I read them on my computer screen quickly in preparation for this.
Q. Is it fair to say that important events you write down in this log?
A. Things that -- yeah.
Q. Let me ask it this way: What do you tend to write down in your log? How do you decide whether you should write it down or not?
A. Things I want to be able to bring back later in case somebody brings it up and asks me about it or if I need to follow up on something in the future.
Q. Okay. Did -- in reviewing this, these notes, have you found any note in which you said that Mr. Marshall advised you that he intended to retire in October or September, sometime in 2016?

Page 151

A. I didn't see it when I read through it but let me read through it again now.
Q. Sure, go ahead.
(Pause in Proceedings)
Q. So what did you find?
A. I see that Bruce was in a room when I say that Joe was getting agitated, and I see that evidently I intended to ask him about bringing me his goals -- his log but Dwayne told me to let it lay.
Q. Okay. Here's -- okay. So by what you just said would you agree that you did not ask Mr. Marshall to see his daily logs?
A. My mind might have said I wanted to at the time but Dwayne evidently by my note -- should have read my notes closer.
Q. And what I was having you look for is if you found anything in your notes in which it said that Joe Marshall had indicated to you that he planned to retire.
A. I did not.
Q. So there's nothing in your notes that says that, right?
A. Says in my notes he asked me if I was trying to force him to retire. I told him I was

Page 152

not trying to.
Q. I see that, but what I'm trying to figure out is if -- I just want to make sure that we've covered everything, because, remember, we looked at a document earlier in which you said the first time you met Mr. Marshall he let you know that he planned to retire in September or October of 2016, so I'm trying to find if you have any note of that anywhere.
A. I do not. He may have told me, he may not have told me. Somebody else may have told me, I don't know.
Q. Okay. So it's also -- does that also mean that it might be untrue as well?
A. I don't really care when or if he retired. It was up to him when he does that or will do that or has done it.
Q. Let's look at the page that's marked as 85.
A. Okay.
Q. You brought it up and said -- do you see at the bottom it says "Joe asked if I was trying to force him to retire"? Do you see that?
A. Yep.
Q. Did I read that correctly?

A. Yeah.
Q. Then it says "I told him that I was not asking him to retire, just wanting him to show me what he did on a daily basis. I need to understand what he did." Did I read that correctly?
A. Yes.
Q. Okay. Now, if you would have told Mr. Marshall that you wanted him to work for -- continue working the scales for another three to five years would it have been included in your notes?
A. May or may not have, no.
Q. So there's nothing in your notes that you just looked through and that's marked as Exhibit 29 indicating that you told Mr. Marshall that you would like him to remain for another three to five years, is there?
A. No.
Q. Okay. Now, in reviewing your notes did you see anything in here in which you said that you believed Mr. Marshall had violent tendencies?
A. I don't see anything in here that would say violent tendencies. I do see in here where he becomes agitated.

Q. Okay. Agitated would be significantly different than violent, would you agree?
A. I agree.
Q. Okay. So if you believed that -- or Mr. Marshall made you concerned of workplace violence and you were talking about it to Human Resources as we saw in that note, why isn't it in your notes?
A. Not every conversation that I had with Joe or with everybody else is written in a note.
Q. Okay. But if something is important you put it in your handwritten daily log, right?
A. Something that I thought I needed to deal with or wanted to remember for the future. If I brought it to somebody else's attention already or elevated it I would not put it in there.
Q. All right. Look at Page 87.
A. (Witness Complies).
Q. Now, it talks -- starts out by talking about the PMP process. Is that the objectives that the employee and the supervisor put together?
A. A PMP process is a Performance Management Plan. Our system is put in place so that my goals support my boss' goals and those that are direct reports to me need to support my goals in their

operations that they're doing.
Q. Okay. Then later in that note on March 11, 2016, you state "He claims to Dwayne Curbow that I'm discriminating against him." Did I read that right?
A. Yes.
Q. What did Dwayne tell you about Mr. Marshall complaining that you were discriminating against him?
A. I think that's all he said. I don't think he said he wasn't going to -- I don't remember exactly what he said, but obviously I wrote a note here that Dwayne is the one that told me that.
Q. Okay. Now, at the bottom -- is that 3-14-16?
A. I would say 3-14 of '16, yes.
Q. I don't see any notes between March 14, 2016 and May 5, 2016.
A. Maybe there was nothing that came up that I needed to write a note about or I was working on other projects.
Q. Okay. So if there's not a note is it fair to say that it wasn't that big of deal?
A. Something I didn't feel I needed to write

a note. It was either documented in another way if it needed to be or it -- there was nothing I felt I needed to do.
Q. Now, look at Page 84, please.
A. (Witness Complies).
Q. Talks about a meeting with Bruce Stuff. Do you see that on February 24, 2016?
A. Yeah.
Q. To discuss the demo project?
A. Yes.
Q. And your notes say "Joe Marshall was asking if he could get an outline of the process from Bruce."
A. Yes.
Q. And then in your handwriting you state "I began to tell Joe that there was no outline and that if he wanted an outline he could write one to determine the step to go through." Did I read that right?
A. Yep.
Q. Okay. So if Joe didn't know what he was supposed to do, wouldn't that have been an appropriate question to ask you, for some kind of an outline on how he was to do the job?
A. One doesn't exist. Didn't exist at the

time, one doesn't exist. If you need one write one, ask questions, what needs to be in there, have Mr. Bruce Stuff look it over for what would have went on.

Q. Let me ask you this: If you wanted an outline of what Mr. Marshall did with the scales position why didn't you just write it?

A. Because I have no idea what it is and I didn't have the time to sit with Mr. Marshall and follow him around to figure out what it is that he needed to do.

Q. Okay. My point is, Mr. Marshall -- you had assigned him a demolition project that my understanding --

A. Demolition program.

Q. Demolition program that Mr. Stuff had done for ten or fifteen years, right?

A. I don't know how many years he'd done it at the time, but quite awhile.

Q. Okay. And you didn't ask Mr. Stuff to do an outline, you asked Mr. Marshall who had never done it to do an outline?

A. If he wants an outline. Bruce had information to pass on to him but it wasn't in an outline format. The information is there, there's

a demo program, there's a demo process. It's just if you wanted it in an outline format, it doesn't exist. If you want to write it, take the information, write it, bring it back and let Bruce say yes or no if that's right or wrong.

Q. Okay.

A. That's where I was headed with that.

Q. All right. I'm just trying to -- I'm just trying to understand and I'm trying to put it into terms that I can understand, so I apologize, but like, for example, you know, I've been accused by my wife a time or two of ignoring the directions and trying to put something together and finding out a little too late that I had forgotten a step and I had to disassemble it and look at the directions and put it together right.

A. Correct.

Q. Have you ever had that happen?

A. Oh, yeah.

Q. Well, what I'm trying to figure out here is, it seems like Mr. Marshall is being given a project or a program to do, he doesn't know how to do it, he's never done it before, and you're asking him and expecting him to do it without any instructions. How do you expect him to get it

right?

A. He got instructions in the form of -- there's a document that's about how to do demos. It's in our architectural guidelines, it's in the demo program. If you want it in a different format of an outline, take it and do that. That's the frustration part. We never got to have that discussion.

Q. Did you ever consider -- and this isn't intended as a shot at either you or Mr. Marshall, but, you know, sometimes in life there's just people we just can't get along with, right, and there's no particular reason, you just -- you don't see eye to eye. You've had that happen before, right?

A. It happens to everybody.

Q. Yeah. So did you ever, you know, try to have your boss or someone else -- instead of sitting in as a witness when you talked to Mr. Marshall, have them try to explain what it was that you wanted him to do as far as that position, because it seems like you guys had some difficulty in communicating?

A. Okay.

Q. Would you agree that you had some

difficulty in communicating?

A. I would agree that there was a lack of communication.

Q. Okay.

A. And communication is on both.

Q. Right. And so what I'm wondering is, you know, did you ever consider having somebody else try to help explain to Mr. Marshall what you expected him to do in the job that he was being transitioned into, because you said he was resistant to change from you?

A. Yeah.

Q. Did you ever have anybody else talk with him about it or try to explain it to him?

A. I didn't request anybody, no.

Q. Okay. Did you think about doing that?

A. Yes.

Q. Okay. Why didn't you do it?

A. We weren't together that long. I mean...

Q. It was over a year.

A. Yeah.

Q. So that's quite a bit of time. Did you ever -- when you looked through your notes did you see any notes about any conversations you'd had about trying to have someone in some kind of an

Page 161

apprentice program to learn Mr. Marshall's job?
A. I do not have a note on that. It was my idea at the beginning when I discovered how much tribal knowledge Joe had that was going to leave if Joe left that position and the position that it left the railroad in of not having some process in place or somebody in place to do that going forward.
Q. How long have you been having to deal with the scales since Mr. Marshall left?
A. Since Andrew left.
Q. Okay.
A. So approximately 2017.
Q. Okay. Did Mr. Marshall ever send you any e-mails or documents detailing how the scale processes were done?
A. Yeah, he had detail steps of what -- you know, the mechanical steps of what it is and what made them work, yes.
Q. Okay. So when did he get those to you?
A. Pretty close after we first started working together.
Q. So we looked at that PIP that you wanted to put Mr. Marshall on. Do you still believe that it was accurate?

Page 162

A. What document are we talking about now? I don't see what's not accurate in it because of what I know now.
Q. Okay. Did you read any of the e-mails or documents that Mr. Marshall responded to you as far as your evaluations and the PIP?
A. I was shown some of them when we went through our prep.
Q. Okay. Back during 2016 did you read them?
A. I don't recall if I read them then or not.
Q. Do you know why you didn't read them?
A. I don't think they were addressed to me.
Q. Were you given copies of them?
A. I don't recall.
Q. Okay. If somebody was given an evaluation and an opportunity to respond -- well, first, let me ask that. When you give an employee an evaluation they're allowed to respond to it, right?
A. Yes.
Q. Okay. And so if Mr. Marshall responded why would you not have reviewed it?
A. It may have been addressed to Dwayne

Page 163

Curbow and he didn't share it with me. I don't know the answer to that.
MR. McKEE: I don't think I've got any more questions.
MR. VOGEL: I don't have any questions. We'll read and sign.
(The deposition proceedings concluded at 4:15 p.m.)

Page 164

DEPONENT'S SIGNATURE

In re: Ervin J. Marshall, vs. Burlington Northern Santa Fe, LLC, d/b/a BNSF Railway Company.
Case No. 2:18-CV-02385-JWL-JPO

Date: May 31st, 2019
Deponent: Mr. Bruce Stuff

I, MR. JOSEPH BUELT, do hereby state that I have read the foregoing questions and answers appearing in this transcript of my deposition consisting of 164 pages; that this is a true and accurate report of said answers given in response to the questions appearing,

____________________
JOSEPH BUELT

Subscribed and sworn to before me this_____ day of______________, 2019.

____________________
Notary Public within and for

_______________County,________

My commission expires:

Page 165

ERRATA SHEET

In re: Ervin J. Marshall, vs. Burlington Northern Santa Fe, LLC, d/b/a BNSF Railway Company.
Case No. 2:18-CV-02385-JWL-JPO

Date: May 31st, 2019
Deponent: Mr. Joseph Buelt

Page ______ line ______
Should read:___________________________________
Reason:________________________________________

Page ______ line ______
Should read:___________________________________
Reason:________________________________________

Page ______ line ______
Should read:___________________________________
Reason:________________________________________

Page ______ line ______
Should read:___________________________________
Reason:________________________________________

Page ______ line ______
Should read:___________________________________
Reason:________________________________________

Page ______ line ______
Should read:___________________________________
Reason_________________________________________

_____________________________
JOSEPH BUELT

Subscribed and sworn to before me this _____ day of ___________________, 2019.

______________________________
Notary Public within and for

_______________ County, ______

Commission expires:

Page 166

C E R T I F I C A T E

STATE OF KANSAS )
 ) Ss:
GEARY COUNTY )

I, Sandra K. Powers, a Certified Shorthand Reporter within and for the State of Kansas, hereby certify that the within-named witness was first duly sworn to testify the truth, and that the deposition given in response to the questions propounded, as herein set forth, was first taken in machine shorthand by me and afterwards reduced to writing under my direction and supervision and is a true and correct record of the testimony given by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorneys or counsel, or financially interested in the action.

WITNESS my hand and official seal at my office, this 31st day of May, 2019.

________________________
Sandra K. Powers, C.S.R.