IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

ERVIN J. MARSHALL                )
     Plaintiff,                )
                        )
     v.                )     Case No. 2:18-CV-02385-JWL-JPO
                        )
BURLINGTON NORTHERN SANTA        )
FE, LLC d/b/a BNSF RAILWAY        )
COMPANY                )
     Defendant.                )

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ervin J. Marshall, Jr. submits his Response to Defendant's Motion for Summary

Judgment as follows:

## I.      INTRODUCTION

There is sufficient evidence in this case to establish that Plaintiff was constructively

discharged after suffering discrimination, harassment, retaliation and hostile work environment

from Defendant based upon Plaintiff's age. Defendant's proffered legitimate non-discriminatory

reasons for its actions against Plaintiff are merely pretext for discrimination. There is very little

uncontroverted evidence to support Defendant's motion for summary judgment. Plaintiff,

however, has set forth significant evidence to establish that Defendant's alleged reasons for its

treatment of Plaintiff should not be trusted. The documents Defendant is relying on to support its

treatment of Plaintiff are entirely subjective and therefore raise genuine issues of material fact

regarding whether Defendant's alleged reasons for its treatment of Plaintiff are pretextual,

particularly in this instance where Plaintiff has either denied the allegations or has offered very

different and harmless explanations for the alleged incidents. In addition to the subjective nature

of Defendant's documents and testimony, its actions are highly suspect. Defendant's inaccurate

and false accusations against Plaintiff personally and the performance of his job duties, including a lack of documentation at the time of the supposed incidents, suggests that Defendant might be covering up a discriminatory purpose. Additionally, inconsistencies in Defendant's reasons for, among other things:

- removing Plaintiff's benefits including his company car and Procard,

- significantly interfering with Plaintiff's ability to perform his job, including the modification of his job duties,

- refusing to provide training or direction for new assignments and projects,

- investigating Plaintiff's behavior and work performance instead of investigating his complaints of age discrimination, retaliation, harassment and hostile work environment,

- and, accusing Plaintiff of having violent tendencies

further contribute to suspicions regarding the truthfulness of Defendant's proffered reasons for Plaintiff's treatment. In addition to the subjective and suspect nature of Defendant's testimony and documentation supporting Plaintiff's treatment, additional evidence of discrimination, including Defendant's comments to Plaintiff about his retirement date, preference for younger employees and Defendant's failure to follow its own policies, further support a determination that Defendant's proffered reasons are pretext for age discrimination. Because Defendant has failed to set forth sufficient evidence to support its motion for summary judgment, Defendant's motion should be denied.

## II.    PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF FACTS ("DSOF")

### I.    Plaintiff's Responses to Defendant's Statement of Uncontroverted Facts

Defendant has included numerous footnotes to its Statement of Uncontroverted Facts. Although Plaintiff believes this is an inappropriate attempt to argue facts in the light most favorable to Defendant, out of an abundance of caution, Plaintiff has provided responses to each footnote.

**Plaintiff's Hiring by and Employment with BNSF**

1.      Plaintiff Ervin J. "Joe" Marshall, Jr. was born in October 1956 and is currently 62 years old.  Deposition of Ervin J. Marshall, Jr. ("Marshall Depo."), attached to BNSF's Motion as Exhibit A, at 6, 10.

   **Plaintiff's Response: Uncontroverted.**

2.      Plaintiff began his employment with defendant BNSF Railway Company in May 1977 as a bridge and builder helper based in Kansas City, Kansas.  Marshall Depo. at 17.

   **Plaintiff's Response: Uncontroverted that Plaintiff began as a full-time employee with Defendant in May 1977 as a bridge and builder helper based in Kansas City, Kansas. However, Plaintiff further states that he also worked as a summer helper during the Summer of 1974 for Defendant. [ECF 40-2, Marshal Depo. 16:9 – 16:24].**

3.      At the time of his hiring, plaintiff was an hourly employee and a member of the union.  Marshall Depo. at 17.

   **Plaintiff's Response: Uncontroverted.**

4.      Plaintiff worked in other hourly positions between 1977 and 2007 in BNSF's Structures Department, which is part of the railroad's Engineering Department, and is responsible for maintaining BNSF structures, including bridges.  Marshall Depo. at 17-18.

   **Plaintiff's Response: Uncontroverted.**

5.      In August 2007, plaintiff applied and was selected for a salaried position as a Scale Inspector, which was also in BNSF's Structures Department.  Marshall Depo. at 19.

**Plaintiff's Response: Uncontroverted that Plaintiff was selected for the salaried position of Scale Inspector in August 2007. Controverted that Plaintiff "applied" for the position. Plaintiff placed a bid and went through the bidding process put in place by Defendant for such positions. Plaintiff's bid was chosen out of numerous candidates throughout BNSF. [ECF 40-2, Marshall Depo. 19:1 – 19:9].**

6.     The Scale Inspector position was headquartered in Kansas City, Kansas, but was responsible for work across the country testing, inspecting, repairing, and working on industrial scales that were used to weigh rail cars.  Marshall Depo. at 19, 21.

 **Plaintiff's Response: Uncontroverted.**

7.     In July 2014, plaintiff's job title changed to "Supervisor, Scales," although the title change did not impact his job duties or responsibilities.  Marshall Depo. at 24-25.

**Plaintiff's Response: Uncontroverted to the extent his job title change did not affect his job duties or responsibilities at the time of the title change. However, Plaintiff's duties, responsibilities and salary had been increased to reflect the position of Supervisor, Scales in the year or two preceding the title change. [ECF 40-2, Marshall Depo. 21:22 – 25:6].**

**<u>Plaintiff's Transfer to Facilities</u>**

8.     In June 2015, when plaintiff was 58 years old, BNSF informed plaintiff that his position was being moved from the Heavy Bridge team to the Facilities team, both of which were within the Structures Department.  Marshall Depo. at 27-28.

 **Plaintiff's Response: Uncontroverted.**

9.     The change in teams did not impact plaintiff's job title, geographic base of employment, compensation, or benefits.  Marshall Depo. at 30.

 **Plaintiff's Response: Uncontroverted.**

10.     In Facilities, plaintiff began reporting to Joseph Buelt, Manager of Engineering, who plaintiff estimates was approximately 53 years old at the time he began supervising plaintiff. Marshall Depo. at 30-31; Deposition of Joseph Buelt ("Buelt Depo."), attached to BNSF's Motion as Exhibit B, at 4-5.

**Plaintiff's Response: Controverted. Defendant mistakenly relies on Plaintiff's testimony for its DSOF 10. Plaintiff did not and does not personally know Mr. Buelt's age and the testimony cited was merely the result of Plaintiff being pressured to guess by Defendant's counsel during his deposition. [ECF 40-2, Marshall Depo. 31:2 – 31:8; see also Plaintiff's Exhibit "A", Marshall Declaration].**

**Despite Defendant's citation, Plaintiff is unable to find any testimony regarding Mr. Buelt's age in Defendant's Exhibit B.[1]**

11.     Buelt reported to Dwayne Curbow, Director of Facility Engineering, who was born in July 1957 and was 57 years old at the time he became part of plaintiff's supervisory chain of command.  Marshall Depo. at 31; Deposition of Dwayne Curbow ("Curbow Depo."), attached to BNSF's Motion as Exhibit C, at 11, 13.

**Plaintiff's Response: Controverted to the extent Defendant relies on Plaintiff's deposition testimony for DSOF 11. Plaintiff in fact testified he did not know Mr. Curbow's age, and only attempted a guess when pressured by Defense counsel. [ECF 40-2, Marshall Depo. 31:14 – 31:20; see also Plaintiff's Exhibit "A", Marshall Declaration].**

**Otherwise uncontroverted, but immaterial.**

---

[1] According to a copy of Buelt's BNSF employee transcript generated in April 2019 to be produced in this litigation, Buelt was 57 years old.  *See* Transcript, attached to BNSF's Motion as Exhibit D.  Accordingly, he would have been approximately 53 at the time he began working with plaintiff in 2015.
**Plaintiff's Response: Objection: Plaintiff objects to any reliance of the Court on Defendant's Exhibit D as it is undated, and Plaintiff has no way to verify the accuracy of the age allegation or when the "transcript" was generated. Otherwise uncontroverted, but immaterial.**

12.     Shortly after his assignment to Facilities, Buelt informed plaintiff that he would no longer be able to utilize a BNSF-sponsored vehicle as part of his job duties.  Marshall Depo. at 39-40.

**Plaintiff's Response: Uncontroverted that a number of Plaintiff's benefits, including a company car, were taken away from him after he began reporting to Mr. Buelt and Mr. Curbow. [ECF 40-2, Marshall Depo. 40:14: - 41:5]. Plaintiff controverts that Mr. Buelt told him he would no longer be able to utilize a company car. Plaintiff testified as follows: "Joe Buelt didn't tell me anything. He called me up and said take your car keys and your credit card and go give them to Dwayne. That was all the instruction I got." [ECF 40-2, Marshall Depo. 13:19 – 43:24].**

13.     Plaintiff is not aware of any other employees in Facilities who were provided with company-owned vehicles.  Marshall Depo. at 41.

**Plaintiff's Response: Objection. Controverted. DSOF 13 misstates Plaintiff's testimony. Plaintiff testified the new group was large and he did not know whether or not anyone else in the group had a vehicle. [ECF 40-2, Marshall Depo. 40:10: - 41:15].**

14.     The decision to reassign plaintiff's vehicle to another employee was made by the department's Assistant Vice President, as it was not standard procedure for "system" employees to have company vehicles.  Buelt Depo. at 67-68.

**Plaintiff's Response: Controverted. In June 2015, Plaintiff was moved from the Heavy Bridge team to the Facilities team, both of which were in the Structures Department. [DSOF 8]. Plaintiff was an exempt employee in the Structures Department when he received his company car and remained an exempt employee in the Structures Department when his company car was summarily taken away without explanation. [DSOF 8; see also ECF 40-2,**

**Marshall Depo. 39:24 – 41:5]. Further, when Plaintiff was transferred to Facilities, he was told his job responsibilities and benefits would remain the same, and his job included responsibilities for BNSF scales around the country. [See DSOF 6].**

15.     After BNSF reassigned plaintiff's company car, he used a rental car when he had to travel for business, and BNSF covered the cost of the rental.  Marshall Depo. at 138-39.

**Plaintiff's Response: Uncontroverted. ADD INFO. ABOUT HOW VEHICLE LOSS AFFECTED ABILITY TO DO JOB.**

16.     At the same time the company car was reassigned, Buelt also told plaintiff he could no longer use a "Procard," a card issued through BSNF that plaintiff used to purchase materials. Marshall Depo. at 43.

**Plaintiff's Response: Controverted to the extent Mr. Buelt told Plaintiff he could no longer use his "Procard". Plaintiff testified as follows:**

> **Q.   And was this something that Mr. Beult told you as well; that he would need the Procard?**
> **A.   No. Joe Buelt didn't tell me anything. He called me up and said take your car keys and your credit card and go give them to Dwayne.  That was all the instruction I got.**
> **Q.   Did you get any explanation from Mr. Beult or Mr. Curbow or anyone else as to why you were being asked to turn over the Procard?**
> **A.   I did not.**
> **Q.   Do you know anyone else on Mr. Curbow's team who had use of a Procard?**
> **A.   I would have no knowledge of that.**

**[ECF 40-2, Marshall Depo. 43:19 to 44:6].**

**Uncontroverted that Plaintiff used the Procard to purchase needed materials and equipment. Plaintiff further states that the loss of the Procard fundamentally changed how he could do his job, and in some circumstances made it impossible.**

**Q.   I appreciate that.  But you were informed that you could go through the standard BNSF purchasing invoicing process to obtain materials that you might need to perform your job duties; correct?**

**A.   No, not actually; no.  Not totally.  If I need gloves, yes, I could go through that person and buy gloves.**

**Q.   Okay.**

**A.   But if I needed a specific bolt, you couldn't just go into this catalog system and find this specific bolt on the day you are there and expect to be able to have it to use.**

**Q.   So the process that you would have to use would take longer to obtain the materials that you might need once the Procard was gone?**

**A.   It fundamentally changed the way I had to do my job.  It cost the BNSF money, it cost them time, delays.  It fundamentally changed the way I had to do my job.**

**Q.   Because you're saying it was more complicated, it took longer, it was more difficult?**

**A.   It was impossible, in some cases impossible to get the material you needed in the time you needed it.**

**[ECF 40-2, Marshall Depo. 45:9 to 46:8; see also [ECF 40-2, Marshall Depo. 44:10 – 45:8].**

17.     Plaintiff is not aware of any other employee in Facilities who had use of a Procard.

[Marshall Depo. at 44].

**Plaintiff's Response: Objection to the extent it mischaracterizes Plaintiff's testimony. Controverted. Plaintiff stated he has no knowledge of anyone else's Procard status. [ECF 40-2, Marshall Depo.44:4 – 44:6].**

18.     Buelt also had instructed plaintiff not to perform job duties that were the responsibility of hourly employees, such as manual labor on the scales.  Marshall Depo. at 36.

**Plaintiff's Response: Uncontroverted that Buelt told Plaintiff to stop performing "manual labor on the scales."  Controverted that the job duties at issue were the responsibility of hourly employees. [ECF 40-2, Marshall Depo. 36:20 – 39:7; see also Marshall Depo. Ex. 1, MARSHALL0099 – MARSHALL00100, attached as Plaintiff's Exhibit "B"]. Plaintiff's job description included performance of some manual labor in the**

**maintenance of Defendant's scales. [See Plaintiff's Exhibit "B"]. Plaintiff further states that Defendant's directive was another significant change to Plaintiff's job responsibilities that he had been successfully performing for over 10 years. It also demonstrates the fundamental lack of understanding by his new management of Plaintiff's position and its intention to force Plaintiff out due to his age. [ECF 40-2, Marshall Depo. 36:20 – 37:12; see also Marshall Depo. Ex. 6, BNSF-MARSHAL 000078 – BNSF-MARSHALL 000080 attached hereto as Plaintiff's Exhibit "C"].**

19.     Plaintiff understands, "in a big picture sense," that in certain situations the union representing BNSF hourly employees could bring a grievance against the company if salaried employees performed work intended for hourly employees.  Marshall Depo. at 37.  *See also* Buelt Depo. at 87 (explaining that exempt employees were not to perform work of "craft employees" pursuant to terms of a collective bargaining agreement).

**Plaintiff's Response: Uncontroverted to the extent Plaintiff understands "in a big picture sense," that <u>in certain situations</u> where the union representing BNSF hourly employees could bring a grievance against the company if salaried employees performed work intended for hourly employees. Plaintiff alleges that his job was not one of those circumstances. See Marshall Depo. Ex. 1, MARSHALL0099 – MARSHALL00100, attached as Plaintiff's Exhibit "B"]. Plaintiff's job description included performance of some manual labor in the maintenance of Defendant's scales. [See Plaintiff's Exhibit "B"].**

**Plaintiff further states that no such evidence of any grievances filed against Defendant by the union representing BNSF hourly employees related to Plaintiffs performance of his job duties has been identified.  Until 2015, Plaintiff had been performing his job duties as**

given to him by Defendant that were specific to his unique position within BNSF. [ECF 40-2, Marshall Depo. 37:3 – 39:23].

### Plaintiff's 2015 Year-End Performance Evaluation

20.     In January 2016, plaintiff received his 2015 year-end performance evaluation. Marshall Depo. at 50-51 and Depo. Ex. 8.

**Plaintiff's Response: Uncontroverted. Although not identified as a Statement of Fact, Defendant included a footnote to DSOF 20 that states "BNSF refers to its salaried employee evaluation system as its Performance Management Process, or "PMP."  Marshall Depo. at 51. Plaintiff does not controvert that BNSF's salaried employee evaluation system as the Performance Management Process "PMP".**

21.     Plaintiff's 2015 mid-year performance evaluation had been completed by his previous supervisor, but the 2015 year-end evaluation was completed and delivered by Buelt. Marshall Depo. at 52 and Depo. Ex. 8.

**Plaintiff's Response: Uncontroverted.**

22.     In their evaluations, employees receive ratings in a series of categories followed by an overall rating.  The ratings range from "needs improvement" to "on target" to "exceeds expectations" to "far exceeds expectations."  Marshall Depo. at 167-68.

**Plaintiff's Response: Uncontroverted.**

23.     In plaintiff's 2015 year-end PMP, Buelt gave plaintiff an overall rating of "on target." Marshall Depo. at 57 and Depo. Ex. 8.[2]

**Plaintiff's Response: Uncontroverted.**

---

[2] BNSF refers to its salaried employee evaluation system as a Performance Management Process or "PMP". Marshall Depo. at 51.
**Plaintiff's Response: Uncontroverted.**

24.     With regard to two categories on the 2015 year-end PMP, the leadership model and a specific scales project for which plaintiff was responsible, Buelt gave plaintiff a rating of "needs improvement."  Marshall Depo. at 54 and Depo. Ex. 8.

  **Plaintiff's Response: Uncontroverted.**

25.     Buelt gave plaintiff a needs improvement score on the leadership model because he was unaccepting of process changes and was behaving in a "demonstrative" and "obstinate" manner with Buelt, and also had not completed a leadership training course required of all exempt officers. Buelt Depo. at 75, 77, 81; *see also* Buelt Depo. at 81 (explaining that the "[m]ain reason for the NI was because when [Buelt] went to . . . talk to [plaintiff, plaintiff] started yelling at [Buelt]"); Curbow Depo. at 24 (reciting fact that plaintiff yelled at Curbow when discussing work-related matters).

  **Plaintiff's Response - Controverted. Mr. Buelt gave conflicting, inconsistent and contradictory testimony regarding the reasons for assigning Plaintiff a "Needs Improvement" on the Leadership Model of Plaintiff's 2015 end of year PMP. Mr. Buelt stated during his deposition that the written 2015 year-end PMP for Plaintiff contained his entire reasoning for rating Plaintiff a "needs improvement" under the Leadership Model. Mr. Buelt repeatedly stated that his decision was made based upon only what is included in the document. [ECF 40-3, Buelt Depo. 95:17 – 96:2]; see also [ECF 40-2, Marshall Depo. Exhibit No. 8 at page 61 of 115]. However, Mr. Buelt then contradicted himself and went on to identify additional reasons for giving Plaintiff a "needs improvement". He stated that his rating was based upon Plaintiff's inability to accept change, was demonstrative, obstinate and hard to deal with. [ECF 40-3, Buelt Depo. 75:2 – 75:20]. He also testified that the NI was assigned because Plaintiff did not attend a leadership course. [ECF 40-3, Buelt Depo. 77:18 – 78:1] Mr. Buelt relied on this decision even though Plaintiff did not supervise any**

**employees, had never been required to do so before and was only given "hints" that he needed to attend. [ECF 40-3, Buelt Depo. 80:11 – 81:25]. Mr. Buelt also stated that he gave Plaintiff an NI because Plaintiff yelled at him. [ECF 40-3, Buelt Depo. 80:15 – 81:25].**

26.     Plaintiff is not aware of any way in which the two "needs improvement" ratings on his 2015 year-end PMP impacted his compensation.  Marshall Depo. at 58.  *See also* Buelt Depo. at 98 (explaining that a needs improvement rating in two categories of PMP did not trigger any kind of corrective action or impact plaintiff's compensation).

**Plaintiff's Response: Controverted. Plaintiff testified that he was told the importance of the evaluations and that the ratings affect decisions on raises. Plaintiff is unaware of how BNSF makes specific decisions with respect to how compensation is affected by an employee's rating. [ECF 40-2, Marshall Depo. 57:24 – 58:17]. Plaintiff also testified that he believes his 2015 year-end review results caused his raise to be lower. [ECF 40-2, Marshall Depo. 210:8 – 210:12]. [See also ECF 40-3, Buelt Depo. 99:4 – 99:8] (Plaintiff tells Curbow his raise was the worst he had ever received).**

27.     Shortly after receiving his 2015 year-end PMP, plaintiff wrote to Curbow, Buelt's supervisor, and set out some concerns about the evaluation, including his belief that the "needs improvement" ratings in two categories were inaccurate and unfair.  Marshall Depo. at 53-55 and Depo. Ex. 10.

**Plaintiff's Response: Uncontroverted that Plaintiff wrote a letter to Mr. Curbow after receiving his 2015 year-end PMP and that he believed, among other things, the PMP was inaccurate and unfair. Plaintiff further stated that he believed the ratings were a "stain on [his] record" and that Mr. Buelt deliberately included false and inaccurate facts even after**

being presented with evidence to the contrary. **[ECF 40-2 at pages 68-73 of 115, Marshall Depo., Exhibit No. 10].**

28.     Plaintiff did not mention alleged age discrimination or make any reference to age in the letter, but did believe his age was an issue with Buelt because Buelt had made references to believing plaintiff would be leaving the company and asked him to "structure [his] job so that any 26-year-old new hire can do it."  Marshall Depo. at 56 and Depo. Ex. 10; *see also* Marshall Depo. at 58-60.[3]

**Plaintiff's Response: Uncontroverted that Plaintiff did not specifically use the word "age" in the letter. However, Plaintiff did tell co-workers, Mr. Stuff and Mr. Barthel, about the age discrimination he was experiencing by Mr. Buelt [ECF 40-2, Marshall Depo. 89:10 – 89:25]. See also [ECF 40-3, Buelt Depo. Ex. 26, wherein Mr. Buelt criticizes Plaintiff for complaining how he is being treated with other employees in the office.**

29.     In March 2016, plaintiff contacted BNSF's third-party retirement benefits administrator and requested an estimate as to what his retirement benefits would be if he were to retire as a salaried employee on his 60th birthday in October 2016.  Marshall Depo. at 74-76.

**Plaintiff's Response:  Uncontroverted.  Plaintiff  made  an  inquiry  regarding  his potential exempt benefits as a salaried employee. [ECF 40-2, Marshall Depo. 75:9 – 75:21]. Plaintiff further states that it is not uncommon for employees to make inquiries regarding**

---

[3] Buelt has denied making any reference to age, but acknowledges he discussed with plaintiff the need to structure his job so a "college kid" could do it as part of preparation to backfill plaintiff's duties when he eventually retired. Buelt Depo. at 57, 59
**Plaintiff's Response – Defendant's statement is inconsistent and contradictory. Plaintiff does not controvert that Mr. Buelt told Plaintiff he needed to structure his job so that a "college kid" could do it. Plaintiff also does not controvert that Mr. Buelt denied making any reference to age when he responded to Defendant HR's request for information during its investigation into Plaintiff's age discrimination claims, and even blamed Plaintiff himself for making the comment. However, during his deposition, Mr. Buelt admitted to making the comment regarding a college "kid". Mr. Buelt's attempt to play word games because his comment may not include a specific age is disingenuous at best. [ECF 40-3, Buelt Depo. 57:12 – 58:14]; see also [ECF 40-3, Buelt Depo., Exhibit No. 26].**

**retirement benefits all the time. [ECF 40-2, Marshall Depo. 74:2 - 74:13; See Bruce Stuff's**
**Deposition, attached hereto as Plaintiff's Exhibit "D", Stuff Depo. 32:6 – 32:19; see also ECF**
**40-4, Curbow Depo. 119:10 – 119:14].**

30.     Plaintiff understood that employees were eligible for a "full retirement" on their
60th birthday with 30 or more years of BNSF service.  Marshall Depo. at 76; *see also* Marshall
Depo. at 77 ("everybody on the railroad knows . . . this is a great job because you can retire at 60
with 30 years' service").

**Plaintiff's Response: Uncontroverted, but immaterial.**

31.     When plaintiff made the March 2016 call, he had not made any decisions regarding
retirement, but wanted to know what his benefits might be out of curiosity.  Marshall Depo. at 76-
77.

**Plaintiff's Response: Uncontroverted. Plaintiff inquired about his exempt benefits as**
**a salaried employee of Defendant. [ECF 40-2, Marshall Depo. 74:2 - 74:13].**

**Plaintiff's March 2016 Age Discrimination Allegations**

32.     On March 18, 2016, plaintiff again wrote Curbow to address a number of issues,
including a dispute with Buelt in February 2016 following Buelt's request that plaintiff complete a
daily log regarding his work activities.  Marshall Depo. at 80-81 and Depo. Ex. 13.

**Plaintiff's Response: Uncontroverted that, among other things, Plaintiff's March 18,**
**2016 letter addressed continuing harassment and discrimination by BNSF including being**
**asked to keep a daily log that tracked the times he arrived and departed from the office.**
**Plaintiff further states that this request treated Plaintiff as an hourly employee that was**
**required to clock in and out.**

33.     Plaintiff had previously said Buelt did not know what plaintiff did on a daily basis, prompting Buelt's request for the log.  Marshall Depo. at 80 and Depo. Ex. 13.  *See also* Buelt Depo. at 83 (Q: "Why did you ask [plaintiff] to keep a log book?"  A: "Because I wanted to find out what he was doing and what his job was."  Q  "[D]idn't you want to know what other people that worked in the Facilities group, what their jobs were?"  A: "I had an understanding of what they were.").

**Plaintiff's Response: Controverted. Plaintiff testified in his deposition that while Mr. Buelt may not have known what Plaintiff's daily job duties were in 2015, by the time of Mr. Buelt's request, he had had almost daily contact with Plaintiff regarding his daily job duties and had no need for a daily log. [ECF 40-2, Marshall Depo. 80:10 – 81:17].**

**Defendant's own Human Resources Department found Mr. Buelt's request inappropriate. See Erika McCubbin's Deposition, attached hereto as Exhibit "E", [McCubbin Depo. 64:11 – 64:22].**

34.     In the course of the February 2016 discussion regarding the log, plaintiff asked Buelt why he was "fucking with" him.  Marshall Depo. at 81.

**Plaintiff's Response: Uncontroverted. When Mr. Buelt requested Plaintiff to keep an unnecessary log of his clock-in, clock-out times and daily activities, Plaintiff felt that he was being punished and expressed his concern by asking Mr. Buelt: "[w]hy are you fucking with me?" [ECF 40-2, Marshall Depo. 81:18 – 82:3]. Joe Buelt acknowledged in his deposition that Plaintiff was visibly upset but did not ask Plaintiff to explain. [ECF 40-3, Buelt Depo. 25:1 – 25:24; 27:7 – 27:22].**

35.     The March 2016 letter from plaintiff to Curbow also addressed a December 2015 incident in which Buelt allegedly "berated" plaintiff in the presence of a co-worker regarding travel

arrangements plaintiff had made for an out-of-town business trip.  Marshall Depo. at 82-85 and Depo. Ex. 13.[4]

       **Plaintiff's Response: Uncontroverted.**

36.     The same letter also discussed a meeting during which Buelt told plaintiff that he did not believe plaintiff had enough to do, and assigned him BNSF's buildings demolition projects. Marshall Depo. at 86-88 and Depo. Ex. 13.  Plaintiff contends that when he asked for assistance in learning the requirements of the demolition job, Buelt would not provide him with any help.  *Id.*[5]

       **Plaintiff's Response: Uncontroverted.**

37.     In the closing paragraph of the March 2016 letter, plaintiff described himself as "the newest and oldest member in the Facilities Group," and expressed his belief that Buelt "would like to replace [him] with someone younger and easier to manipulate."  Marshall Depo. at 88-89 and Depo. Ex. 13.

       **Plaintiff's Response: Uncontroverted.**

---

[4] Buelt has explained that he asked the co-worker, Derek Brown, who also was a member of the Facilities management team, to attend the meeting as "a learning experience" and "witness the process."  Buelt Depo. at 53.
**Plaintiff's Response – Controverted. Buelt has given contradictory reasons for Derek Brown's presence in the meeting including as a learning experience, "to witness the process", and because he needed a witness based on Buelt's own characterization of Plaintiff fitting the description of someone with workplace violence. [ECF 40-4, Buelt Depo.71: 10 – 72:1 , 53:9 – 53:13, 76:11 – 76:22.**

[5] While BNSF is presenting the material facts in this motion in the light most favorable to plaintiff, Buelt has testified that that he did not instruct the manager who had been in charge of the demolition program not to assist plaintiff, but rather told him that he could provide assistance but needed to be sure plaintiff actually completed the work himself. *See* Buelt Depo. at 121. Buelt later became aware that plaintiff had never taken on the assignment to oversee demolition work. Buelt Depo. at 105-06.
**Plaintiff's Response – Controverted. While Defendant claims it is presenting material facts in light most favorable to Plaintiff, its continued use of contradictory footnotes suggests otherwise. Further, Buelt did testify that he gave Plaintiff the demo program without any directions or instruction and told Bruce Stuff not to do anything on the demo program because he expected Plaintiff to do it. [ECF 40-3, Buelt Depo. 121:4 – 121:1]. He also refused to allow Bruce Stuff to create an outline to help Plaintiff and told Plaintiff if he wanted an outline he would need to draft it himself (ignoring the fact Plaintiff had no experience or knowledge regarding demolition). [ECF 40-3, Buelt Depo. 156:11 – 158:7].**

38.     Plaintiff also wrote that he believed "the constant negative scrutiny and treatment that [he had] been subjected to by [Buelt] constitutes harassment and age discrimination and illustrates his ongoing attempt to get rid of me."  Marshall Depo. at 89 and Depo. Ex. 13.

**Plaintiff's Response: Uncontroverted.**

39.     On April 12, 2016, plaintiff met with Sarah Reedy, a BNSF human resources manager who was investigating his allegations of harassment and discrimination.  Marshall Depo. at 91-92.

**Plaintiff's Response: Objection. Defendant's Statement of Fact 39 is not supported by, and misstates, the testimony cited. Uncontroverted that Plaintiff met with Ms. Reedy on or about April 12, 2016 following his March 2016 letter containing his allegations of harassment and discrimination based upon his age. Plaintiff does not know to what extent Ms. Reedy did or did not investigate his allegations of harassment and discrimination based upon age, other than his one-on-one interview. [ECF 40-2, Marshall Depo. 91:21 – 92:2]. Plaintiff asserts that instead of investigating his complaints, Sarah Reedy and Defendant choose to investigate Plaintiff's job performance and false allegations that Plaintiff was violent. [ECF 40-2, Marshall Depo. Ex. 16, attached hereto as Plaintiffs Exhibit "___"].**

40.     Following the meeting, Reedy drafted a statement for plaintiff's review summarizing his allegations and explained to him that he could review it and make corrections and supplementations to it, which plaintiff did.  Marshall Depo. at 92-94 and Depo. Ex. 14.  Plaintiff and Reedy then signed the statement.  Marshall Depo. at 94-95 and Depo. Ex. 14.

**Uncontroverted that Plaintiff read the document and was given an opportunity to make corrections or changes based upon his understanding at the time. [ECF 40-2, Marshall Depo. 92:15 – 93:12].**

## BNSF's Presentation of PIP to Plaintiff

41.     On June 2, 2016, Curbow invited plaintiff to attend a June 10 "communications meeting."  Marshall Depo. at 97 and Depo. Ex. 15.

**Plaintiff's Response: Uncontroverted.**

42.     Plaintiff attended the June 10 meeting along with Curbow, Buelt, Reedy, and Tamala Cleaver, a BNSF human resources director.  Marshall Depo. at 97-98.

**Plaintiff's Response: Uncontroverted.**

43.     At the meeting, BNSF presented plaintiff with a Performance Improvement Plan ("PIP"), which stated that it was to recognize areas of plaintiff's performance in need of improvement "and raise them to an acceptable level of performance."  Marshall Depo. at 98-99 and Depo. Ex. 15.

**Plaintiff's Response: Uncontroverted.**

44.     After the presentation of the PIP, Buelt and Curbow left the room and Reedy and Cleaver stayed with plaintiff.  Marshall Depo. at 101.

**Plaintiff's Response: Uncontroverted.**

45.     Reedy then read a written statement that BNSF had found plaintiff's allegations of discrimination and harassment to be unsubstantiated.  Marshall Depo. at 101.

**Plaintiff's Response: Uncontroverted.**

46.     Plaintiff at some point received a letter from Reedy dated June 13, 2016 stating that she had "reviewed the facts thoroughly and at this time have not substantiated any instances of discrimination, harassment or unfair treatment by [plaintiff's] supervisor."  Marshall Depo. at 102 and Depo. Ex. 16.

**Plaintiff's Response: Uncontroverted that at some point Plaintiff received a letter from Reedy dated June 13, 2016. Plaintiff states that the letter speaks for itself. [ECF 40-2, Marshall Depo Ex. 16].**

47.    The letter also stated that BNSF had found "communication issues" that "will be addressed."  Marshall Depo. at 102 and Ex. 16.

**Plaintiff's Response: Objection to the extent DSOF 44 misstates the evidence cited. Plaintiff states that the letter speaks for itself. [ECF 40-2, Marshall Depo Ex. 16 at 178].**

48.    On June 16, 2016, plaintiff prepared a written response to the PIP in which he expressed his disagreement with the alleged deficiencies set out in the document.  Marshall Depo. at 108-09 and Depo. Ex. 17.

 **Plaintiff's Response: Uncontroverted.**

49.    In the June 2016 written response, plaintiff stated he had "never . . . used inappropriate language" in the workplace, although he acknowledged asking Buelt why he allegedly kept "fucking with" him.  Marshall Depo. at 110-11 and Depo. Ex. 17.

**Plaintiff's Response: Uncontroverted that Plaintiff felt so distressed and humiliated by Defendant's lack of investigation into his age discrimination claims that he made an excited utterance of "why do you keep fucking with me." Instead of actually investigating Plaintiff's complaints, Defendant instead chose to continue its pattern and practice of discrimination and harassment based upon Plaintiff's age.**

50.    Plaintiff also stated that he had been maintaining a daily log of his activities since March 2015 but had not shared it with anyone, including Buelt, because "[n]obody asked for it."  Marshall Depo. at 111-12 and Depo. Ex. 17.

 **Plaintiff's Response: Uncontroverted.**

**Plaintiff's July 7, 2016 Notice of Resignation**

51.     On July 7, 2016, plaintiff provided Buelt and Curbow with a letter giving notice

that he was resigning from his salaried position "[d]ue to the untenable position" in which his

leadership and human resources had placed him.  Marshall Depo. at 115-16 and Depo. Ex. 18.

     **Plaintiff's Response: Uncontroverted.**

52.     Plaintiff stated in the letter he had "no choice but to resign [his] position as an

exempt officer of the company," and explained that he intended to retain his employment with

Defendant and return to an hourly position with the union prior to retiring.[6]  Marshall Depo. at 116

and Depo. Ex. 17.

     **Plaintiff's Response: Uncontroverted.**

53.     Plaintiff wrote that he would remain in his salaried position until September 21,

2016 and move back to an hourly position on September 22, 2016.  Marshall Depo. at 127 and

Depo. Ex. 17.

     **Plaintiff's Response: Uncontroverted.**

54.     On July 22, 2016, at Buelt's request, plaintiff sent an e-mail to employees and

contractors with whom he worked in his salaried scales position notifying them that he would be

resigning from his salaried role in September 2016.  Marshall Depo. at 131-32 and Depo. Ex. 19.

     **Plaintiff's Response: Uncontroverted.**

55.     That same day, plaintiff sent Buelt an e-mail stating he understood from Buelt that

his job duties would be reassigned to Andrew Barthel, another member of the Facilities team, and

---

[6] **BNSF employees who came through the union as hourly employees prior to obtaining salaried positions have the option, provided they continued paying union dues, to return to the hourly workforce, and many employees do so prior to retirement based on an understanding that an hourly employee has more favorable health insurance retirement benefits.  Marshall Depo. at 116-17.**
**Plaintiff's Response: Uncontroverted.**

that Barthel would be receiving a corresponding increase in his pay grade.  Marshall Depo. at 133-34 and Depo. Ex. 20.

     **Plaintiff's Response: Uncontroverted.**

56.     Buelt responded to plaintiff's e-mail and told him he was "incorrect," explaining that Barthel was not told he would receive a pay grade increase, and that plaintiff's duties would not all be transferred to Barthel, as some would be assumed by a contractor.[7]  Marshall Depo. at 135-36 and Depo. Ex. 20.

     **Plaintiff's Response: Uncontroverted that Buelt responded to plaintiff's email and explained why he was "incorrect". Plaintiff further states that the email string, in which Plaintiff explains his point of view as well, speaks for itself. [ECF 40-2, Marshall Depo. Ex. 20. See also email correspondence dated October 7, 2016, from Dwayne Curbow to BNSF-MARSHALL 001038, attached hereto as Plaintiff's Exhibit "F", (stating Plaintiff retired as of October 7, 2016 and that Andrew Barthel, a significantly younger employee was taking over Plaintiff's job responsibilities).]**

     **BNSF's Decision Not to Go Forward with the PIP**

57.     On August 5, 2016, plaintiff attended a meeting with Erika McCubbin, a BNSF human resources manager,[8] during which McCubbin provided plaintiff a letter again addressing his concerns about alleged discrimination and the PIP.  [Marshall Depo. at 140, 144-45 and Depo. Ex. 21].

---

[7] BNSF ultimately transferred the majority of plaintiff's duties to contractors.  *See* Curbow Depo. at 111.
**Plaintiff's Response: Controverted. It is unclear whether or not Defendant intended the majority of Plaintiff's workload to go to outside venders. In October 2016, Dwayne Curbow drafted an email stating that Mr. Marshall had retired and Andrew Barthel would assume Marshall's work load.  [See Plaintiff's Exhibit "F"].**

[8] Cleaver and Reedy left the company in June 2016 shortly after the PIP meeting with plaintiff, and McCubbin later became the human resources contact for plaintiff's division.  Marshall Depo. at 103, 140.
**Plaintiff's Response: Uncontroverted.**

**Plaintiff's Response: Plaintiff does not controvert that he attended an August 5, 2016 meeting with Erika McCubbin, a BNSF human resources manager. Defendant states the August 5 letter provided by McCubbin did not address his concerns about alleged discrimination in the PIP, except to recite BNSF's general policies on discrimination and inform Plaintiff that no such behavior had been found. The letter ended with a statement that its investigation did find some communications that needed to be address. [See Marshall Depo. Ex. 21, MARSHALL000110 - MARSHALL000111, attached hereto as Plaintiff's Exhibit "G"].**

**Uncontroverted that Plaintiff was given a letter addressing his complaint(s) of discrimination. Plaintiff further states that the letter speaks for itself. [ECF 40-2, Marshall Depo. Ex. 21].**

58.     In the letter, McCubbin set out BNSF's policy prohibiting discrimination and stated the company took plaintiff's concerns seriously, but explained that she had "reviewed the facts thoroughly" and had "not substantiated unfair treatment by" Curbow or Buelt.  Marshall Depo. at 144-45 and Depo. Ex. 21.

**Plaintiff's Response: Uncontroverted. Plaintiff states that the letter speaks for itself. [Marshall Depo. Ex. 21]. Plaintiff further states that within the letter, McCubbin failed to identify the ways in which she "reviewed the facts thoroughly" to make any such finding(s). [ECF 40-2, Marshall Depo. Ex. 21].**

59.     McCubbin added, however, that after a review, BNSF had elected not to proceed with the PIP that had been provided to plaintiff in June, and told plaintiff she thought the PIP was "unjust and unfair."[9]  Marshall Depo. at 145 and Depo. Ex. 21.

---

[9] Again, BNSF is presenting these facts in the light most favorable to plaintiff, but McCubbin has been deposed and denied referring to the preliminary PIP as "unjust" or "unfair."

**Plaintiff's Response: Uncontroverted.**

60.     Plaintiff understood that because he never signed off on accepting the PIP, it was never formally issued.  Marshall Depo. at 145; *see also* Marshall Depo. at 121 (Q: "So the PIP was never actually formally issued?"  A: "No.").  *See also* Buelt Depo. at 100 (PIP was "never put into effect").

**Plaintiff's Response: Uncontroverted that the PIP was never formally issued. Plaintiff further states that he believed the only reason Defendant did not formally issue the PIP was because he had already submitted his resignation letter. [ECF 40-2, Marshall Depo. 149:3 – 149:13].**

### Plaintiff's 2016 Mid-Year Performance Evaluation

61.      On August 8, 2016, plaintiff met with Buelt, Curbow, and McCubbin for his 2016 mid-year PMP review.  Marshall Depo. at 161-62.

**Plaintiff's Response: Uncontroverted.**

62.     During the meeting, plaintiff received a letter headed "Performance Expectations." Marshall Depo. at 162-63 and Depo. Ex. 22.

**Plaintiff's Response: Uncontroverted.**

63.     The Performance Expectations document addressed plaintiff allegedly having used disrespectful language and a disrespectful tone toward others, including Buelt, and failing to maintain regular office and working hours.  Marshall Depo. at 163, 165 and Depo. Ex. 22.

**Plaintiff's Response: Uncontroverted to the extent Marshall Depo. Ex. 22 speaks for itself. Plaintiff requests that the Court view DSOF 63 in a light most favorable to Plaintiff.**

---

**Plaintiff's Response: Controverted. See Plaintiff's Response to DSOF 59. Ms. McCubbin did not believe that the PIP was the "proper tool" to address Plaintiff's performance and was not suitable. Plaintiff's Exhibit E, [McCubbin Depo. 23:9 – 23:17].**

Plaintiff disputed the allegations made in Marshall Depo. Ex. 22 by providing Defendant with direct contradictory evidence. Testimony and documents gathered throughout the litigation process has supported Plaintiff's assertion that the contents of the Letter of Expectations are inaccurate, misleading and false.

With respect to Respectful Communications, Erica McCubbin denied that Plaintiff threatened her, yelled at her or cussed at her. [McCubbin Depo. 27:13 – 27:25].  She also confirmed that she was not aware of anybody that supervised Plaintiff in his career spanning almost 4 decades working for BNSF, other than Mr. Curbow and Mr. Buelt, saying that he was aggressive or had loud outburst or that he used inappropriate language. [McCubbin Depo. 29:14 – 2:20].

Mr. Buelt could only recall one incident of Plaintiff using inappropriate language and could not identify anyone advising him that Plaintiff was disrespectful or inappropriate. [ECF 40-3, Buelt Depo. 49:5 – 49:8, 52:2 – 52:11, 82:9 – 82:18, 105:11 – 105:19].

Bruce Stuff, a member of the Facilities department testified he had never seen or heard Plaintiff do anything inappropriate, use inappropriate language, personally attack him, or see Plaintiff get in his or anyone else's face. [Stuff Depo. 48:9 – 48:12, 82:9 – 82:19].

Dwayne Curbow did not begin to allege Plaintiff was inappropriate or unprofessional until after Plaintiff's continued complaints about age discrimination by his management team in his challenge to the PIP. [ECF 40-4, Curbow Depo. 50:6 – 50:10, 54:1 – 54:6]. Further, Mr. Curbow could not identify any examples of Plaintiff using inappropriate language, nor can he recall anyone else making such a complaint (other than Joseph Buelt). [ECF 40-4, Curbow depo. 60:25 – 61:11].

**The Letter of Expectations second concern alleges Plaintiff failed to maintain proper work hours by arriving late, taking lunch and/or leaving work early. [ECF 40-2, Marshall Depo. Ex. 22]. Plaintiff has disputed this allegation multiple times. Plaintiff was an exempt employee and did not have to punch a time clock. [ECF 40-3, Buelt Dep. 108:3 – 108:5]. He provided Defendant with a detailed log of his arrival/departure times, his sick days and his vacation days. Defendant's only support of this concern is Mr. Buelt's inability to find Plaintiff at his cubicle on a handful of occasions. Additionally, Mr. Buelt testified that he did nothing to find out if Plaintiff was out of the office for work requirements or absences due to illness or doctors' appointments. He did not even simply ask Plaintiff before making the unsupported allegations. [ECF 40-3, Buelt Depo. 106:22 – 108:13].**

64.     Plaintiff states that other than the incident in which he acknowledges using "the F word" during a discussion with Buelt, he always used appropriate language, although he agrees his voice can get "elevated," he might "talk louder" when he gets "excited," and that sometimes his discussions with Buelt became "heated."  Marshall Depo. at 163-64.

**Plaintiff's Response: Uncontroverted. Additionally, Plaintiff testified that he has trouble hearing in the left ear due to railroad work.**

65.     Plaintiff denies that he failed to maintain regular hours, and further denies that he was late to work, left work early, or took long lunch breaks.  Marshall Depo. at 165-66.[10]

---

[10] Buelt testified that on multiple occasions he was unable to find plaintiff during regular business hours, and therefore began documenting his arrivals, departures, and times away from the office at Curbow's directive.  Buelt Depo. at 106-07.

**Plaintiff's Response: Uncontroverted that Mr. Buelt testified he began keeping track of Plaintiff's time when he believed Plaintiff was absent from the office during regular business hours because he could not find Plaintiff.**

**Plaintiff states however, that Mr. Buelt testified that he did not recall doing anything to verify Plaintiff was absent, late or leaving work early on any of the documented occasions. [ECF 40-3, Buelt Depo. 106:22 – 107:24]. Mr. Buelt affirmed that Plaintiff was an exempt employee and was not required to punch a time clock. [ECF 40-3, Buelt Depo. 108:3 – 108:5]. He also testified that employees traveled frequently and often need to leave early or arrive early. [ECF 40-3, Buelt Depo. 108:6 – 108:13].**

**Plaintiff's Response: Uncontroverted. See also Plaintiff's Response to DSOF 63.**

66.     The Performance Expectations memo stated that further incidents of the nature set out in the document "may result in progressive disciplinary action up to and including dismissal from employment."  Marshall Depo. at 172-73 and Depo. Ex. 22.

**Plaintiff's Response: Uncontroverted.**

67.     In plaintiff's 2016 mid-year PMP, plaintiff received an overall rating of "needs improvement."  Marshall Depo. at 168 and Depo. Ex. 23.

**Plaintiff's Response: Uncontroverted.**

68.     The mid-year PMP is not used by BNSF to make compensation decisions.  Marshall Depo. at 168.

**Plaintiff's Response: Objection. Defendant's Statement of Fact 68 is not supported by, and misstates, the cited testimony. Controverted. At the time he was hired, Plaintiff was told that evaluations are important because they determine how raises are calculated, especially if an employee received a needs improvement rating on the leadership model. [ECF 40-2, Marshall Depo. 57:24 – 58:7].**

69.     On August 19, 2016, plaintiff wrote to Curbow responding to the Performance Expectations letter and the 2016 mid-year PMP, expressing his disagreement with many of the comments in the two documents regarding his performance and conduct.  Marshall Depo. at 174-75 and Depo. Ex. 24.

**Plaintiff's Response: Uncontroverted, but incomplete. Plaintiff's August 19, 2016 letter to Mr. Curbow included among other things, Plaintiff's complaint of continuing discriminatory and retaliatory behavior by Defendant including that a significant portion of**

**Plaintiff's 2016 mid-year PMP was an exact duplication of the PIP that had been presented to Plaintiff. Defendant rescinded the PIP and replaced it with an Expectations Letter that continued to be based on false and inaccurate allegations. Plaintiff also complained about the failure of his management team to respond in any way to Plaintiff's complaints of age discrimination. The August 19, 2016 letter also includes Plaintiff's notice that although he was planning to retire at age 65, he was forced to retire early based upon the "ongoing harassment, discrimination and retaliation I have suffered at the BNSF…" [ECF 40-2, Marshall Depo. Ex. 24, BNSF-MARSHALL 000116 – BNSF-MARSHALL 000118.**

<u>**Plaintiff's Resignation and Filing of Charge**</u>

70.     On September 22, 2016, plaintiff went forward with his previously announced resignation from his salaried position and returned to an hourly position as a Structures foreman. Marshall Depo. at 176-77.

**Plaintiff's Response: Uncontroverted that Plaintiff left his salaried position with Facilities to return to a scheduled employee position with Defendant. Plaintiff further states that he did return to the craft on this date, but he continued his employment with Defendant up to and including on or about October 3, 2016. [ECF 40-2, Marshall Depo. 33:13 – 33:25]; see also [ECF 40-2, Marshall Depo. Ex. 18].**

71.     Plaintiff remained in the hourly position for eleven days before retiring on October 3, 2016.  Marshall Depo. at 179, 183.

**Plaintiff's Response: Uncontroverted.**

72.     On May 18, 2017, plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission and the Kansas Human Rights Commission alleging age discrimination and retaliation against BNSF.  Pre-Trial Order Stipulated Fact No. 9.

**Plaintiff's Response: Uncontroverted.**

### III.        PLAINTIFF'S STATEMENT OF FACTS ("PSOF")

**PSOF1.**        Plaintiff's last day working for BNSF was on or around October 3, 2016.

**PSOF2.**        Plaintiff dually filed a Charge of Discrimination with the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC") on or about May 16, 2017. [ECF 1-1, Exhibit A to Plaintiff's Federal Complaint].

**PSOF3.**        Plaintiff was issued his Right to Sue letter on or about April 24, 2018. [ECF 1-2, Exhibit B to Plaintiff's Federal Complaint].

**PSOF4.**        Plaintiff filed his Federal Complaint on or about July 23, 2018. [ECF 1, Plaintiff's Federal Complaint].

**PSOF5.**        Plaintiff was born in October of 1956 and is presently 62 years old. [ECF 40-2, Marshall Depo. 10:15 – 10:20].

**PSOF6.**        Plaintiff began working as a full-time hourly employee for BNSF in May 1977 as a Bridge and Builder Helper in Kansas City, Kansas. [ECF 40-2, Marshall Depo. 17:1 – 17:12].

**PSOF7.**        Plaintiff was promoted to a full Bridge and Builder Mechanic in approximately 1980 or 1981. This position included work as a carpenter, welder, assistant foreman and foreman. [ECF 40-2, Marshall Depo. 17:16 – 18:13].

**PSOF8.**        Plaintiff bid on the position of Scale Inspector and was chosen for that promotion in August 2007. [ECF 40-2, Marshall Depo. 19:1 – 19:8].

**PSOF9.**        Plaintiff's Scale Inspector position was a salaried, management position headquartered out of Kansas City, Kansas. [ECF 40-2, Marshall Depo. 19:9-19-15].

**PSOF10.**        As Scale Inspector, Plaintiff was responsible for performing work for Defendant throughout the United States. [ECF 40-2, Marshall Depo.19:19 – 19:23].

PSOF11.    The Scale Inspector position included, but was not limited to, responsibility for testing, inspecting, repairing and working on industrial scales that were used to weigh rail cars. [ECF 40-2, Marshall Depo.21:17 – 21:21].

PSOF12.    In or about 2010, Plaintiff assumed all the track scale duties previously performed by Assistant Director, Don Lozano after Mr. Lozano retired. [ECF 40-2, Marshall Depo. 22:2 – 22:19].

PSOF13.    Plaintiff continued to perform these additional job responsibilities even after a new Assistant Director was hired. [ECF 40-2, Marshall Depo.22:2 – 22:19].

PSOF14.    In or about 2011, Plaintiff wrote a letter to the Assistant Director and Director requesting a salary increase and a job title change based upon the additional job responsibilities. [ECF 40-2, Marshall Depo. 22:2 – 23:1].

PSOF15.    In or about 2013, Plaintiff received a 3.3 percent raise that was retroactive for three months. [ECF 40-2, Marshall Depo. 22:2 – 23:1].

PSOF16.    In or about July 2014, Plaintiff received a position title change to Supervisor, Scales. [ECF 40-2, Marshall Depo. 24:1 – 25:6].

PSOF17.    Ms. Guarino was the Assistant Director Structures Engineering in 2014 – 2015. [See Madlyn Guarino Deposition attached hereto as Plaintiff's Exhibit "H", Guarino Dep. 7:5 – 7:7].

PSOF18.    Ms. Guarino was Plaintiff's direct supervisor from October 2014 to June 2015. [See Plaintiff's Exhibit "H", Guarino Depo. 7:24 – 8:2].

PSOF19.    Between 2007 and 2014, Plaintiff successfully performed the duties of Scale Inspector and Supervisor, Scales, receiving either "meets expectations" or "exceeds expectations" on every mid-year and year-end evaluation and PMP. [See BNSF-

MARSHALL00351 – BNSF-MARSHALL00467, attached hereto as Plaintiff's Exhibit "I" and ECF 40-2, Marshall Depo, 114:1 – 114:24; See also, ECF 40-3].

**PSOF20.** From October 2014 to June 2015, Ms. Guarino had a good understanding of Plaintiff's job duties and responsibilities as Supervisor, Scales in the upkeep and maintenance of BNSF scales. [See Plaintiff's Exhibit "H", Guarino Depo. 8:6 – 8:19].

**PSOF21.** During the period Ms. Guarino was Plaintiff's supervisor, she expected Plaintiff to work "the required hours in order to get the job done sufficiently". [See Plaintiff's Exhibit "H", Guarino's Depo. 28:18 – 28:22].

**PSOF22.** Ms. Guarino rated Plaintiff as "on target" for his 2014 end-of-year Performance Management Plan. [See Plaintiff's Exhibit "H", Guarino Depo. 17:3 – 17:6].

**PSOF23.** Ms. Guarino rated Plaintiff as "on target" for his 2015 mid-year Performance Management Plan. [See Plaintiff's Exhibit "H", Guarino Depo. 7:7 – 7:10].

**PSOF24.** Ms. Guarino found Plaintiff's overall performance to be satisfactory. [See Plaintiff's Exhibit "H", Guarino Depo. 20:17 – 20:19].

**PSOF25.** Ms. Guarino recalls Plaintiff was always respectful to her. [See Plaintiff's Exhibit "H", Guarino Depo. 36:4 – 36:6].

**PSOF26.** In or about June 2015, Plaintiff's position was moved from the Heavy Bridge Team to the Facilities Team. [ECF 40-2, Marshall Depo. 27:6 – 27:15].

**PSOF27.** Mike Herzog informed Plaintiff about his move to the Facilities Group and told Plaintiff that his job would not change. [ECF 40-2, Marshall Depo.29:4 – 29:10].

**PSOF28.** After Plaintiff's transfer, he reported to Joseph Buelt. [ECF 40-2, Marshall Depo. 30:17 – 30:20].

**PSOF29.** In or around August 2015, Buelt informed Plaintiff that he was not to

perform manual labor on the scales. [ECF 40-2, Marshall Depo. 36:12 – 36:19].

**PSOF30.**     Plaintiff had a company-provided vehicle since 2007. [ECF 40-2, Marshall Depo. 40:4 – 40:18].

**PSOF31.**     In or around August 2015, Plaintiff was informed that his company-provided vehicle was being taken away. [ECF 40-2, Marshall Depo. 39:24 – 40:3].

**PSOF32.**     Plaintiff played no role in the decision regarding the vehicle and was provided no explanation as to why the vehicle was being taken away. [ECF 40-2, Marshall Depo. 40:19 – 41:5].

**PSOF33.**     The company-provided vehicle that was taken from Plaintiff was given to Mike Herzog instead. [ECF 40-3, Buelt Depo. 67:1 – 68:1].

**PSOF34.**     Plaintiff was provided with a Procard, which was a card that, in case of emergency or a maintenance situation, allowed him to make timely purchases of materials while testing the scales. [ECF 40-2, Marshall Depo. 44:7 – 45:8].

**PSOF35.**     After Plaintiff's transfer to Facilities and without any explanation, Defendant took away Plaintiff's company issued Procard, which was a card that Plaintiff used to purchase materials. [ECF 40-2, Marshall Depo. 43:4 – 44:3].

**PSOF36.**     Without his Procard, Plaintiff's job was fundamentally changed and, in some circumstances impossible due to delays in obtaining certain materials while performing his job duties. **[**ECF 40-2, Marshall Depo. 45:9 to 46:8; see also ECF 40-2, Marshall Depo. 44:10 – 45:8].

**PSOF37.**     Plaintiff's job duties changed when he transferred to the Facilities group and caused Plaintiff to have additional work to do. [ECF 40-4, Curbow Depo. 110:15 – 111:7].

**PSOF38.**     Plaintiff's supervisors, Buelt and Curbow, made little or no attempt to

understand what Plaintiff's job duties were prior to taking away his Procard and company vehicle. [ECF 40-2, Marshall Depo. Ex. 6].

**PSOF39.**     Plaintiff had a meeting with his supervisors to gain clarity on his new job description. [ECF 40-2, Marshall Depo. 50:4 – 50:11].

**PSOF40.**     Plaintiff did not come out of that meeting feeling any clearer about his job duties, and Defendant refused to provide a new job description to Plaintiff despite his requests [ECF 40-2, Marshall Depo. 50:12 – 50:16].

**PSOF41.**     On or around January 18, 2016, Plaintiff was issued a Performance and Development Review ("PMP"), otherwise known as a year-end performance evaluation. [ECF 40-2, Marshall Depo. 50:19 – 51:5].

**PSOF42.**     Plaintiff received a 'Needs Improvement' rating on Leadership Model and the Hold the Scale project. [ECF 40-2, Marshall Depo. 54:11 – 54:21].

**PSOF43.**     Plaintiff believed that the 'Needs Improvement' rating(s) were inaccurate and unfair, to say the least. [ECF 40-2, Marshall Depo. 54:22 – 55:1].

**PSOF44.**     Plaintiff believed that evaluations, and especially 'Needs Improvement' rating(s), determined how his raises were calculated and, in turn, affected his compensation. [ECF 40-2, Marshall Depo. 57:24 – 58:17].

**PSOF45.**     In or around late 2015, Buelt told Plaintiff that his age was an issue and that he wanted to replace Plaintiff with a younger employee. [ECF 40-2, Marshall Depo. 58:18 – 59:8].

**PSOF46.**     Buelt referenced that Plaintiff was older and would be leaving the company by telling Plaintiff that he wanted Plaintiff to structure his job so that "a 26-year-old new hire can do it". [ECF 40-2, Marshall Depo. 60:16 – 61:5].

PSOF47.    Sometime in 2015 or 2016, Buelt told Plaintiff that he needed to set up his job so that a college kid could come in and manage the program. [ECF 40-3, Buelt Depo. 31:15 – 32:5].

PSOF48.    At the time that Buelt became Plaintiff's supervisor, Plaintiff intended to retire when he was 65 years old, meaning he would work for six and half more years. [ECF 40-2, Marshall Depo. 61:6 – 61:17].

PSOF49.    Buelt had no reason to believe that Plaintiff intended to retire at age 60. [ECF 40-3, Buelt Depo. 17:13 – 17:21].

PSOF50.    Buelt cannot recall Plaintiff ever telling him that he planned to retire in September or October 2016. [ECF 40-3, Buelt Depo. 59:19 – 60:7].

PSOF51.    Plaintiff informed Curbow that he intended to work until he was sixty-five. [ECF 40-4, Curbow Depo. 23:9 – 23:21].

PSOF52.    On or around March 10, 2016, Plaintiff contacted Defendant's benefits company to get an estimate of what his benefits would be if he were to retire. [ECF 40-2, Marshall Depo. 74:14 – 75:21].

PSOF53.    Prior to his retirement, in order to plan his retirement, Curbow contacted Defendant's benefits company to get an estimate of what his benefits would be if he were to retire. [ECF 40-4, Curbow Depo. 119:10 – 119:14].

PSOF54.    Prior to his retirement, Mr. Stuff calculated his retirement benefits in order to see what his benefits would be if he were to retire. [See Deposition of Bruce Stuff, attached hereto as Plaintiff's Exhibit "D", Stuff Depo. 31:12 – 31:21].

PSOF55.    Buelt made it an objective of Plaintiff's for him to maintain a daily log of his job duties. [ECF 40-2, Marshall Depo. 79:6 – 80:12].

**PSOF56.**     Despite Plaintiff's disagreement with the daily log objective set by Buelt, Plaintiff maintained a daily log of his activities beginning on March 1, 2015 forward. [ECF 40-2, Marshall Depo. 111:12 – 111:15].

**PSOF57.**     Despite Plaintiff's disagreement with the daily log objective set by Buelt, Plaintiff showed his daily log(s) to Buelt. [ECF 40-3, Buelt Depo. 106:8 -106:21].

**PSOF58.**     On or around June 16, 2016, Plaintiff submitted the daily logs to Defendant's Human Resources department. [ECF 40-2, Marshall Depo. 112:10 – 112:22].

**PSOF59.**     Buelt did not require any other employee in the Facilities group to maintain a daily log book of their job duties and/or activities. [ECF 40-3, Buelt Depo. 83:6 – 83:12].

**PSOF60.**     Buelt did not have exit plans for Andrew Barthel or Derek Brown, nor did he require Mr. Barthel or Mr. Brown to maintain daily logs, even though it would have helped Mr. Beult and other employees better understand how to carry on the projects. [ECF 40-3, Buelt Depo. 138:11 – 139:12].

**PSOF61.**     Buelt told Plaintiff that he was to handle projects himself and that Mr. Stuff and Mr. Barthel were not to help Plaintiff. [ECF 40-2, Marshall Depo. 88:3 – 88:23].

**PSOF62.**     On or about March 18, 2016, Plaintiff informed his supervisors that he believed Buelt was harassing him due to his age, discriminating against him due to his age, and attempting to get rid of him due to his age. [ECF 40-2, Marshall Depo. 88:24 – 89:15].

**PSOF63.**     Prior to this letter, Plaintiff had informed Mr. Stuff and Mr. Barthel that he believed Buelt was discriminating against him due to his age. [ECF 40-2, Marshall Depo. 89:16 – 89:25].

**PSOF64.**     Mr. Stuff advised Plaintiff that he was worried Buelt would begin treating

him in the same way that Buelt was harassing Plaintiff at the time that Plaintiff retired. [ECF 40-2, Marshall Depo. 89:16 – 89:25].

**PSOF65.**     On or about June 10, 2016, Plaintiff was presented with a Performance Improvement Plan ("PIP") by Buelt, Curbow, and Human Resources representatives, Tamala Cleaver and Sarah Reedy. [ECF 40-2, Marshall Depo. 97:13 – 98:10].

**PSOF66.**     Plaintiff had never heard of any other exempt employee being placed on a PIP. [ECF 40-2, Marshall Depo. 99:6 – 99:9].

**PSOF67.**     Curbow was employed by Defendant for thirty-two years. [ECF 40-4, Curbow Depo. 10:18 – 10:20].

**PSOF68.**     Curbow never placed any other employee on a PIP during his 32-year career with Defendant. [ECF 40-4, Curbow Depo. 120:9 – 120:23].

**PSOF69.**     Ms. Guarino has been employed by Defendant for 17 years. [See Plaintiff's Exhibit "H", Guarino Depo. 6:25 – 7:1].

**PSOF70.**     Ms. Guarino has never placed an employee on a PIP during her 17-year career with Defendant. [See Plaintiff's Exhibit "H", Guarino Depo. 20:17 – 20:19].

**PSOF71.**     Following presenting Plaintiff with the PIP, Cleaver and Reedy provided a letter to Plaintiff stating that his allegations of discrimination and harassment had been found to be unsubstantiated. [ECF 40-2, Marshall Depo. 102:1 – 103:8].

**PSOF72.**     Plaintiff asked Cleaver and Reedy if they thought the issuance of the PIP seemed retaliatory due to his March 18, 2016 complaint of discrimination and harassment. Cleaver and Reedy told Plaintiff that, "yes, it kind of does". [ECF 40-2, Marshall Depo. 105:10 – 106:2].

**PSOF73.**     Following the meeting in which Plaintiff was informed that his allegations

of discrimination and harassment were unsubstantiated, Cleaver and Reedy were terminated and escorted off the property. [ECF 40-2, Marshall Depo. 102:18 – 103:8].

PSOF74.     On or about July 7, 2016, Plaintiff submitted a letter to Defendant, notifying BNSF of his resignation from his Exempt Position and his intention to continue employment with Defendant in a different position and "return to the craft" on September 22, 2016. [ECF 40-2, Marshall Depo. Ex. 18].

PSOF75.     Plaintiff stated that his original plan was to work until he was 65. [ECF 40-2, Marshall Depo. Ex. 18].

PSOF76.     Plaintiff stated that he felt he had no choice but to resign his position as an exempt employee due to the "untenable position" that Defendant placed him in. [ECF 40-2, Marshall Depo. Ex. 18].

PSOF77.     Plaintiff's July 7, 2016 letter was not a definitive notice of resignation and/or retirement, as Plaintiff could have withdrawn his resignation if he had chosen to do so. [ECF 40-2, Marshall Depo. 146:5 – 146:10].

PSOF78.     Plaintiff only began considering retirement after he was presented with the PIP, due to his belief that the PIP was full of lies and due to Defendant's failure to respond to any of Plaintiff's concerns regarding the same. [ECF 40-2, Marshall Depo. 117:24 – 118:10].

PSOF79.     In response to Plaintiff's email attaching his resignation letter, Defendant's Human Resources representative, Courtney Johnson, stated that HR would close out Plaintiff's PIP and send an expectations letter instead. [See McCubbin Depo. Ex. 38, attached hereto as Plaintiff's Exhibit "Z"].

PSOF80.     The PIP also was never formally issued because after reviewing the PIP that Buelt prepared for Plaintiff, Defendant's Human Resources department decided that it

should not be put in place. [ECF 40-2, Marshall Depo. 121:12 – 121:14, ECF 40-3, Buelt Depo. 113:2 – 113:6].

**PSOF81.**     Plaintiff believed that the only reason Defendant did not move forward with the PIP was because he submitted his resignation. [ECF 40-2, Marshall Depo. 148:17 – 149:17].

**PSOF82.**     Ms. McCubbin did not believe that the PIP was the proper tool to address Plaintiff's performance. [Plaintiff's Exhibit "E", McCubbin Depo. 23:9 – 23:17].

**PSOF83.**     On or about July 22, 2016, at the request of Mr. Buelt, Plaintiff sent an email notifying Defendant and its contractors of his return to the craft in September 2016. [ECF 40-2, Marshall Depo. Ex. 19].

**PSOF84.**     On or about August 8, 2016, Plaintiff attended a meeting with Mr. Buelt, Mr. Curbow, and Ms. McCubbin in which he was issued his 2016 mid-year PMP. [ECF 40-2, Marshall Depo. 161:13 – 162:1].

**PSOF85.**     At the August 8, 2016 meeting, instead of the PIP, Plaintiff was issued an expectations letter regarding his performance. [ECF 40-2, Marshall Depo. Ex. 22].

**PSOF86.**     The expectations letter is signed by Curbow. [ECF 40-2, Marshall Depo. Ex. 22].

**PSOF87.**     However, Ms. McCubbin drafted the Letter of Expectations, without help from Buelt or Curbow, and placed it on Curbow's letterhead with his signature. [See McCubbin Depo. Ex. 37, attached hereto as Plaintiff's Exhibit "R"].

**PSOF88.**     The Letter of Expectations stated that Plaintiff could be subjected to progressive disciplinary action, up to and including dismissal. [ECF 40-2, Marshall Depo. Ex. 22].

**PSOF89.**    On or about August 11, 2016, Defendant's upper management exchanged emails regarding Plaintiff's whereabouts, as he was not present in the Kansas City, Kansas office and they were worried about him due to his disagreement with the negative mid-year PMP and Expectations Letter from August 8, 2016. [See BNSF-MARSHALL001298, attached hereto as Plaintiff's Exhibit "J"].

**PSOF90.**    Defendant checked its electronic logs for Plaintiff and was ready to request a well-being check by the authorities; however, they found out that he was out of the office due to a pre-scheduled work trip. [See BNSF-MARSHALL001344 – BNSF-MARSHALL001346, attached hereto as Plaintiff's Exhibit "K"].

**PSOF91.**    On or about August 19, 2016, Plaintiff submitted a letter to Mr. Curbow, Ms. McCubbin, and Mr. Rasmussen responding to his 2016 mid-year performance review in which Plaintiff expressed his disagreement with certain aspects of the PMP. [ECF 40-2, Marshall Depo. 174:24 – 175:15; ECF 40-2, Marshall Depo. Ex. 24].

**PSOF92.**    Plaintiff never received any response to the concerns within his letter from Mr. Curbow, Mr. Rasmussen, or Ms. McCubbin. [ECF 40-2, Marshall Depo. 175:16 – 175:24].

**PSOF93.**    On or about August 22, 2016, Plaintiff notified BNSF employees and outside vendors that he was resigning from his exempt position and returning to the craft on September 22, 2016. [See BNSF-MARSHALL00999 – BNSF-MARSHALL001000, attached hereto as Plaintiff's Exhibit "L"].

**PSOF94.**    Plaintiff informed the employees and vendors that Defendant was reassigning his job duties, or a significant portion of his job duties, to Andrew Barthel. [See Plaintiff's Exhibit "L", BNSF-MARSHALL00999 – BNSF-MARSHALL001000].

**PSOF95.**    Plaintiff was further required to train Mr. Barthel so that he would be

prepared to assume Plaintiff's duties upon Plaintiff's return to the craft.

PSOF96.     Plaintiff was tasked with meeting multiple requirements prior to his return to the craft position as a Structures Foreman, including but not limited to additional training, a background check, and confirmation of his motor vehicle license qualifications. [See BNSF-MARSHALL00895 – BNSF-MARSHALL00906, attached hereto as Plaintiff's Exhibit "M", See also ECF 40-2, Marshall Dep. 128:6 - 128:14].

PSOF97.     On or about August 26, 2016, Plaintiff accessed Defendant's benefits information which included information regarding retirement.

PSOF98.     On or about September 1, 2016, Defendant's upper management began exchanging emails regarding Plaintiff's return to the craft and his new position. [See BNSF-MARSHALL00943 – BNSF-MARSHALL00958, attached hereto as Plaintiff's Exhibit "N"].

PSOF99.     On or about September 2, 2016, Defendant completed the Motor Vehicle Certification of Violations for Plaintiff. [See BNSF-MARSHALL00319, attached hereto as Plaintiff's Exhibit "O"].

PSOF100.     On or about September 2, 2016, Defendant ran a background check on Plaintiff. [See BNSF-MARSHALL00320 – BNSF-MARSHALL00325, attached hereto as Plaintiff's Exhibit "P"].

PSOF101.     On or about September 13, 2016, Plaintiff emailed Ms. McCubbin asking if he needed to submit any information to Human Resources regarding his return to the craft. [See BNSF-MARSHALL00985 – BNSF-MARSHALL00986, attached hereto as Plaintiff's Exhibit "Q"].

PSOF102.     Defendant, through Randy Planchon, created the Structures foreman position for Plaintiff. [ECF 40-2, Marshall Depo. 177:16 – 178:20].

**PSOF103.**      On or about September 22, 2016, Plaintiff returned to the craft as a Structures Foreman. [ECF 40-2, Marshall Depo. 176:24 – 177:14].

**PSOF104.**      Defendant did not provide Plaintiff with any work to do while he was in the position of a Structures Foreman. [ECF 40-2, Marshall Depo. 179:17 – 179:25].

**PSOF105.**      Plaintiff's return to the craft was neither an immediate nor an automatic process.

**PSOF106.**      On August 22, 2016, Plaintiff sent an email to BNSF employees and outside vendors that he was resigning his exempt position and returning to the craft on September 22, 2016. The notification also stated that BNSF would be reassigning Plaintiff's duties to Andrew Barthel. [See Plaintiff's Exhibit "L"].

**PSOF107.**      Defendant has created a culture in which its employees and management assume that employees, both exempt and non-exempt, will retire after reaching the age of 60 years old and attaining 30 years of service. [ECF 40-3, Buelt Depo. 16:6 – 16:16, 63:17 – 63:23; Plaintiff's Exhibit "D", Stuff Depo. 36:15 – 37:5].

**PSOF108.**      Plaintiff's direct supervisor, Joseph Buelt, testified that when an employee nears the age of retirement, Defendant asks that employee if they have an exit plan, retirement plan and if he/she knows the date they will retire. [ECF 40-3, Buelt Depo. 16:6 – 16:16].

**PSOF109.**      Buelt further testified that he has seen very few railroaders work past the date reach age 60 and with attain 30 years of service. [ECF 40-3, Buelt Depo. 63:17 – 63:23].

**PSOF110.**      Bruce Stuff, one of Plaintiff's co-workers on the Facilities team also testified that a lot of employees retire with 30 years of service and at the age of 60. [Plaintiff's Exhibit "D", Stuff Depo. 36:15 – 37:5].

**PSOF111.**      Mr. Stuff also testified that he just assumed Plaintiff was 60 years old and

wanted to retire. [Plaintiff's Exhibit "D", Stuff Depo. 36:10 – 37:14].

PSOF112.    In addition, during depositions it was learned, that since Plaintiff's departure, Curbow retired at 60 years and 6 months and Stuff retired at age 60. [See ECF 40-4, 9:21 – 9:23].

PSOF113.    Dwayne Curbow, Plaintiff's Director and Mr. Buelt's immediate supervisor made several comments in Buelt's evaluation regarding younger employees and not including Plaintiff in his plans for the future. [See BNSF-MARSHALL 000573 – BNSF-MARSHALL 000580, Stuff Depo. Ex. 25, attached hereto as Plaintiff's Exhibit "S"; see also ECF 40-3, Buelt Depo. at 131:15-131:23].

PSOF114.    Plaintiff's employment history with Defendant shows that he regularly took on additional responsibilities and projects that were identified by either himself or his previous supervisors with enthusiasm. [ECF 40-2, Marshall Depo. Ex. 8].

PSOF115.    Plaintiff's employment history does not contain any allegations of violence, or unprofessionalism. [ECF 40-4, Curbow Depo. 31:13 – 31:23].

PSOF116.    At the time of his transfer to the Facilities Department in June 2015, Plaintiff was the oldest employee in the group. [DSOF 37 and ECF 40-2, Marshall Depo. Ex. 13].

PSOF117.    Almost immediately after the transfer, Buelt, Plaintiff's new supervisor, started focusing on how and when Plaintiff could be replaced by a younger employee. [ECF 40-2, Marshall Depo. Ex. 13, BNSF-MARSHALL 000089 – BNSF-MARSHALL 000090].

PSOF118.    In the Facilities Group, Plaintiff was assigned to work for managers that knew nothing about his job. [ECF 40-3, Buelt Depo. 11:13 – 11:22; ECF 40-4, Curbow Depo.

PSOF119.    In fact, Buelt never discussed Plaintiff's job duties with his prior

supervisor. [Plaintiff's Exhibit "H", Guarino Depo. 25:20-25:22].

**PSOF120.** Without knowing his job duties and workload, Plaintiff's new management team made significant changes to the job, including taking away the tools necessary for him to perform his job, including his company truck, taking the company credit card and transferring work to Plaintiff that had been handled by another employee for years without giving him any instruction or direction.

**PSOF121.** If Plaintiff asked questions it was met with hostility, accusations of incompetence and allegations that ""he's very resistant to change"". [Plaintiff's Exhibit "T", BNSF001361].

**PSOF122.** The Performance Improvement Plan (PIP) given to Plaintiff in June 2016 had various unsupported requirements expectations not required for other employees, including, among other things, allegations that Plaintiff had "aggressive behavior", "loud outbursts" and made "personal attacks towards employees". [ECF 40-2, Marshall Depo. Ex. 15]. Defendant's earlier draft of the PIP contained additional allegations considered by Defendant. [See BNSF-MARSHALL 001171 – BNSF-MARSHALL 001183, attached hereto as Plaintiff's Exhibit "U"].

**PSOF123.** Defendant never provided Plaintiff with any explanation of how his job duties would change. Buelt admits that he never put together any information or directions explaining how his job duties were going to change. [Buelt 31:2-31:6].

**PSOF124.** In fact, during Buelt's first meeting with Plaintiff, Buelt asked Plaintiff when he planned to retire.

**PSOF125.** Defendant evaluated Plaintiff as "needs improvement" based upon Defendant's characterization of Plaintiff as ***obstinate***, ***very resistant to change***, and ***inability to modernize his skill set***. [BNSF-MARSHALL 0001357 – BNSF-MARSHALL 001361, attached

hereto as Exhibit "T"]. Additionally, Buelt and Curbow were having discussions about creating a plan for Plaintiff leaving his position. [Buelt 27:23-28:3].

PSOF126.    Defendant also lowered Plaintiff's score on the alleging he was to stop performing the manual labor associated with the essential functions of his job duties and responsibilities. [Plaintiff's Exhibit "T"]

PSOF127.    Plaintiff responded to his 2015 year-end review with a 5-page letter to address the misstatements, mischaracterizations and mistruths contained in the Review. Plaintiff complained that the review was a "stain on his record". [Plaintiff's Response to DSOF 27; ECF 40-2. Marshall Depo. Ex. 13, BNSF-MARSHALL 000089 – BNSF-MARSHALL 000090].

PSOF128.    Although the letter does not specifically mention age, Plaintiff reasonably construed from Mr. Buelt's numerous comments, the removal of benefits and fundamental changes to his job description and Defendant's negative review of his performance were discriminatory actions based on Plaintiff's age. Plaintiff received no response to his complaint letter, and it was never addressed by Defendant [ECF 40-2. Marshall Depo. Ex. 13]

PSOF129.    On or about February 26, 2016, Mr. Buelt met with Plaintiff about his 2016 Performance Management Plan and his objectives for 2016. [ECF 40-2. Marshall Depo. Ex. 13]. By this time, Mr. Buelt had supervised Plaintiff for approximately eight (8) months and had been in contact on an almost daily basis regarding the details and performance of Plaintiff's job duties. [ECF 40-2. Marshall Depo. Ex. 13].

PSOF130.    Plaintiff believed this requirement to be discrimination and harassment based upon his age, and during the meeting he expressed his distress at the situation by asking Mr.

Buelt, "are you fucking with me?"". [ECF 40-3. Buelt Depo. 27:7 – 27:14 (Buelt recognized that Plaintiff was expressing his concerns)]. This was the first and only time Plaintiff has used a curse word as an exempt employee. [40-2, Marshall Depo. 81:18 – 82:2].

**PSOF131.**    Plaintiff's letter cited specific examples of discrimination and harassment based upon age, including the removal of his vehicle and Procard benefits, humiliating Plaintiff in front of other employees regarding his workload, and including false accusations and allegations on his 2015 Performance Development Review and performance of his job duties. [ECF 40-2, Marshall Depo. Ex. 13, BNSF-MARSHALL 000089 – BNSF-MARSHALL 000090].

**PSOF132.**    Plaintiff's March 2016 letter also included his complaint regarding Buelt's ongoing allegations and false belief allegation that Plaintiff wasted time and did not have enough to do. Buelt repeated in front of Plaintiff and other employees that ""[W]e know you don't have enough to do. *We know!*"" [ECF 40-2, Marshall Depo. Ex. 13, BNSF-MARSHALL 000089 – BNSF-MARSHALL 000090].

**PSOF133.**    Mr. Buelt later testified that he had no basis on which to make that claim and never asked Plaintiff about his workload. [ECF 40-3, Buelt Depo. 91:11 – 92:1].

**PSOF134.**    Plaintiff's March 2016 complaint was forwarded to Defendant's Human Resources department for investigation. Instead of actually investigating Plaintiff's age complaint, Defendant quickly began focusing on Plaintiff's job performance and unsupported allegations from Plaintiff's management team regarding Plaintiff's behavior.

**PSOF135.**    On or about April 12, 2016, Mr. Buelt provided a statement in response to a series of questions asked by Human Resources during its investigation of Plaintiff's complaint

about age discrimination. [Buelt Depo. Ex. 26, BNSF-MARSHALL –001357 – BNSF-MARSHALL 001361].

**PSOF136.** Defendant's Human Resources included questions about Plaintiff's behavior and performance as further discrimination and retaliation against Plaintiff for making his age complaint. For example, HR asked Buelt if Plaintiff ""had ever blown up on him."" [Plaintiff's Exhibit "T", Buelt Depo. Ex. 26, BNSF-MARSHALL –001357 – BNSF-MARSHALL 001361].

**PSOF137.** Buelt took this opportunity to include nearly 2 pages of accusations against Plaintiff. [Plaintiff's Exhibit "T", Buelt Depo. Ex. 26, BNSF-MARSHALL –001357 – BNSF-MARSHALL 001361].

**PSOF138.** Buelt alleged again that Plaintiff was resistant to change, that he voiced his opinions and pushed back when given activities he did not agree with. He also alleged that Plaintiff was prone to outbursts and that Plaintiff had guns. [Plaintiff's Exhibit "T", Buelt Depo. Ex. 26, BNSF-MARSHALL –001357 – BNSF-MARSHALL 001361].

**PSOF139.** During his deposition, Buelt testified that he identified Plaintiff as an employee who had the potential to be violent in the workplace. [ECF 40-3, Buelt Depo. 48:1 – 48:11].

**PSOF140.** Buelt also told Curbow about his belief that he believed that Plaintiff had the traits that could lead to violence in the workplace. [ECF 40-3, Buelt Depo. 47:12 – 47:15].

**PSOF141.** Curbow then testified that he told his wife if anything happened to him at work, she should tell the police to look at Plaintiff. [ECF 40-4, Curbow Depo.

**PSOF142.**     Both Buelt and Curbow denied feeling intimidated or in fear of Plaintiff.

**PSOF143.**     Neither Buelt nor Curbow reported Plaintiff as a potentially violent employee, and neither Buelt nor Curbow referred Plaintiff to any BNSF's Employee Assistance Program.

**PSOF144.**     In addition, Plaintiff's co-workers denied witnessing any inappropriate, violent, or intimidating behavior by Plaintiff during his time in the Facilities Group. [Plaintiff's Exhibit "D"].

**PSOF145.**     Further, in Mr. Buelt's response to HR''s set of questions, he states that Plaintiff told him the first day that they met that he was going to retire in September or October 2016. [Plaintiff's Exhibit "T", Buelt Depo. Ex. 26, BNSF-MARSHALL –001357 – BNSF-MARSHALL 001361].

**PSOF146.**     On April 12, 2016, HR met with Plaintiff regarding his complaints of harassment and discrimination based upon age. During the meeting, Sarah Reedy, HR, told Plaintiff that she did not believe ""he had a case."" [ECF 40-2, Marshall Depo. Ex. 2].

**PSOF147.**     Later that day, HR provided Plaintiff a draft of his statement and allowed Plaintiff to make changes and additions to the document. [ECF 40-2, Marshall Depo Ex. 14].

**PSOF148.**     In the statement, Plaintiff reiterated that he felt he was being forced into retirement based upon his age. [ECF 40-2, Marshall Depo Ex. 14].

**PSOF149.**     Instead of addressing Plaintiff's complaint, Defendant presented Plaintiff with a Performance Improvement Plan. [ECF 40-2, Marshall Depo. Ex. 5].

**PSOF150.** The PIP continued to include the same allegations against Plaintiff that he had opposed in multiple written complaints about harassment and discrimination.

**PSOF151.** Plaintiff provided his response to the PIP on June 17, 2016. Later that day, Plaintiff received a meeting request to attend a meeting to address his response to the PIP.

**PSOF152.** Buelt is "…six foot four, three hundred pounds." [ECF 40-3, Buelt Dep. 54:13-54:14].

**PSOF153.** Buelt understood and testified that his size can be "intimidating" and "imposing" and that he needed to watch what he said. [ECF 40-3, Buelt Dep. 54:15-54:19].

**PSOF154.** Buelt further testified that Plaintiff could have remained in his position another three to five years. [ECF 40-3, Buelt Dep. 153:14-153:19].

**PSOF155.** "[BNSF's] expectation is that you work an eight-hour day when you're in the office" [ECF 40-3, Buelt Dep. 108:6-108:13] and based solely on his purported observations of attendance issues, Buelt recommended that Plaintiff be required to work 9-hour days. [See BNSF001173, attached hereto as Plaintiff's Exhibit "U"].

**PSOF156.** Buelt testified that "[n]ormal office hours are from eight to four thirty. We ask people because we travel extensively that if you need to come in earlier and leave earlier, it's okay, but our expectation is that you work an eight-hour day when you're in the office." [ECF 40-3, Buelt Dep. 108:6-108:13].

**PSOF157.** Plaintiff's prior manager, Guarino, testified that she could not recall Plaintiff not working full days. She further testified that she was unaware of any exempt employees being required to work a minimum of nine hours per day. [Plaintiff's Exhibit "H", Guarino Dep. 29:12-29:15].

**PSOF158.** BNSF claimed that it had taken appropriate action to correct Buelt's

behavior and said. In fact, HR found that Buelt's "leadership issues" would be addressed in a PIP. However, Buelt testified that he was never counseled or coached or disciplined for issues with Mr. Marshall". [ECF 40-43, Buelt Dep. 130:10-130:12].

**PSOF159.** BNSF''s position statement to the EEOC said that "[I]n the following weeks, Manager McCubbin completed her review of Manager Reedy's investigation of the March and April internal complaints and of Mr. Marshall's June retaliation complaint." [See BNSF-MARSHALL 000059 – BNSF-MARSHALL 000072 at BNSF-MARSHALL 00069].

**PSOF160.** Notably, during her employment with BNSF, Erika McCubbin never conducted an investigation for BNSF in which she found discrimination, harassment or retaliation. [Plaintiff's Exhibit "E", McCubbin Dep. 8:17-9:6].

**PSOF161.** She did not testify to investigating Plaintiff's complaints, she testified that she investigated concerns about Plaintiff's "performance improvement plan.". [Plaintiff's Exhibit "E", McCubbin Dep 14:19-14:23]. When asked ""[d]id you do any investigation into the complaint that Joe Marshall made that he believed he was being discriminated, harassed or retaliated against?"" Her response was, ""I don't *recall* the specifics."" [Plaintiff's Exhibit "E", McCubbin Dep 14:24-15:3].

**PSOF162.** "And then the very first meeting I had with Dwayne Curbow, he told me, he said well, we'll find something for you to do, like they didn't think I had a job or that I did anything. I mean, it started immediately." [ECF 40-2, Marshall Dep. 200:4-200:14].

**PSOF163.** Prior to his transfer to Facilities, Plaintiff received either "meets expectations" or "exceeds expectations" on every mid-year and year-end evaluation and Professional Management Process ("PMP"). [ECF 40-2, Marshall Depo, 114:1 – 114:24].

## IV.        SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a moving party is entitled to summary judgment only if the movant shows there is no genuine dispute as to any material issue of fact.  In so doing, all facts and reasonable inferences that can be drawn from facts are to be construed in the light most favorable to the non-moving party.  *Jurasek v. Utah State Hosp.*, 158 F.3d 506 510 (10th Cir.  1998). The party moving for summary judgment must demonstrate its entitlement therefore beyond a reasonable doubt.  *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.  1993). The non-moving party must present sufficient probative evidence to establish a good faith basis in fact to support its allegations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 107 S. Ct. 2505, 91 L.Ed.2d 2202 (1986).

"On a motion for summary judgment, a moving defendant does not establish its prima facie entitlement to judgment as a matter of law by merely pointing to gaps in the plaintiff's case. The *moving defendant must affirmatively demonstrate the merit of its claim or defense*". *UB Distributors, LLC v. S.K.I. Wholesale Beer Corp.*, 76 N.Y.S.3d 608, 609 (App. Term 2d Dep't 2d, 11th & 13th Dists. May 16, 2018)[11]. "In light of the defendants' failure to meet their prima facie burden, we agree with the Supreme Court's determination to deny their motion for summary judgment, *regardless of the sufficiency of the plaintiff's opposition papers*". *Id.*

In discrimination cases, where intent and credibility issues are inherent, summary judgment standards should be applied strenuously. *Stewart in Swenson v. Lincoln County School District 2*,

---

[11] "Here, the defendants failed to establish their prima facie entitlement to judgment as a matter of law. *While the defendants submitted the deposition transcripts of their two principals and warehouse manager in which those witnesses denied that the defendants engaged in a double-redemption scheme, those witnesses also testified that the defendants kept no records of their container redemption transactions or records of a "cashbox" they used to pay some of their redemption expenses*. Those witnesses offered vague and conflicting testimony as to why the defendants' redemption volume fell so drastically around the time prosecutors acted on the double-redemption scheme on Long Island. *Where, as here, conflicting inferences can be drawn from the evidence and issues of credibility exist, summary judgment is inappropriate*". *UB Distributors, LLC v. S.K.I. Wholesale Beer Corp.*, 76 N.Y.S.3d 608, 609-10 (App. Term 2d Dep't 2d, 11th & 13th Dists. May 16, 2018) (emphasis added) (see Bykov v. Brody, 150 A.D.3d 808, 809, 51 N.Y.S.3d 900; Vanderhurst v. Nobile, 130 A.D.3d 716, 717, 13 N.Y.S.3d 231; Cortale v. Educational Testing Serv., 251 A.D.2d 528, 531, 674 N.Y.S.2d 753).

260 F.Supp.2d 1136 (D. Wyo. 2013). At summary judgment, even the uncontradicted testimony of interested witnesses supporting the employer, should not be considered or otherwise weighed. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149-151 (2000). A Court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer. *Washington v. Davis*, 426 U.S. 1229, 242 (1976). "The Court is not to weigh the credibility of witnesses at the summary judgment stage." *Fugett v. Security Transport Services, Inc.*, 147 F.Supp.3d 1216, 1238 (D. Kan. 2015). However, "[a] fact finder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 147 (2000).

## V.     ARGUMENT AND AUTHORITY

The ADEA's purpose is "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). The ADEA specifically prohibits discrimination in employment against persons 40 and above because of age. *See* 29 U.S.C.A. §§ 623(a)(1), 631(a). Unless a plaintiff has direct evidence of discrimination, indirect or circumstantial evidence of discrimination is considered using the McDonnell Douglas burden-shifting analysis. *Webber v. Mid-Kansas Pediatric Assocs.,* P.A., No. 15-1285-GEB, 2016 U.S. Dist. LEXI 159704, *21-22 (D. Kan. Nov. 17, 2016). Under this framework, the plaintiff must first demonstrate a prima facie case of discrimination. *Id.* Once the plaintiff has established a prima facie case, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination." *Id*. If the defendant does so, the burden shifts back to the plaintiff, to show that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

A plaintiff can establish a prima facie case of age discrimination "by showing (1)

membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012) (citing *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007)).

## A.   Plaintiff's claims are timely.

All of Plaintiff's claims, including his constructive discharge claim, are timely, and he has exhausted his administrative remedies as required by law. [PSOFs 1-4]. Defendant reliance on *Green v. Brennan,* 136 U.S. 1769 (2016), is misplaced. Defendant argues that "standing alone" *Green* requires the Court to find Plaintiff's statute of limitations on his constructive discharge claim has run. In *Green* the Court found that "a constructive-charge claim accrues – and the limitations period begins to run – when the employee gives notice of his resignation, not on the effective date of that resignation." *Id.* at 1782. *Most importantly*, the Court declined to decide what constituted plaintiff's actual notice of resignation. *Id.*, and the case was remanded back to the Tenth Circuit. On remand, the Tenth Circuit found the earlier date relied upon by Defendant was incorrect, because Plaintiff continued to have the option of continuing his employment with Defendant in a subsequent/different position. Based on that finding, the Tenth Circuit vacated the portion of its holding that found the constructive-discharge untimely, reversed summary judgment in favor of defendant and remanded the case to the District Court on the issue of constructive-discharge. *Green v. Brennan*, (D.C. No. 1:10-CV-02201) (D. Colo. Oct. 2016).

### 1.   Plaintiff did not resign from BNSF on July 7, 2016.

On July 7, 2016, Plaintiff sent a letter stating that, on September 22, 2016, he intended to leave his exempt position with BNSF and "return to the craft" and retire **_at some point._** Plaintiff's letter did not give notice that he was ending his employment relationship with Defendant. [PSOFs 74-77]. Plaintiff's letter, further, was not a definitive notice of resignation and/or retirement

because Plaintiff could have chosen to continue his employment with Defendant, and, in fact, did continue his employment with Defendant as Structures Foreman. [PSOFs 74-77].

    **2.**    **Returning to the craft was neither immediate nor automatic.**

Plaintiff's return to the craft was neither an immediate nor an automatic process. [PSOFs 96 - 103]. Defendant identified multiple requirements that Plaintiff had to meet prior to being eligible to return to the craft, including, but not limited to, participating in additional training, a background check and confirmation of his motor vehicle license qualifications. [PSOFs 96 - 103]. Additionally, Plaintiff's "return to the craft" was by no means a certainty as of July 7, 2016 or even by early September 2016. In fact, there was no position available for him as of July 7, 2016.

    **3.**    **Defendant's actions after Plaintiff's letter dated July 7, 2016 evidence its expectation that Plaintiff would continue his employment with BNSF.**

Following Plaintiff's July 7, 2016 letter, both parties' actions evidence an expectation that Plaintiff's employment with Defendant would continue. The PIP given to Plaintiff on June 10, 2016, warns that "[f]ailure to meet these specified requirements could result in additional disciplinary action up to and including ***dismissal from your exempt status***." [ECF 40-2, Marshall Depo. Ex. 15].

On August 8, 2016, Defendant, including specifically Joe Buelt, Dwayne Curbow and Erika McCubbin, held a meeting with Plaintiff to discuss his 2016 mid-year Performance Management Plan. [DSOFs 41, 42]. At the end of the meeting Defendant's Human Resource representative, Erika McCubbin, presented Plaintiff with a Letter of Expectations. Although the letter contained a signature block for Dwayne Curbow, it was drafted and finalized by Erica McCubbin, Human Resources. [PSOFs 84 – 88; See Plaintiff's Exhibit "R", BNSF-MARSHALL00853 – BNSF-MARSHALL00855. The letter ***included a last sentence advising Plaintiff that if he did not meet the expectations, he could be disciplined up to and including***

**_dismissal from employment._** It went on to state: [**_I] am fully confident in your ability to perform_**

**_your duties and responsibilities in the future._** [PSOF 87 and Plaintiff's Exhibit "R"] If Defendant

believed that Plaintiff had given notice of his retirement or resignation from employment with

Defendant, then the Letter of Expectations would have been unnecessary.

Although the difference between "dismissal from your exempt status" and "dismissal from

employment" is subtle, it is significant because it shows that both parties understood the difference

between Plaintiff leaving his exempt position and Plaintiff leaving his employment altogether.

It was not until August 19, 2016, at the earliest, that Plaintiff announced his resignation

from BNSF. On that day, Plaintiff provided his written response to the 2016 mid-year PMP given

to him on August 8, 2016. [See Plaintiff's Response to DSOF 69]. Plaintiff's response stated:

> Based on the ongoing harassment, discrimination and retaliation I have suffered at
> the BNSF *I have been forced to exercise my option and retire from the BNSF*. I
> had planned on working until age 65 but the situation has become untenable.

[See Plaintiff's Response to DSOF 69 and ECF 40-2, Marshall Depo. Ex. 24]. Plaintiff's August

19, 2016 letter was copied on Craig Rasmussen, AVP Engineering Services & Structures, Erika

McCubbin, Human Resources and Plaintiff's Personnel file. [ECF 40-2, Marshall Depo. Ex. 24].

On August 22, 2016, Plaintiff sent an email to that he was resigning his exempt position

and returning to the craft on September 22, 2016. The notification also stated that BNSF would be

reassigning Plaintiff's duties to Andrew Barthel. [PSOFs 93 - 94].

On September 1, 2016, in anticipation of Plaintiff beginning his position in the craft,

Defendant begins an email discussion regarding Plaintiff's new position. [PSOF 98]. On

September 2, 2016, Defendant prepared for Plaintiff to return to the craft and perform his job as

Structures Foreman by completing a Motor Vehicle Certification of Violations for Plaintiff. [PSOF

99]. That day, Defendant prepared for Plaintiff to return to the craft by performing a background

check on Plaintiff. [PSOF 100].

Defendant provided Plaintiff with a date and place to report as Structures Foreman on September 22, 2016; however, Defendant did not give Plaintiff any work to complete and isolated him. [PSOF 104].

It is evident by the actions of both parties, that both Plaintiff and Defendant expected Plaintiff to continue his employment with Defendant past September 22, 2016 with no set date for his actual retirement until sometime in late September 2016. Plaintiff asserts that the date of Plaintiff's definitive notice of resignation and/or retirement from his employment with Defendant is a genuine issue of material fact that must be decided by the trier of fact.

### 4.    Defendant's acts were continuing violations as part of a pattern or routine practice of discrimination based upon age.

Filing an EEOC charge within the statutory time limit is not a jurisdictional prerequisite to filing a civil lawsuit. Instead, a plaintiff's failure to file a timely EEOC charge permits a defendant only an affirmative defense, subject to waiver, estoppel and equitable tolling. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 at 392, 398 (1982). In *Lincoln v. BNSF*, 900 F.3d 1166 (10th Cir. 2018), the Tenth Circuit, en banc, found that a plaintiff's failure to exhaust administrative remedies before bringing a Title VII, ADA or Age Discrimination in Employment Act claim does not deprive a federal court of jurisdiction over the claim. *Id.* at 1185-86.

Although generally a Plaintiff cannot maintain an ADEA action for discriminatory acts that occurred more than 300 days before filing a charge, unless the Plaintiff can show that a violation extended into the statutory period. *Bruno v. Western Elec. Co.*, 829 F.2d 957, 960 (10th Cir. 1987). Here, Defendant's behavior centered around its desire for Plaintiff to retire at age 60. Plaintiff's complaints were about age discrimination. When his complaints were supposed to be investigated, Defendant investigated Plaintiff's performance, and, each time, found no discrimination and penalized Plaintiff with the intent to force him to retire.

Defendant's illegal discriminatory and retaliatory behavior is a continuing violation and demonstrates a pattern or practice of discrimination against employees based upon age. Defendant has created a culture in which its employees and management assume that employees, both exempt and non-exempt, will retire after reaching the age of 60 years old and attaining 30 years of service. [PSOFs 107 - 112]. Plaintiff's direct supervisor, Joseph Buelt, testified that when an employee nears the age of retirement, Defendant asks that employee if they have an exit plan, retirement plan and if he or she knows the date they will retire. [PSOF 108]. Buelt further testified that he has seen very few railroaders work past age 60 with 30 years of service. [PSOF 109]. Bruce Stuff, on the Facilities team, also testified that a lot of employees retire with 30 years of service and at the age of 60. [PSOF 110]. Stuff also testified that he just assumed Plaintiff was 60 years old and wanted to retire. [PSOF 111]. In addition, during depositions it was learned, that since Plaintiff's departure, Curbow retired at 60 years and 6 months and Stuff retired at age 60. [PSOF 112].

Plaintiff asserts that it is a genuine issue of material fact whether Defendant engaged in a pattern or routine practice of making employment decisions based on the assumption that its employees will retire at age 60. And, as part of its practice it forced Plaintiff out.

In addition, July 7, 2016, 15 minutes after HR received Plaintiff's email giving "notice that he plans to go back to the craft, Courtney Johnson sent an email to Monique Robinson, Craig Rasmussen and Erika McCubbin stating "Erika will close out the complaint with Mr. Marshall and send you the expectation letter to review this week." [PSOF 79]. Drawing all inferences in Plaintiff's favor, the evidence supports an inference that the investigations involving Plaintiff were, in fact, investigations into his performance and for the purpose of forcing him into resigning.

**B.    Defendant discriminated against Plaintiff based upon his age in violation of the ADEA**

**1.    Plaintiff was constructively discharged.**

"To prove a constructive discharge [under Title VII], an employee must show that the

employer deliberately created intolerable working conditions with the intention of forcing her to quit." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010). The employer can render working conditions intolerable through inaction as well as action. *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 617 (8th Cir. 2000). "If an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge." *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 574 (8th Cir. 1997).

Plaintiff has alleged that Defendant discriminated, harassed, retaliated and created a hostile work environment based on his age, that under the totality of the circumstance, any reasonable person could find Plaintiff was constructively discharged. There are numerous examples of behavior that – *in the light most favorable to Plaintiff* – infers that it was motivated by Plaintiff's age:

- Plaintiff was the oldest employee in the Facilities Group. [DSOF 37].

- Continuing to ask Plaintiff when he planned to retire starting on his first day in the Facilities Group.

- "And then the very first meeting I had with Dwayne Curbow, he told me, he said well, we'll find something for you to do, like they didn't think I had a job or that I did anything. I mean, it started immediately." [PSOF 173, ECF 40-2, Marshall Depo. 200:4-200:14].

- Telling Plaintiff to structure his position so that a "college kid" could do it. Making the comments both to Plaintiff directly and during a conference call with contractors. [PSOF 47; Plaintiff's Response to DSOF 28 and footnote; ECF 40-3, Depo. Buelt 57:17-57:20; ECF 40-2, Marshall Depo. 95:2 – 96:7].

- Continuing to ask Plaintiff to create an "exit plan". [PSOF 108]; [ECF 40-3, Buelt Depo. 16:17-17:3]. As Buelt testified, "we were going through what happens if Joe decides to leave the company, where does it leave the company? As managers we have to plan for five, ten, fifteen, twenty years down the road." [ECF 40-3, Buelt Depo. 40:24-41:4]. Buelt did not ask younger employees to do the same. [PSOF 60; ECF 40-3, Buelt Depo. 138:11 – 138:13]. When someone is close to retirement, "we kind of ask them, 'do you have an exit plan, a retirement plan, Do you have a date?" [ECF 40-3, Buelt Depo. 16:6 – 16:16].

- Curbow's comment in Buelt's evaluation stating, "Helping the younger people in the group will only help them in the long run with future projects and positions." [BNSF000577]. The younger employees being Derek Brown and Andrew Atkinson. [Buelt 131:15-131:23].

- Curbow's comment in Buelt's evaluation excluding Plaintiff as a member of the team. "I look forward seeing you work with Derek, Terry, Bruce and Andrew and developing them for advancement within the BNSF." [BNSF000578]. "I really look forward to your leadership with Derek, Terry, Andrew and Bruce." [BNSF000579].

- Curbow's comment in Buelt's evaluation stating, "Joe it's going to be a new railroad for you moving forward, so enjoy." [BNSF000579].

- Comments that Plaintiff was "very resistant to change". [See PSOF 125, Plaintiff's Exhibit "T" BNSF-MARSHALL 001357 – BNSF-MARSHALL 001361].

- Comments that Plaintiff was obstinate. [See PSOF 125, See Plaintiff's Exhibit "T" BNSF-MARSHALL 001357 – BNSF-MARSHALL 001361].

- Comments that Plaintiff was unable to modernize his skill set. [PSOF 125, See Plaintiff's Exhibit "T" BNSF-MARSHALL 001357 – BNSF-MARSHALL 001361].

- Buelt and Curbow were having discussions about creating a plan for Plaintiff leaving his position. [PSOF 125, ECF 40-3, Buelt Depo. 27:23-28:3].

- Then, replacing Plaintiff with a much younger employee. [PSOFs 94 - 95].

Although the threshold may be high to show constructive discharge, there are several times where a Court should have little difficulty finding evidence of a constructive discharge, including:

- The employer unjustifiably demoted the employee.

- The employer cut the employee's wages, salary or benefits without a good reason.

- The employee's job responsibilities were reduced without justification.

- The employee was reassigned to menial or degrading work without justification.

- The employee was reassigned to a supervisor with less experience than the employee.

- The employee was badgered, humiliated or harassed in order to get him or her to walk out.

- The employee was urged to retire or accept a demotion.

Employers, such as here, frequently claim they made legitimate business decisions. Whether an employer made a legitimate business decision or constructively discharged an employee should be a fact question resolved by a jury.

"Constructive discharge through placement in a job that is 'intolerable' may be shown by a deliberate placement in a job for which one is not qualified and that one is unable to perform, regardless of whether the environment is intolerably abusive or oppressive." *Green v. Harvard Vanguard Med. Assocs., Inc.*, 944 N.E.2d 184, 195 n.10 (Mass. App. Ct. 2011); *see also Allison v. Treadco, Inc.*, 1 F. App'x 598, 599 (8th Cir. 2001) (considering whether a new position required the plaintiff "to perform duties he was incapable of performing" in determining whether or not a constructive discharge occurred).

In June 2015, Plaintiff had been successfully performing his job duties for nearly four (4) decades. [See Plaintiff's Response to DSOF 63]. During that time, Plaintiff received either "meets expectations" or "exceeds expectations" on every mid-year and year-end evaluation and Professional Management Process ("PMP"). [PSOF 19]. Plaintiff regularly took on additional responsibilities and projects that were identified by either himself or his previous supervisors with enthusiasm. [ECF 40-2, Marshall Depo. Ex. 8]. Plaintiff's employment history does not contain any allegations of violence, or unprofessionalism.

At the time of his transfer to the Facilities Department, Plaintiff was the oldest employee in the group. [PSOF 116, DSOF 37]. Almost immediately, Buelt, Plaintiff's new supervisor, started focusing replacing Plaintiff with a younger employee. [DSOF 37]. Defendant then engaged in a systematic and ongoing pursuit to ensure Plaintiff had no other choice but to resign and/or retire.

Defendant transferred Plaintiff to the Facilities Group for unknown reasons. [See Plaintiff's Exhibit "H", Guarino Depo. 25:23-26:4]. "And then the very first meeting I had with Dwayne

Curbow, he told me, he said well, we'll find something for you to do, like they didn't think I had a job or that I did anything. I mean, it started immediately." [PSOF 173, ECF 40-2, Marshall Depo. 200:4-200:14]. Plaintiff was assigned to work for managers that knew nothing about his job. [PSOF 118; ECF 40-3, Buelt Depo. 11:13 – 11:22; ECF 40-4]. In fact, Buelt never discussed Plaintiff's job duties with his prior supervisor. [PSOF 119, See Plaintiff's Exhibit "H", Guarino Depo. 25:20-25:22]. Without knowing his job duties and workload, Plaintiff's new management team made significant changes to the job, including taking away the tools necessary for him to perform his job, including his company truck, taking the company credit card and transferring work to Plaintiff that had been handled by another employee for years without giving him any instruction or direction. If Plaintiff asked questions it was met with hostility, accusations of incompetence and allegations that "he's very resistant to change". [See Plaintiff's Exhibit "T" at BNSF001361]. Then, Defendant evaluated Plaintiff based on his purported failure to meet expectations on job duties that had never been part of his job and had not been explained to him.

The Performance Improvement Plan (PIP) given to Plaintiff in June 2016 had various unsupported expectations and allegations, including:

- Allegations that Plaintiff had "loud outbursts" and made "personal attacks towards employees". [PSOF 122, ECF 40-2, Marshall Depo. Ex. 15 at MARSHALL00258].

- Allegations that Plaintiff used "inappropriate language". [PSOF 122, ECF 40-2, Marshall Depo. Ex. 15 at MARSHALL00258].

- Allegations of "aggressive behavior". [PSOF 122, ECF 40-2, Marshall Depo. Ex. 15 at MARSHALL00258] [PSOF 122, Plaintiff's Exhibit "U" at BNSF001175].

- Allegations that Plaintiff had not "completed tasks and projects". [PSOF 122, ECF 40-2, Marshall Depo. Ex. 15 at MARSHALL00258].

- Allegations of attendance issues. "You have demonstrated difficulty in owning your responsibility to work a full day when in the office. You have a demonstrated taking long lunch breaks, and leaving early. I have documented this on May 5, May

6, and June 2." [PSOF 122, ECF 40-2, Marshall Depo. Ex. 15 at MARSHALL00258].

● Requirement to keep a daily log. [PSOF 122, ECF 40-2, Marshall Depo. Ex. 15 at MARSHALL00259].

● "[D]evelop a written plan of action on how you will improve daily communication with your peers and leadership team". [PSOF 122, ECF 40-2, Marshall Depo. Ex. 15 at MARSHALL00259].

● Consequences of not meeting expectations was "*[t]ermination of employment*." [PSOF 122, Plaintiff's Exhibit "U" at BNSF001175].

The various drafts of the PIP give a deeper look into Defendant's unfair treatment of Plaintiff. These drafts show the lengths Plaintiff's management team was willing to go in order to set Plaintiff up for failure and termination. [PSOF 122, Plaintiff's Exhibit "U", BNSF001171-BNSF001183]. It further is indicative of the hostility Defendant showed to Plaintiff. The recommendations made by Plaintiff's management team included:

● Plaintiff "expected fulfillment of a *nine (9) hour workday*." [PSOF 122, See Plaintiff's Exhibit "U" at BNSF001173].

● Plaintiff "will schedule an *Anger Management Class* approved by BNSF Human Resources department to include an assessment completed by a License professional". [See PSOF 122, Plaintiff's Exhibit "U" at BNSF001175].

● "[M]ust develop a game plan to *build relationships and trust* with your peers and leadership team." [See PSOF 122, Plaintiff's Exhibit "U" at BNSF001176].

● "Mr. Marshall will *identify and recommend 6 (six) new duties* for consideration by August 5, 2016". [See PSOF 122, Plaintiff's Exhibit "U" at BNSF001178].

● Consequences of not meeting expectations was "*[t]ermination of employment*." [See PSOF 122, Plaintiff's Exhibit "U" at BNSF001174].

As shown below, Defendant could not support its position.

    a.    **Buelt never explained his expectations to Plaintiff or told him how his job duties were going to change.**

Although Plaintiff had been assured that his job responsibilities, title, pay and benefits would remain the same after the transfer to Facilities, Defendant's new management team quickly

set out to transform Plaintiff's job into an untenable situation.

Defendant never provided Plaintiff with any explanation of how his job duties would change. Buelt admits that he never put together any information or directions explaining how his job duties were going to change. [ECF 40-3, Buelt Depo. 31:2-31:6].

In fact, during Buelt's first meeting with Plaintiff, Buelt, asked Plaintiff when he planned to retire. [PSOF _____]. Plaintiff replied that it was none of Buelt's business. [PSOF _____]. Defendant was not deterred. It quickly set about interfering with Plaintiff's ability to perform his job. Defendant took away his company provided vehicle and his Procard. Plaintiff had used his company truck for nearly a decade for work-related travel and to transport equipment needed to certify, maintain and repair Defendant's scale system. [PSOFs _____]; [see also, ECF _____, Marshall Depo. Ex. 1, Plaintiff's Job Description, MARSHAL000099 – MARSHALL000100].

Defendant reassigned Plaintiff's work vehicle to another employee, Mike L. Herzog. [PSOF _____]. Defendant's management team made this decision without any discussion with Plaintiff, or any actual knowledge of Plaintiff's job duties. [PSOFs _____]. Defendant's choice to significantly interfere with his ability to perform his job duties was made based upon Plaintiff's age and Defendant's overall expectation and desire that employees nearing the age of 60 will retire, and, because Plaintiff was not willing to retire at 60, Defendant pushed him out the door.

> **b.    Buelt began spreading rumors and giving false information to others about Plaintiff's retirement.**

Throughout the end of 2015, Buelt made numerous unsupported and false statements that Plaintiff planned to retire in September or October 2016, including in a statement to Human Resources as part of Defendant's "investigation" of Plaintiff's age discrimination complaint. He also made it plain to Plaintiff, other BNSF employees and even to outside vendors that BNSF expected Plaintiff to structure his job so that a college kid could do it. [PSOF 47, Plaintiff's

Response to DSOF 28 and footnote; see also ECF 40-2, Marshall Depo. 95:2 – 96:7]. Buelt later testified that he had no knowledge that Plaintiff was planning to retire in September or October 2016.

        **c.**        **Plaintiff's 2015 year-end review.**

Defendant completed Plaintiff's 2015 year-end Performance Development Plan and presented it to Plaintiff in January 2016. The Review contained two sections that rated Plaintiff as "needs improvement". The low ratings were based upon Defendant's characterization of Plaintiff as _**obstinate**_, _**resistant to change**_, and _**inability to modernize his skill set**_. [PSOF 125, Plaintiff's Exhibit "T"; Plaintiff's Response to DSOF 25]. The District of Kansas and other courts have recognized that employees can reasonably construe comments regarding resistance to change to be discriminatory comments. Courts have also recognized that resistance to change is an age-related stereotype which the ADEA was created to combat. See *William, et al. v. Nex-Tech Wireless, LLC*, 15-4888-SAC-KGS (D. Kan. 2017) citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610-11 (1993); *O'Reilly v. Marina Dodge, Inc.*, 435 Fed. Appx. 8, 12 (2nd Cir. 2011); *Hartsel v. Keys*, 87 F.3d 795, 802 (6th Cir. 1996) cert. denied, 519 U.S. 1055 (1997); *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507 n.4 (5th Cir. 1988); *Conn v. American National Red Cross*, 149 F. Supp.3d 136, 147 (D.D.C. 2016); *Peterson v. MidState Group, Inc.*, 54 F. Supp.3d 1039, 1044 (E. D. Wis. 2014). In addition, Defendant has also given contradictory and changing reasons for rating Plaintiff as "needs improvement" on portions of his 2015 year-end review.

Plaintiff responded to his 2015 year-end review with a 5-page letter to address the misstatements, mischaracterizations and mistruths contained in the Review. [PSOF 127, Plaintiff's Response to DSOF 27].

        **d.**        **Plaintiff's 2016 Performance Management Plan**

On or about February 26, 2016, Buelt met with Plaintiff about his 2016 Performance Management Plan and his objectives for 2016. [PSOFs 127-133, Marshall Depo., Ex. 13, BNSF-MARSHALL 000089 – BNSF-MARSHALL 000090]. By this time, Buelt had supervised Plaintiff for approximately eight (8) months and had been in contact on an almost daily basis regarding the details and performance of Plaintiff's job duties. [PSOFs 127 - 133, Marshall Depo., Ex. 13, BNSF-MARSHALL 000089 – BNSF-MARSHALL 000090]. Regardless, Buelt added a new objective requiring Plaintiff to keep a daily log of his clock-in and clock-out times, activities, greatest success and obstacle for the day. [PSOF 127 - 133, Marshall Depo., Ex. 13, BNSF-MARSHALL 000089 – BNSF-MARSHALL 000090]. Buelt did not require any of the other employees in the department to complete a daily log. [ECF 40-3, Buelt Depo. 83:6 – 83:12]. Plaintiff believed this requirement to be discrimination and harassment based upon his age, and during the meeting he expressed his distress at the situation by asking Buelt, "are you fucking with me?". [ECF 40-3, Buelt Depo. 27:7 – 27:14 (Buelt recognized that Plaintiff was expressing his concerns)]. This was the first and only time Plaintiff has used a curse word as an exempt employee. [PSOF _____, 40-2, Marshall Depo. 81:18 – 82:2].

On or about March 18, 2016, Plaintiff submitted a written response to the 2016 Performance Management Plan. In his response, Plaintiff complained that he believed that Defendant was discriminating and harassing him based upon his age. [PSOFs 127-133, Marshall Depo. Ex. 13, BNSF-MARSHALL 000089 – BNSF-MARSHALL 000090].

The letter cited specific examples of discrimination and harassment. [PSOF 127 – 133, Marshall Depo. Ex. 13, BNSF-MARSHALL 000089 – BNSF-MARSHALL 000090]. It also included complaints regarding Buelt's ongoing allegations that Plaintiff wasted time and did not have enough to do. Buelt repeated in front of Plaintiff and other employees that "[W]e know you

don't have enough to do. *We know!"* [PSOF 127 – 133, Marshall Depo. Ex. 13, BNSF-MARSHALL 000089 – BNSF-MARSHALL 000090]. Buelt later testified that he had no basis on which to make that claim and never asked Plaintiff about his workload. [PSOF 127 - 133, Buelt Depo. 91:11 – 92:1].

e.      **Defendant's "Investigation" of Plaintiff's Complaints**

Plaintiff's March 2016 complaint was forwarded to Defendant's Human Resources department for investigation. Instead of investigating Plaintiff's age complaint, Defendant quickly began focusing on Plaintiff's job performance and unsupported allegations from Plaintiff's management team regarding Plaintiff's behavior.

On or about April 12, 2016, Buelt provided a statement in response to a series of questions asked by Human Resources during its investigation. [Plaintiff's Exhibit "T", Buelt Depo. Ex. 26, BNSF-MARSHALL –001357 – BNSF-MARSHALL 001361]. Defendant's Human Resources included questions about Plaintiff's behavior and performance as further discrimination and retaliation against Plaintiff for making his age complaint. For example, HR asked Buelt if Plaintiff "had ever blown up on him." [Plaintiff's Exhibit "T", Buelt Depo. Ex. 26, BNSF-MARSHALL –001357 – BNSF-MARSHALL 001361]. Buelt responded with nearly 2 pages of accusations against Plaintiff. [Plaintiff's Exhibit "T"].

Buelt alleged again that Plaintiff was resistant to change, that he voiced his opinions and pushed back when given activities he did not agree with. He also alleged that Plaintiff was prone to outbursts and that Plaintiff had guns. [Plaintiff's Exhibit "T", Buelt Depo. Ex. 26, BNSF-MARSHALL –001357 – BNSF-MARSHALL 001361]. During his deposition, Buelt testified that he identified Plaintiff as an employee who had the potential to be violent in the workplace. [E ____, Buelt Depo.     ]. Buelt also told Curbow that he believed that Plaintiff had traits that could lead to violence in the workplace. [PSOF _____, Buelt Depo. _____]. Curbow then testified

that he told his wife if anything happened to him at work, she should tell the police to look at Plaintiff. [PSOF _____, Curbow Depo. __---]. These allegations were made only after Plaintiff began complaining about discrimination and hostile work environment. Prior to his complaints, Plaintiff had never been accused or identified as a potentially violent employee. In fact, Buelt and Curbow were only able to identify one incident of Plaintiff raising his voice or using profanity at the workplace – and that was in response to what he believed to be unlawful treatment. [PSOFs _____]. Both Buelt and Curbow denied feeling intimidated or in fear Plaintiff. [PSOF _____]. Neither Buelt nor Curbow reported Plaintiff as a potentially violent employee, and neither Buelt nor Curbow referred Plaintiff to BNSF's Employee Assistance Program. [PSOF _____]. In addition, Plaintiff's co-workers denied witnessing any inappropriate, violent, or intimidating behavior by Plaintiff during his time in the Facilities Group. [PSOFs _____, Stuff Depo.      ; Brown statement _____].

### f.    Plaintiff's Management Team interfered in the investigation process and provided false and misleading statements

In his statement to HR, Buelt also denied telling Plaintiff to structure his job so that a 24-year-old could do it. Instead, Buelt alleged that Plaintiff made a comment about a college kid being able to do his job. [PSOF _____, Buelt Depo. Ex. 26, BNSF-MARSHALL –001357 – BNSF-MARSHALL 001361]. During his deposition, however, Buelt admitted that he told Plaintiff that he needed to set up his job so that a college kid could do it. [PSOF _____ Buelt Depo. 31:15 – 31:23].

Further, in Buelt's response to HR's set of questions, he states that Plaintiff told him the first day that they met that he was going to retire in September or October 2016. [PSOF _____, Buelt Depo. Ex. 26, BNSF-MARSHALL –001357 – BNSF-MARSHALL 001361]. Once again, Buelt testified to the contrary in his deposition. When asked during his deposition if he had any

note confirming that Plaintiff made the statement about retirement, Buelt stated that he did not. [PSOF ____, Buelt Depo. 152:2 – 152:12]. Buelt also denied multiple times that he had any knowledge of Plaintiff planning to retire in September or October 2016..

On April 12, 2016, HR met with Plaintiff regarding his complaints of harassment and discrimination based upon age. During the meeting, Sarah Reedy, HR, told Plaintiff that she did not believe "he had a case." Later that day, HR provided Plaintiff a draft of his statement and allowed Plaintiff to make changes and additions to the document. In the statement, Plaintiff reiterated that he felt he was being forced out into retirement based upon his age. [ECF 40-2. Marshall Depo. Ex. 14].

>    g.    **Defendant Presents Plaintiff with a Performance Improvement Plan based upon misleading information gathered during Defendant's "investigation" of Plaintiff's age complaints**

On June 10, 2016, Plaintiff attended a "communications meeting" with Buelt, Curbow, Tamala Cleaver (HR) and Sarah Reedy (HR). Plaintiff believed the meeting was in response to his March 2016 age complaint. Instead of addressing Plaintiff's complaint, Buelt presented Plaintiff with a Performance Improvement Plan. [ECF 40-2, Marshall Depo. Ex. 5]. The PIP continued to include the same allegations against Plaintiff that he had opposed in multiple written complaints about harassment and discrimination.

On June 10, 2016, following the meeting regarding the PIP, Reedy and Cleaver stayed in the room and read Plaintiff a one-paragraph statement advising Plaintiff that Defendant had not found sufficient proof of discrimination or harassment.  On June 14, 2016, Plaintiff was notified that Tamala Cleaver and Sarah Reedy were no longer employed by Defendant. He was also advised that Defendant planned to move forward with his PIP.  Plaintiff provided his response to the PIP on June 17, 2016. Later that day, Plaintiff received a meeting request. On June 20, 2016, during a telephone call with SAI contractors, Buelt commented that he wanted a 22 or 23-year-old

contractor employee to do Plaintiff's job. [ECF 40-2, Marshall Depo. Depo. Ex. 5].

### h.    HR rescinded the PIP only to replace it with a "Performance Expectations" letter.

Although HR alleges that it rescinded the PIP, it was clear that the allegations by Buelt and Curbow had hit the mark. On August 8, 2016, Defendant purportedly rescinded the PIP only to replace it with a "Performance Expectations" letter from Curbow (McCubbin admits to drafting the letter) that included the allegations that he was "disrespectful", used "inappropriate language" and was not working the appropriate number of hours. [BNSF-MARSHALL 000113-BNSF-MARSHALL 000114]. The letter also threatened that "[f]urther exceptions of this nature will not be tolerated and may result in progressive disciplinary action, up to and including dismissal from employment." [BNSF-MARSHALL 000113-BNSF-MARSHALL 000114]]. Finally, the letter was distributed to Plaintiff's managers, Human Resources, Craig Rasmussen, AVP, and a copy was placed in Plaintiff's "Personnel file".

### i.    Allegations of Plaintiff using inappropriate language are misleading.

Allegations that Plaintiff used "inappropriate language" are technically accurate, but misleading. Buelt admits that Plaintiff used a cuss word or inappropriate language when talking to Buelt only one time. [ECF 40-3, Buelt 52:7-52:11]. And, Plaintiff admits that after numerous negative interactions, with Buelt and continued pressure for Plaintiff to retire and Plaintiff's repeated requests for assistance and direction from Buelt, Plaintiff asked Buelt, "why are you fucking with me?" Clearly, Plaintiff's question was out of frustration – and out of character – and should have prompted Buelt to inquire into Plaintiff's feelings, but, although Buelt did not know why Plaintiff had asked him that question, he did not ask for any explanation. Plus, Buelt testified that it was not a big deal stating, "we were going through a transition and when you have change

there's hurt feelings." [Buelt 25:17-25:24].

> **j.      Implications of fear about Plaintiff's behavior towards his management team are misleading**

Any implication that Buelt was afraid of Plaintiff are false. Buelt admits that he was never threatened by Plaintiff. [Buelt 55:3-55:7] and that he "may have" raised his voice with Plaintiff. [Buelt 24:23-24:25]. Moreover, Buelt testified that "I'm six foot four, three hundred pounds." [Buelt 54:13-54:14]. Buelt had also been previously warned by a prior supervisor that his physical stature could be used against him. Buelt understood and testified that his size can be "intimidating" and "imposing" and that he needed to watch what he said. [Buelt 54:15-54:19].

> **k.      Plaintiff's job was not being eliminated.**

BNSF claims that Plaintiff's job was eliminated. However, the testimony of Buelt was much different. Buelt testified that "I didn't say his job was going to be eliminated. When he left the position we weren't going to back fill it. The position would be eliminated when he left." [Buelt 133:23-134:9]. Buelt further testified that Plaintiff could have remained in his position another three to five years. [Buelt 153:14-153:19]. Defendant's position that Plaintiff's job would be eliminated upon his departure supports the constructive discharge claim because it shows that Defendant had an incentive to push Plaintiff out of his job.

> **l.      Lack of support for Plaintiff's purported attendance issues.**

Although Buelt claims that Plaintiff was late to work, took long lunches and left early, the only purported support for the allegations came from Buelt concerning three-days, May 5, May 6 and June 2. However, as Buelt admitted, he did not even ask Plaintiff about his purported attendance issues, such as if he had a medical appointment. [Buelt 107:18-108:2]. Then, knowing that "[BNSF's] expectation is that you work an eight-hour day when you're in the office" [Buelt

108:6-108:13] and based solely on his purported observations of attendance issues, Buelt was recommending that Plaintiff be required to work 9-hour days. [Plaintiff's Exhibit "U", BNSF001173]. Buelt testified that "[n]ormal office hours are from eight to four thirty. We ask people because we travel extensively that if you need to come in earlier and leave earlier, it's okay, but our expectation is that you work an eight-hour day when you're in the office." [Buelt 108:6-108:13]. Plaintiff's prior manager, Guarino, testified that she could not recall Plaintiff not working full days. She further testified that she was unaware of any exempt employees being required to work a minimum of nine hours per day. [Plaintiff's Exhibit "H", Guarino Depo. 29:12-29:15].

> **m.**      **Buelt was not coached, counseled or disciplined for any issues with Plaintiff.**

BNSF claimed that it had taken appropriate action to correct Buelt's behavior, and said that Buelt's "leadership issues" would be addressed in a PIP. However, Buelt testified that he was never counseled or coached or disciplined for issues with Mr. Marshall". [Buelt 130:10-130:12].

> **n.**      **Although the Court is not to make credibility determinations, if Plaintiff's behavior was actually as reported by Buelt and Curbow, then it belies logic that he was not disciplined.**

If Plaintiff, truly, was screaming, cussing, threatening and refusing to perform his job, then it suggests that the witnesses are exaggerating any purported issues with Plaintiff. In fact, Curbow specifically testified, "***I don't feel that he deserved to be terminated***." [Curbow 43:22-44:1].

> **o.**      **Human Resource's continued investigations into Plaintiff when he complained of discrimination and retaliation support Plaintiff's claim of a constructive discharge.**

BNSF's position statement to the EEOC said that "In the following weeks, Manager McCubbin completed her review of Manager Reedy's investigation of the March and April

internal complaints and of Mr. Marshall's June retaliation complaint." [BNSF000069]. Notably, during her employment with BNSF, Erika McCubbin never conducted an investigation for BNSF in which she found discrimination, harassment or retaliation. [Mccubbin 8:17-9:6]. She did not testify to investigating Plaintiff's complaints, she testified that she investigated concerns about Plaintiff's "performance improvement plan.". [Mccubbin 14:19-14:23]. When asked "[d]id you do any investigation into the complaint that Joe Marshall made that he believed he was being discriminated, harassed or retaliated against?" Her response was, "I don't **recall** the specifics." [Mccubbin 14:24-15:3].

The actions of Defendant and its management created a discriminatory, hostile working environment that included retaliating against Plaintiff for making a complaint of age discrimination. Such actions create a genuine issue of material fact that a reasonable person would have felt compelled to resign/retire. *Dediol v. Best Chevrolet, Inc.,* 655 F3d, 435, 444 (5th Cir. 2011) (to determine if a reasonable employee would feel compelled to resign the courts consider demotion; reduction in job responsibility, reassignment of work to a younger supervisor, humiliation by the employer, continued employment terms on less favorable than employee's former status). In *Acrey v. American Sheep Association,* 981 F.2d 1569, 1574 (10th Cir. 1992) the Tenth Circuit found that the Plaintiff had presented genuine issues of material fact for summary judgment when she was faced with a litany of performance deficiencies, had long-standing job responsibilities taken away and was refused training and/or instruction on new job duties. *Id.*

Defendant created such a hostile environment that – *in the light most favorable to Plaintiff* – a reasonable person would find it impossible to continue working for Defendant. Even when Plaintiff attempted to move to another position, Defendant refused to provide him with any actual work and forced him to sit idle in an empty office until he eventually retired. Plaintiff had no other

choice but to finally elect early retirement in October 2016.

> **p.      Plaintiff's constructive discharge took place under circumstances giving rise to an inference of discrimination**

Plaintiff was constructively discharged, and his job responsibilities, were given to a younger employee, Andrew Barthel. [See BNSF-MARSHAL 001038 - 001039].

> **2.      Plaintiff's Prima Facia Case under the ADEA other than constructive discharge.**

Plaintiff incorporates the standard for analysis of ADEA claims stated above.

Defendant does not dispute prongs (1) and (3), therefore, it is undisputed that Plaintiff was a member of a protected class under the ADEA and was qualified for his positions. "At the prima facie stage of the McDonnell Douglas analysis, a plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant." *Equal Employ Opportunity Comm. v. Horizon/CMS Healthcare*, 220 F.3d 1184, 1193 (10th Cir. 2000). Plaintiff must show only that adverse action occurred under circumstances giving rise to an inference of discrimination. *Bennett v. Windstream Communications, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015).

> **a.      Plaintiff suffered adverse employment actions**

The Tenth Circuit liberally defines the phrase "adverse employment action." *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1279 (10th Cir. 2010). Such actions are not limited to monetary losses in the form of wages or benefits. *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998). Defendant contests that its acts were adverse. Defendant contends that taking away his company truck and Procard had no impact on Plaintiff's ability to perform his job. And, if so, then it was not related to his age. The evidence shows that Buelt and Curbow did not know anything about Plaintiff's job, much less what tools were necessary for him to perform his duties. Certainly,

an inference can be drawn that Defendant took Plaintiff's truck and Procard to prevent him from performing his job.

Defendant claims that a PIP is not – *standing alone* – an adverse employment action. However, Plaintiff was not simply given a PIP that was later rescinded. He was investigated by HR, then given an "Expectation Letter" that was distributed to his management team, HR and to an Assistant Vice-President. The PIP, the "Expectation Letter", allegations that Plaintiff was not performing, was having attendance issues immediately placed Plaintiff in an "at-risk" status. *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1225 (10th Cir. 2006). Moreover, a PIP for BNSF was more than a simple written warning. Plaintiff's prior supervisor, Guarino, testified that in the 17 years that she worked for BNSF she had ***never given an employee a PIP***. [Plaintiff's Exhibit "H", Guarino Depo. 6:25-7:1 and Guarino 20:17-20:19]. Further, Curbow, as the Director of Facility Engineering since 2008 testified that he had "***never given a PIP throughout my career***". [ECF 40-4, Curbow Depo. 14:18-14:21 and Curbow 119:20-119:23]. In the light most favorable to Plaintiff and drawing all reasonable inferences, whether the PIP or the "Expectation Letter" put Plaintiff in an "at-risk" status, and thereby, was an adverse action, presents a question for the jury.

### b.       Plaintiff can Show Pretext

As set forth throughout, Defendant's proffered reasons for Plaintiff's constructive discharge/adverse actions were not legitimate and not supported by the record. "[A] plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010). The employer's burden to prove legitimate, business reasons for Plaintiff's adverse action is one of production, not persuasion; it can involve no credibility assessment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (applying McDonnell Douglas

framework in the context of an ADEA action). Plaintiff may show pretext in many ways.

> Typically, a plaintiff may show pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that . . . [the plaintiff] was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

*Dewitt*, 845 F.3d at 1307 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

"'Evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the McDonnell Douglas formula requires us to ration the evidence between one stage or the other.'" *Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003)(quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3rd Cir. 2000)).

It is undisputed that Plaintiff capably performed his job for almost 40 years. He had good reviews and he was promoted multiple times. Although Defendant contends it took certain actions based upon legitimate business reasons, Defendant has provided inconsistent and false explanations for its alleged legitimate business reasons as described in detail above.

Plaintiff has shown that members of management, including his director supervisor, made numerous comments regarding Defendant's preference for younger employees, and Defendant's focus on structuring jobs and providing training and education for younger employees. The comments were made by Plaintiff's direct decision makers and were made in reference to Plaintiff's position. Plaintiff asserts that such comments are suggestive of a policy or goal by Defendant to replace its workforce with younger employees.

The Tenth Circuit has found that, although an employer may be permitted to make reasonable inquiries into the retirement plans of its employees, such inquiries can be considered circumstantial evidence of discrimination, particularly when such a retirement inquiry does not

stand alone. *Maughan v. Alaska Airlines, Inc.*, 281 Fed. Appx. 803, 807. For example, in *Maughan v. Alaska Airlines*, the Tenth Circuit found that a retirement inquiry in conjunction with rumors that the Plaintiff was denied a job position because of his retirement plans and allegations of a change in attitude toward the Plaintiff justified reversal of granting of summary judgment in favor of the employer. *Maughan v. Alaska Airlines, Inc.*, 281 Fed. Appx. 803, 807 (10th Circuit reversing the district courts grant of summary judgment). Buelt's inquiry into Plaintiff's retirement combined with the significant amount of additional circumstantial evidence presented here is clearly relevant to Defendant's motivation for its treatment of Plaintiff.

While standing alone, Buelt's inquiry into Plaintiff's retirement may not give rise to an inference of discrimination, such remarks are not irrelevant. *See e.g. Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922-923 (stating that "such remarks are not irrelevant"). Rather, such facts are "surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow, thus providing additional threads of evidence that are relevant to the jury." *Id.* (internal citations and quotations omitted). "Stray remarks therefore constitute circumstantial evidence that, when considered together with other evidence, may give rise to a reasonable inference of age discrimination." *Id.* Buelt's inquiry into Plaintiff's retirement plans and learning that he did not plan to retire for some years, then mere weeks later bringing up Plaintiff's alleged performance issues surely are the kinds of facts that would cause a reasonable trier of fact to raise an eyebrow. An inference of discrimination based on Plaintiff's age is supported by these facts.

Moreover, "an employer's pretextual motivation could be inferred from a poor performance review that was added after the employee was terminated." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 910 (10th Cir. 2011) (citing *Maughan v. Alaska Airlines, Inc.*, 281 F. App'x 803, 808 (10th Cir. 2008). Consider that Buelt in April 2016, in response to an inquiry by Human Resources in the investigation of Plaintiff's age discrimination complaints,

stated that Plaintiff intended to retire in September or October 2016; then during his deposition, Buelt testified that he had no idea when Plaintiff was going to retire – until he actually did.  The only conclusion supported by all of these facts is that of a strong inference of discrimination, and as such Defendant's motion for summary judgment should be denied. Thus, even assuming Buelt's inquiry about Plaintiff's retirement was a stray occurrence, such a statement, when considered in conjunction with Plaintiff's prima facie case and showing of pretext, clearly gives rise to an inference of intentional age discrimination.

**C.   Defendant created and maintained a hostile work environment as part of a plan to force Plaintiff to resign.**

Plaintiff incorporates the facts as set forth above. BNSF has policies on discrimination, retaliation, harassment and hostile work environments. Plaintiff followed that policy and complained that he felt he was being treated differently due to his age. Defendant, however, ignored its policies and permitted its behavior until Plaintiff felt he would be terminated.

To qualify as a "hostile" workplace, conduct must be intentional, severe, recurring and/or pervasive and interfere with the employee's ability to perform his or her job.  To determine whether conduct or speech is a minor offense or is intimidating, offensive or abusive, a Court typically considers how often it occurred, the reaction it garnered, and how a "reasonable person" would characterize it. A hostile work environment is the sum of actions, communications or behaviors that alter the terms, conditions, or expectations of a comfortable workplace for an employee.

Spanning the nearly 40 years Plaintiff worked for BNSF, Buelt and Curbow are the only people that made allegations about Plaintiff's behavior or alleged any performance issues. For nearly 40 years, Plaintiff's performance had always been, at least, meets expectations in an industry that is not known for its sensitivity. Yet, Plaintiff, who Defendant has described as

a "bully", complained to HR multiple times, verbally and in writing. Based on Defendant's representations the allegations were more than trivial and were significant enough that it assigned multiple HR representatives to investigate over several months.

Setting aside the comments that could represent direct evidence of age discrimination, surely, telling a subordinate to structure his job so a "college kid" could do it, that his job was being eliminated, lying about a subordinate during HR investigations, making up purported attendance issues about a subordinate, assassinating a subordinate's character, setting up a subordinate for failure by choosing not to give him any direction, lying about a subordinate's plans to retire, spreading rumors that a subordinate is violent, modifying a subordinate's job duties, taking away the tools necessary for a subordinate to do his job, including false information in evaluations and performance plans goes beyond "offhand comments" or "isolated incidents". The actions, and inactions, of BNSF were part of a "steady barrage" of offensive comments and behaviors as part of a plan to force Plaintiff to retire.

Defendant's attitude towards Plaintiff is further emphasized by how it treated Plaintiff after October 3, 2016. In its position statement, BNSF continued its accusations about Plaintiff's behavior. [See Plaintiff's Exhibit "W", BNSF000071]. In Curbow's deposition, he called Plaintiff the worst employee he ever had [ECF 40-4, Curbow Depo. 120:8-120:10] and he told his wife that Plaintiff should be looked at if anything were to happen to him. [ECF 40-4, Curbow Depo 27:9-27:16].

When Plaintiff followed BNSF's policy and reported the behavior, HR launched investigations involving numerous individuals. However, as shown by Erika McCubbin's

testimony, HR's investigations were focused on evaluating Plaintiff's performance and resulted in negative evaluations and performance plans being given to Plaintiff.[12] Even months after wrongly, by its own admission, giving Plaintiff a Performance Improvement Plan, it chose to take further action against Plaintiff by threatening to terminate his employment *in a meeting run by Joseph Buelt*.

The attacks began the day that Plaintiff was transferred. Although Defendant characterizes the events as an inability to get along with Buelt, it was much more. In fact, BNSF's position statement to the EEOC claimed that "Mr. Marshall's attack on manager Buelt was *relentless*."[13] [See Plaintiff's Exhibit "W" at BNSF000067] (emphasis added). The word "relentless" means "that does not relent; unyieldingly severe, strict, or harsh; unrelenting". Dictionary.com, https://www.dictionary.com/browse/relentless (last visited Aug. 20, 2019). If BNSF and its counsel believed that Plaintiff's purported attacks on Buelt were "relentless", then there can be no doubt that the behavior of Buelt and BNSF was severe and pervasive and altered the terms, conditions or privileges of his employment. Moreover, the consistent theme was Plaintiff's age and the when he intended to retire.

Certainly, the behavior of Defendant rises to the level of a hostile work environment. It began immediately upon Plaintiff's transfer and it occurred frequently. Plaintiff had no choice but to work with Buelt and Curbow and they, clearly, did not like Plaintiff for

---

[12] "Ultimately, Manager Reedy's found no evidence of age discrimination. However, her investigation revealed *significant performance concerns regarding Mr. Marshall* that were left unaddressed by Manager Buelt". [BNSF000068].

[13] "*Mr. Marshall's attack on Manager Buelt was relentless*. On April 12, 2016, Mr. Marshall alleged that Manager Buelt said discriminatory age-related comments. Mr. Marshall claimed that Manager Buelt told him he should 'structure [his] job so that a 24-year old new hire could do it.' As explained below, this is untrue." [BNSF000067].

unexplained reasons. Plaintiff testified that BNSF "systematically allowed this behavior to go on and by not doing anything to stop it actually supported it." [ECF 40-2, Marshall Depo. 199:9-199:13]. The conduct was severe, which can be shown by the continued involvement of HR the duration of the investigations. It can also be shown by the allegations about Plaintiff's behavior. For 40 years, BNSF had no problems with Plaintiff's behavior or his performance[14], but, after his transfer, the environment in the Facilities Group was so toxic that it purportedly turned him into an employee that could not perform his job, was capable of workplace violence and avoided the office. BNSF's conduct was far more than a mere offensive utterance. As set forth throughout, Defendant was looking for reasons to terminate Plaintiff. Buelt reassigned work to him and refused to give him any direction. Buelt went so far as to try and bait Plaintiff into confrontations. Buelt and Curbow also used their superior positions to influence the investigations with false allegations, which required Plaintiff to constantly defend himself. The conduct also unreasonably interfered with Plaintiff's work performance. In a matter of months working in the Facilities Group, Plaintiff went from a respected long-term employee to an employee that was purportedly incapable of doing anything right. Finally, Defendant believed that he was so upset by Defendant's actions that it requested that a welfare check be done.[15] Defendant's motion should be denied.

---

[14] In his nearly 40 years working for BNSF, Plaintiff had never received a PIP until June 2016. [ECF 40-2, Marshall Depo. 207:22-207:24].

[15] On August 11, 2016, Defendant engaged in a series of emails because it became "concerned" when Plaintiff was not present at the Kansas City, Kansas office. [See Plaintiff's Exhibits "J", BNSF-MARSHALL 001298, and Plaintiff's Exhibit "K", PSOFs 89-90]. Defendant understood that Plaintiff was considerably distressed after he received the negative mid-year PMP and Letter of Expectations on August 8, 2016. [PSOF 89-90]. Defendant knew Plaintiff vigorously disagreed with Defendant's continued insistence that Plaintiff was not meeting expectations based upon misstatements and incorrect information supplied by his management team. Defendant believed Plaintiff may be at risk and requested a review of the electronic logs for Plaintiff and was ready to request a welfare check by the authorities. [PSOF 89-90]. Plaintiff was not in the Kansas City, Kansas office due to a pre-scheduled work trip.

**D.      BNSF retaliated against Plaintiff for complaining of discrimination.**

Defendant concedes that Plaintiff made age complaints. A prima facie retaliation case is made if the plaintiff shows that he engaged in protected opposition to discrimination, and, as a result, suffered materially adverse action, *i.e.*, action sufficient to "dissuade" a reasonable worker from making her complaint.[16] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff is not required to show "an ultimate employment decision or substantial employment action." *Crawford*, 529 F.3d at 974. It is therefore unnecessary to decide whether a reasonable jury could find that Plaintiff was constructively discharged to prevail on his retaliation claim.

This court has noted that: "a plaintiff's opposition to a supervisor's discriminatory comment 'has been considered sufficient to constitute the opposition to a discriminatory employment practice required to establish the initial prong of a retaliation claim.' *Loggins v. Cleveland County,* 2005 WL 2318606 at *6 (W.D.Okla.2005).

As discussed extensively herein, Defendant made numerous comments regarding Plaintiff's retirement, required Plaintiff to structure his job so that a college kid could perform it, and made false and unsupported allegations regarding Plaintiff's behavior and actions in response to Plaintiff's complaints about discrimination and harassment. Defendant's own documents show that instead of investigating Plaintiff's complaints, it instead focused on Plaintiff's work

---

[PSOFs 89-90 at BNSF-MARSHALL 001298, BNSF-MARSHALL 001344 – BNSF-MARSHALL 001346].

[16] "The district court erred in relying on a pre-Burlington Northern case, *Haynes v. Level 3 Communications*, 456 F.3d 1215 (10th Cir.2006), for the proposition that the disciplinary action taken against Ms. Bertsch was materially adverse only if it actually effected a significant change in her employment status, rather than Burlington Northern's rule of possible dissuasion of an employee from making or supporting a charge of discrimination. Second, it erred in refusing to consider pretext in determining there was no evidence of a causal connection between her complaints about Latimer's conduct and her termination, contrary to *Proctor v. United Parcel Service*, 502 F.3d 1200, 1209 (10th Cir.2007)." *Bertsch v. Overstock.com*, 684 F.3d 1023, 1028-29 (10th Cir. 2012).

performance and the allegations made by his management team. After Plaintiff moved to a new position, Defendant forced Plaintiff to still idle in an empty room until he had no choice but to elect early retirement.

For the purposes of establishing a prima facie case, it is sufficient for there to be a temporal proximity between Plaintiff's constructive discharge and his protected opposition to discrimination. Here Plaintiff continued to complaint about the hostile work environment and discrimination based upon his age until well into August 2016.  Defendant's discriminatory and retaliatory actions continued well into October 2016. Even if the Court does not consider Plaintiff's protected acts and Defendant's behavior sufficiently close in time, it must still consider it. *See Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013)("if the adverse action occurs three months out, the action's timing alone will not be sufficient to establish the causation element"). There is, however, other evidence to support a causal connection. First, less than 30 days after Plaintiff's complaint about age in March 2016, Defendant began focusing on allegations regarding Plaintiff's job performance, behavior and attitude. Second, at the same time Defendant met with Plaintiff to present him with a Performance Improvement Plan, Defendant also advised Plaintiff that it did not find any evidence of age discrimination. Defendant has provided only scant evidence of legitimate business reasons for engaging its treatment of Plaintiff up to and included his constructive discharge. Plaintiff has provided evidence sufficient to create a genuine issue of material fact as to whether the alleged business reasons for Plaintiff's constructive discharge are a pretext for illegal retaliation.

## E.    Plaintiff's KAAD Claim

Plaintiff withdraws his KAAD claim, but points that in Defendant's argument addressing Plaintiff's KAAD claim, it relies on both the September 22, 2106 and October 3, 2016 as possible dates on which to analyze the timeliness of Plaintiff's claims. [ECF 40 at pg. 14]. Defendant does

not identify or discuss July 7, 2016 as a date on which any statute of limitations began to run.

## CONCLUSION

Defendant seeks to shirk its liability by describing its behavior as "performance-type feedback" and "constructive criticism". Defendants' witnesses testified that it was a general practice that employees retired at or around sixty years of age. When Plaintiff did not appear to be willing to retire at 60, Defendant executed a plan to make him retire. As implied by Defendant, its behavior towards Plaintiff was the norm towards employees nearing retirement age, and the Court should have no difficulty in denying Defendant's motion. Defendant has not satisfied its burden and shown an absence of disputed material facts with respect to Plaintiff's claims.

Plaintiff respectfully requests that the Court deny Defendant's Motions for Summary Judgment and for whatever and further relief this Court deems just and proper.

Respectfully submitted,

MCKEE LAW, L.L.C.

/s/ Aaron C. McKee
Aaron C. McKee                                     KS# 20889
222 South Cherry Street
Olathe, Kansas 66061
Phone: (913) 768-6400
Facsimile: (913) 768-6420
aaronmckee@ksmoemploymentlaw.com

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify a true and correct copy of the foregoing was served and transmitted on August 21, 2019, to the following:

**David C. Vogel (KS #18129) and Heather Miller (KS #78751), Constangy, Brooks, Smith, &**

**Prophete, LLP, 2600 Grand Blvd., Suite 750, Kansas City, Missouri 64108, (816) 472-6400, dvogel@constangy.com, hmiller@constangy.com, Attorneys for Defendant**

☐ US mail          ☒ Electronic Mail     ☒ Case Net          ☐ Facsimile

/s/ Aaron C. McKee