# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Ervin J. Marshall, Jr.,**

        **Plaintiff,**

**v.**                                  **Case No. 18-cv-2385-JWL**

**BNSF Railway Co.,**

        **Defendant.**

## MEMORANDUM & ORDER

Plaintiff Ervin J. Marshall, Jr. filed this lawsuit against his former employer, BNSF Railway Company, alleging discrimination, retaliation, harassment and constructive discharge in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.  This matter is presently before the court on defendant's motion for summary judgment on plaintiff's claims (doc. 40).  As will be explained, the motion is granted in part and denied in part.[1]

## I.    Facts

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to plaintiff as the nonmoving party.  Defendant BNSF Railway Company is an interstate Class I freight railroad and employs more than 40,000 employees.  Plaintiff Ervin J. "Joe" Marshall, Jr. began his employment with defendant in May 1977 as a bridge and builder

---

[1] In the pretrial order, plaintiff asserted claims under the Kansas Age Discrimination in Employment Act, K.S.A. § 44-1111 et seq.  He has expressly abandoned those claims in response to defendant's motion for summary judgment.  The motion, then, is granted as to these claims.

helper based in Kansas City, Kansas. He was 20 years old at that time. At the time of his hiring, plaintiff was an hourly employee and a member of the union. Over the next thirty years, plaintiff worked in a variety of hourly positions for defendant in its Structures Department, which is part of the railroad's Engineering Department and is responsible for maintaining defendant's structures, including bridges.

In August 2007, plaintiff bid for and was chosen for a salaried position as a Scale Inspector, which was also in the Structures Department. The Scale Inspector position was headquartered in Kansas City, Kansas, but required work across the country in terms of testing, repairing and working on industrial scales that were used to weigh rail cars. Plaintiff was the only Scale Inspector employed by defendant and no other employee had the same job duties as plaintiff. In July 2014, plaintiff's job title changed to "Supervisor, Scales," although the title change did not impact his job duties or responsibilities. Throughout this time, plaintiff's performance was consistently rated as satisfactory and the record reveals no issues with plaintiff's performance.

In June 2015, when plaintiff was 58 years old, defendant informed him that his position was being moved from the Heavy Bridge team to the Facilities team, both of which were within the Structures Department. The change in teams did not impact plaintiff's job title, geographic base of employment, compensation or benefits. The change, however, required a change in plaintiff's supervisor. In Facilities, plaintiff began reporting to Joseph Buelt, Manager of Engineering, who was also new to the Facilities team. Mr. Buelt, in turn, reported to Dwayne Curbow, Director of Facility Engineering. Plaintiff testified that he believed that Mr. Buelt was approximately five years younger than plaintiff and that Mr. Curbow's age was "really close" to plaintiff's age. Plaintiff was the oldest employee in Facilities.

Shortly after his assignment to the Facilities team, Mr. Buelt, without explanation, advised plaintiff to turn in the car keys for his company-owned vehicle and to turn in his company "Procard," a card that plaintiff was able to use in case of an emergency or a "maintenance situation" to make timely purchases of materials while testing scales. Plaintiff does not know whether any other employees on the Facilities team had a company-owned vehicle or access to a Procard. Mr. Buelt also instructed plaintiff that, as an exempt employee, he should no longer be performing manual labor on scales. According to plaintiff, the decision to take away plaintiff's company-owned vehicle and Procard significantly impaired plaintiff's ability to do his job and indicated that Mr. Buelt and Mr. Curbow did not fully understand the nature of plaintiff's job. He testified that Mr. Curbow, on plaintiff's first day in Facilities, told him "we'll find something for you to do," which plaintiff interpreted as Mr. Curbow's belief that plaintiff did not actually perform any work in his job. In an effort to clarify expectations about the nature of his job going forward, plaintiff sent an email to Mr. Buelt and Mr. Curbow in August 2015 asking that they provide him with a new job description in light of "fundamental changes" to plaintiff's job duties. Although plaintiff had a meeting with Mr. Buelt and Mr. Curbow to discuss his concerns, he testified that he did not gain any clarity on his job description or management's expectations of him.

Plaintiff testified that Mr. Buelt, sometime in late 2015, asked plaintiff to structure his job so that a "college kid" or "any 26-year-old new hire" could perform it. He also testified that Mr. Buelt, despite the fact that plaintiff intended to work for another 6 years and not retire until age 65, occasionally made comments such as "I know you are going to be retiring soon." According to plaintiff, Mr. Buelt "was always talking about the fact that I would be moving on and that he

wanted me to start to develop a program that would allow a new employee, a younger employee coming in to do my job." Mr. Buelt testified that he did not recall plaintiff ever telling him that he intended to retire in September or October 2015 when he turned 60 years of age, but that he has seen very few employees with 30 years of service who elect to work beyond the age of 60 years old. Plaintiff does not dispute that defendant's employees and management assume that employees with 30 years of service will retire at the age of 60.

In January 2016, plaintiff received his year-end performance evaluation for 2015. Defendant refers to its salaried employee evaluation system as its Performance Management Process ("PMP"). Plaintiff's 2015 year-end PMP was completed and delivered by Mr. Buelt. Plaintiff received an overall rating of "on target," but Mr. Buelt gave plaintiff a "needs improvement" rating on two categories in the PMP, including a specific scales project for which plaintiff was responsible and the leadership model. Mr. Buelt gave plaintiff an "on target" or "exceeds target" rating in other categories. Shortly after receiving his 2015 year-end PMP, plaintiff wrote to Mr. Curbow to set forth his concerns about the PMP, including his belief that the "needs improvement" ratings were unfair and were based on inaccurate information despite the fact that plaintiff had presented contrary evidence to Mr. Buelt. The letter also indicated plaintiff's belief that Mr. Buelt lacked any understanding of plaintiff's job and provided no guidance on projects that he assigned to plaintiff.

On February 26, 2016, Mr. Buelt met with plaintiff. Mr. Buelt told plaintiff that "he was required to start keeping a daily log of his work activities, including his stop and start times and all activities that were worked on each day. Mr. Beult did not ask any other employee on the Facilities team to keep a daily log of work activities. In the course of the February 2016 discussion

with Mr. Buelt, plaintiff asked Mr. Buelt why he was "fucking with" him. On March 18, 2016, plaintiff wrote to Mr. Curbow to address a number of issues, including Mr. Buelt's daily log requirement; the fact that Mr. Buelt had added more duties to plaintiff's original job duties; the "ridiculous" 2015 year-end PMP; Mr. Buelt's micro-managing plaintiff's activities; and Mr. Buelt's repeated statement that plaintiff did not have enough work to do. At the end of the letter to Mr. Buelt, plaintiff expressed his belief that Mr. Buelt had "taken a personal dislike" toward plaintiff and that Mr. Buelt wanted to replace plaintiff with "someone younger and easier to manipulate." Finally, plaintiff stated his belief that Mr. Buelt's "constant negative scrutiny and singular treatment" of plaintiff constituted harassment and age discrimination "and illustrates [Mr. Buelt's] ongoing attempt to get rid" of plaintiff.

On April 12, 2016, plaintiff met with Sarah Reedy, one of defendant's human resource managers. Ms. Reedy, tasked with investigating plaintiff's complaint of age discrimination, separately interviewed plaintiff and Mr. Buelt about plaintiff's complaint of age discrimination. According to plaintiff, the focus of that investigation quickly turned to plaintiff's performance and "unsupported allegations" from defendant's management about plaintiff's behavior. Ms. Reedy drafted a statement for plaintiff to sign after giving him the opportunity to make corrections to the statement. Ms. Reedy did the same for Mr. Buelt. Plaintiff's statement largely mirrored his prior letters to Mr. Curbow—that Mr. Buelt provided no instruction to plaintiff but added duties in an effort to force plaintiff out in favor of a younger employee. In his lengthy statement, Mr. Buelt denied any suggestion that he was discriminating against plaintiff based on his age and expressed frustration at plaintiff's desire to have a "free pass" to "do whatever he wants" at work. Mr. Buelt's statement also introduced a new concern—his asserted belief that plaintiff had a

potential for violence. According to Mr. Buelt, plaintiff yelled at him or "blew up at him" on multiple occasions. Mr. Buelt wrote:

> I've never seen him blow up at anyone other than me and Dwayne. I'm not nervous if he's not armed, but it's unprofessional and unproductive. I've taken classes, and I was a plant manager and required to take workplace violence and recognizing when your employees were going to go off. He seems to represent a lot of the traits I was shown in that training of people that may do that type of activity—he's very resistant to change, he a pretention [*sic*] to have unexpected outbursts that are uncontrollable—it seems like he can't control himself, the PMP review process was one of them. . . . The fact that he blows up is what concerns me. He thinks we are out to get him and I've told him multiple times that I'm here to support you and what he does but I need to know what he does and that he needs to help me understand so that when you leave here it's seamless when you leave.

The record does not reflect whether Ms. Reedy interviewed any other individuals about plaintiff's complaint of age discrimination.

On June 10, 2016, plaintiff attended a "communications meeting" with Mr. Curbow, Mr. Buelt, Ms. Reedy and Tamala Cleaver, one of defendant's human resources directors. Plaintiff believed that the purpose of this meeting was to discuss his complaint of age discrimination and the investigation into that complaint. Instead, defendant presented plaintiff with a Performance Improvement Plan (PIP) indicating areas of plaintiff's performance that needed improvement. The PIP highlighted plaintiff's alleged "unacceptable temper" and inability to accept constructive feedback "without having loud outbursts with personal attacks towards the person delivering the feedback;" plaintiff's alleged "difficulty" in working a full day when in the office; and plaintiff's purported deficiencies in communicating with Mr. Buelt concerning his daily tasks. After presenting the PIP, Mssrs. Buelt and Curbow left the room and Ms. Reedy and Ms. Cleaver stayed with plaintiff to advise him that defendant had found plaintiff's allegations of discrimination and harassment to be unsubstantiated. Ultimately, Ms. Reedy provided a written document to plaintiff

memorializing that defendant had "reviewed the facts thoroughly" and could not substantiate any instances of discrimination, harassment, or unfair treatment by Mr. Buelt. Ms. Reedy also advised in the letter that defendant had found "communication issues" that would be addressed. On June 16, 2016, plaintiff prepared a detailed, lengthy written response to the PIP in which he expressed his disagreement with the alleged deficiencies set forth in the PIP.

On July 7, 2016, plaintiff provided written notice to Mr. Buelt and Mr. Curbow that he was resigning from his salaried position "due to the untenable position" in which his supervisors and human resources had placed him. In that letter, plaintiff stated that he had no choice but to resign his position as an exempt employee and that he intended to return to an hourly position with the union prior to retiring. ("I will return to the ranks of the BNSF Railway Companies Scheduled Employees, and then retire.").[2] Plaintiff wrote that he would remain in his salaried position until September 21, 2016 and move back to an hourly position on September 22, 2016. In his deposition, plaintiff testified that he did not decide to resign from the exempt position until defendant did not respond to his June 16, 2016 letter concerning the PIP.

On August 5, 2016, plaintiff attended a meeting with Erika McCubbin, another one of defendant's human resources managers.[3] During that meeting, Ms. McCubbin provided plaintiff a letter again addressing his complaint of age discrimination and harassment. In that letter, Ms.

---

[2] It is undisputed that employees who came through the union as hourly employees prior to obtaining salaried positions have the option, provided they continued paying union dues, to return to the hourly workforce and that many employees exercise that option prior to retirement based on an understanding that an hourly employee has more favorable health insurance retirement benefits.

[3] Both Ms. Reedy and Ms. Cleaver left defendant's employment in June 2016 and Ms. McCubbin became the HU contact person for plaintiff's division.

McCubbin stated that she had reviewed the facts thoroughly and had "not substantiated unfair treatment" by Mr. Buelt or Mr. Curbow. Ms. McCubbin, however, indicated that defendant had decided not to proceed with the PIP that had been issued to plaintiff in June. According to plaintiff, Ms. McCubbin told him that the PIP was "unjust and unfair." Ms. McCubbin indicated that she would be setting up a meeting with plaintiff, Mr. Curbow and Mr. Buelt to review performance expectations.

On August 8, 2016, plaintiff met with Mr. Buelt, Mr. Curbow and Ms. McCubbin for his 2016 mid-year PMP review. During that meeting, plaintiff received a letter with the title "Performance Expectations." This document addressed plaintiff allegedly having used disrespectful language and a disrespectful tone toward others, including Mr. Buelt, and plaintiff's alleged failure to maintain regular office and working hours. Plaintiff maintains that other than the isolated incident in which he used the "the F word" during the discussion with Mr. Buelt, he always used appropriate language in the workplace. He acknowledged, however, that sometimes his discussions with Mr. Buelt became "heated." Plaintiff denies that he failed to maintain regular office and working hours. The Performance Expectations document stated that further incidents of the nature set forth in the document "may result in progressive disciplinary action up to and including dismissal from employment." In plaintiff's 2016 mid-year PMP, he received an overall rating of "needs improvement." There is no evidence that a mid-year review (as opposed to a year-end review) is used to make compensation decisions.

On August 19, 2016, plaintiff wrote to Mr. Curbow expressing disagreement with the substance of both the Performance Expectations letter and the 2016 mid-year PMP. In that letter, plaintiff stated that "based on the ongoing harassment, discrimination, and retaliation I have

suffered at the BNSF I have been forced to exercise my option and retire from the BNSF. I had planned on working until age 65 but the situation has become untenable." On September 22, 2016, plaintiff returned to an hourly position as a Structures foreman. Plaintiff remained in that position for eleven days before retiring on October 3, 2016. He filed a charge of discrimination with the EEOC and the Kansas Human Rights Commission on May 18, 2017.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.     Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc*., 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc*., 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III.     Age-Based Discrimination Claims

In the pretrial order, and as clarified in his response to the motion for summary judgment, plaintiff asserts that he was subjected to several discriminatory acts based on his age. Specifically, he contends that Mr. Buelt took away his company car and his company credit card; that Mr. Curbow placed him on a "Performance Improvement Plan" in June 2016; that he suffered a constructive demotion in July 2016; that Mr. Curbow issued to plaintiff a "Performance Expectations" letter in August 2016; and that he was constructively discharged. Defendant moves for summary judgment on each of these claims.[4]

As plaintiff has no direct evidence of discrimination, his claims are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Daniels v. United Parcel Serv., Inc*., 701 F.3d 620, 627 (10th Cir. 2012). Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id*. While the Circuit does not rigidly require certain prima facie elements, plaintiff must generally establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id*. (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)). If he establishes a prima facie case, the burden shifts to defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. If defendant meets this burden, summary judgment against plaintiff is warranted unless

---

[4] The parties use the phrase "constructive discharge" to refer to plaintiff's July 2016 decision to resign his exempt position and return to an hourly position. The court believes that "constructive demotion" more accurately describes plaintiff's claim stemming from that decision. The court uses the phrase "constructive discharge" to describe plaintiff's claim stemming from his August 19, 2016 decision to retire from BNSF.

he introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id.* (citing *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011)).

Defendant moves for summary judgment on several of plaintiff's age-based discrimination claims (*i.e.*, his claims that defendant took away his company car and credit card; placed him on a PIP; and issued a "Performance Expectations" letter) on the grounds that the acts challenged by plaintiff do not rise to the level of an "adverse employment action" for purposes of establishing a prima facie case of age discrimination. In assessing whether an employee has suffered an adverse employment action, the Tenth Circuit "take[s] a case-by-case approach, examining the unique factors relevant to the situation at hand." *Braxton v. Nortek Air Solutions, LLC*, 769 Fed. Appx. 600, 603-04 (10th Cir. Apr. 23, 2019) (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)). Adverse employment actions are not limited to monetary losses in the form of wages or benefits; rather, adverse employment actions can include acts that "carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *See id.* at 604 (citations and quotations omitted). But the Circuit has emphasized that a "mere inconvenience or an alteration of job responsibilities" is not an adverse employment action. *Id.* (quoting *Sanchez*, 164 F.3d at 532).

Putting aside for the moment his claims of constructive demotion and constructive discharge, none of the acts identified by plaintiff in his submissions rises to the level of an "adverse employment action" as that phrase has been construed by the Circuit. There is no evidence that any of these acts had any bearing whatsoever on plaintiff's responsibilities, pay, job status or job opportunities and plaintiff does not suggest otherwise. With respect to the company-owned vehicle and use of the Procard, plaintiff cannot identify any other employee in the Facilities

department who enjoyed these benefits and plaintiff concedes that defendant reimbursed him any time that he rented a car for work purposes. He testified that the loss of the Procard was inconvenient because sometimes it took additional time to obtain required materials. Viewing the evidence in the light most favorable to plaintiff, no reasonable jury could find that defendant's decision to take away plaintiff's company-owned card or the Procard was anything more than an inconvenience for plaintiff. But summary judgment is warranted on this claim in any event because, as defendant also argues, it is time-barred. These discrete acts occurred more than 300 days before plaintiff filed his charge of discrimination in May 2017. *See Jones v. UPS, Inc*., 502 F.3d 1176, 1186 (10th Cir. 2007) (each discrete incident of alleged discrimination or retaliation constitutes its own "unlawful employment practice" for which administrative remedies must be timely exhausted).

Any claim based on the June 2016 PIP is also time-barred. *See id*. Regardless, plaintiff does not contend that the PIP had any impact on his pay, benefits, job status or job prospects. In fact, he concedes that the June 2016 PIP was never formally issued and that defendant withdrew that document. And while the August 2016 "Performance Expectations" letter cautioned plaintiff that further issues could result in progressive discipline including termination, it is undisputed that defendant took no further action against him. Plaintiff insists, without evidentiary support, that the PIP combined with the "Performance Expectations" letter placed him in an "at-risk" status. But he does not explain how those disciplinary events affected his salary or status or otherwise placed him at risk of termination. He also points to evidence that PIPs were hardly ever issued to employees, but that contention does not establish that PIPs are "adverse actions" for purposes of Title VII. Thus, plaintiff has not established that the PIP or the "Performance Expectations" letter

constituted an "adverse employment action." *Lucas v. Office of Colorado State Public Defender*, 705 Fed. Appx. 700, 704-05 (10th Cir. Aug. 4, 2017) (affirming summary judgment in favor of defendant where plaintiff presented no evidence that corrective action had any effect on salary or benefits or that it caused a significant change in the terms or conditions of his employment); *Medina v. Income Support Div., State of New Mexico*, 413 F.3d 1131, 1137 (10th Cir. 2005) (warning letter did not constitute adverse employment action where letter did not adversely affect the terms or conditions of the plaintiff's employment; letter did not affect the likelihood that the plaintiff would be terminated, did not undermine the plaintiff's current position and did not affect the plaintiff's future employment opportunities). Summary judgment on each of these claims is required.

Plaintiff also contends that he was constructively demoted from his exempt position and then constructively discharged from his employment thereafter. As defendant urges in its motion, any claim based on plaintiff's constructive demotion from his exempt position is time-barred because it occurred more than 300 days before plaintiff filed his charge of discrimination. The Supreme Court has clearly held that a constructive discharge claim accrues when an employee provides notice of his or her intent to resign, not on the employee's last day of employment. *See Green v. Brennan*, 136 S. Ct. 1769, 1782 (2016) (employee "must also show that he actually resigned"). Viewed in the light most favorable to plaintiff, plaintiff provided notice of his intent to resign from his exempt position on July 7, 2016, when he expressly stated in a letter to Mr. Buelt and Mr. Curbow that he had "no choice but to resign [his] position as an Exempt Officer of the company" and to return to a position as an hourly employee. Thus, even though plaintiff

remained in his exempt position until September 21, 2016, his constructive demotion claim accrued on July 7, 2016—more than 300 days before he filed his charge of discrimination.

In concluding that plaintiff's constructive demotion claim accrued on July 7, 2016, the court rejects two arguments made by plaintiff. First, plaintiff contends that *Green v. Brennan* supports the conclusion that the question of precisely when an employee resigns is typically a factual one. The court disagrees. In *Green v. Brennan*, the Supreme Court remanded the case to the Tenth Circuit to address the issue of when the plaintiff gave notice of his resignation. 136 S. Ct. at 1782. In that case, the plaintiff had signed a settlement agreement that gave him the option of either retiring or reporting for duty at another facility at a lower salary. *Id*. at 1774. The government argued that the plaintiff gave notice of his resignation on the day he signed the settlement agreement and the plaintiff argued that he gave notice of his resignation when he submitted his retirement paperwork. *Id*. at 1782. On remand, the Circuit agreed with the plaintiff that the settlement agreement "did not constitute a definitive notice of resignation because it provided that Mr. Green could still choose to continue his employment with the Postal Service by reporting for duty in Wyoming." *Green v. Brennan*, 669 Fed. Appx. 951, 952 (10th Cir. Oct. 24, 2016). Similar circumstances do not exist here. In this case, it is undisputed that plaintiff's July 7, 2016 letter constituted a definitive notice of his intent to resign from his exempt position.

Second, plaintiff contends that the continuing violation doctrine allows him to recover on his constructive demotion claim because defendant continued to discriminate against plaintiff on the basis of his age within the statutory period. The continuing violation doctrine does not salvage plaintiff's untimely constructive demotion claim. That doctrine applies "when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one

unlawful act," as opposed to "conduct that is a discrete unlawful act." *Hamer v. City of Trinidad*, 924 F.3d 1093, 1098 (10th Cir. 2019) (quoting *Sierra Club v. Oklahoma Gas & Elec. Co.*, 816 F.3d 666, 672 (10th Cir. 2016)). A claim for constructive discharge is one that is based on a discrete unlawful act. *Chapman v. Carmike Cinemas*, 307 Fed. Appx. 164, 174 (10th Cir. Jan. 12, 2009) ("[W]hen the constructive discharge is complete—*i.e.*, when the employee resigns—the discharge is most akin to a wrongful discharge by the employer, which is a discrete and identifiable act."). Accordingly, the continuing violation theory simply does not apply to the claim. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (rejecting continuing violation theory in the context of discrete acts such as termination).

Having concluded that plaintiff's constructive demotion claim is time barred, the court turns to plaintiff's constructive discharge claim. In its motion for summary judgment, defendant does not separately analyze plaintiff's claim that he was forced to retire from BNSF. Rather, defendant's "constructive discharge" analysis focuses exclusively on plaintiff's July 7, 2016 resignation from his exempt position. While some of those arguments might apply to plaintiff's August 19, 2016 decision to retire from the railroad, defendant has not analyzed the evidence in the record with any focus on the August 19 decision and, thus, has failed to show the absence of a genuine issue of material fact with respect to this claim. In reply to plaintiff's argument that his August 19, 2016 decision to retire constituted a constructive discharge, defendant suggests that plaintiff has never asserted a claim based on his ultimate decision to retire from the railroad. That argument is rejected. In the pretrial order, plaintiff expressly alleges that he "had no choice but to retire" effective October 3, 2016 in light of defendant's "continued harassment, discrimination and retaliation." Defendant, then, has not shown that it is entitled to summary judgment on

plaintiff's claim that his August 19, 2016 decision to retire constituted a constructive discharge based on his age.[5]

## IV.     Age-Based Hostile Work Environment

Plaintiff also asserts that he suffered an age-based hostile work environment. The Tenth Circuit has acknowledged that age-based hostile work environment claims may be cognizable under the ADEA. *See MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005)). As defendant highlights, plaintiff's age harassment claim requires a showing of economic damages in order to proceed to trial. *See Villescas v. Abraham*, 311 F.3d 1253, 1260 (10th Cir. 2002) (relief under ADEA includes judgments compelling reinstatement, backpay, payment of wages owed, injunctive relief, declaratory judgment, attorney's fees, "and an additional equal amount as liquidated damages" for willful violations; compensatory damages are not permitted); see also *Ridgell-Boltz v. Colvin*, 565 Fed. Appx. 680, 683 (10th Cir. Apr. 30, 2014) (district court properly dismissed the ADEA claims where plaintiff had already obtained backpay and benefits); *Oglesby v. Hy-Vee, Inc.*, 402 F. Supp. 2d 1296 (D. Kan. 2005) (granting summary judgment in favor of defendant on ADEA harassment claim because plaintiff suffered no economic loss as a result of alleged harassment and could not recover compensatory damages on that claim).

The only claim for economic loss that survives the motion for summary judgment is plaintiff's claim that his August 19, 2016 decision to retire from the railroad constituted a

---

[5] In a footnote in its reply, defendant also argues that this constructive discharge claim should be rejected as "undeveloped and unpersuasive." Because that argument was raised for the first time in the reply brief, the court does not address it. *See Lynch v. Barrett*, 703 F.3d 1153, 1160 n.2 (10th Cir. 2013) (court does not consider arguments raised for the first time in reply brief).

constructive discharge. Thus, plaintiff can proceed on his age harassment claim only as a "hostile-environment constructive discharge claim," a "compound" claim which requires plaintiff to show that working conditions were so intolerable that a reasonable person would have felt compelled to resign." *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 147-148 (2004). Because the court has held that plaintiff's constructive discharge claim will be resolved by the jury, the court necessarily must have the jury resolve this claim as well.

## V.     Retaliation Claims

Plaintiff asserts in the pretrial order that defendant retaliated against him for his complaints about age discrimination and harassment. The court assesses plaintiff's retaliation claims under the *McDonnell Douglas* framework. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). To state a prima facie case for retaliation, plaintiff must show (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection exists between the protected activity and the materially adverse action. *Id.* If plaintiff presents a prima facie case of retaliation, then defendant must respond with a legitimate, nonretaliatory reason for the challenged action. *Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 656 (10th Cir. 2013). Plaintiff, then, must show that defendant's stated reason is pretextual. *Id.*[6]

---

[6] It is unclear whether plaintiff intended to assert a claim of retaliatory harassment in the pretrial order. To the extent he intended to do so, he has not mentioned that claim in response to defendant's motion for summary judgment, let alone explained how he could obtain any relief for that claim under the ADEA. *See Ridgell-Boltz v. Colvin*, 565 Fed. Appx. 680, 683 (10th Cir. Apr. 30, 2014) (district court properly dismissed ADEA claims where defendant had already reinstated plaintiff with back pay and associated benefits and no other relief was available to plaintiff);

Defendant moves for summary judgment on plaintiff's retaliation claims on the grounds that plaintiff has not come forward with evidence that he suffered a materially adverse employment action for which he filed a timely charge of discrimination. In support of that argument, defendant incorporates by reference its arguments concerning plaintiff's age discrimination claims. In other words, defendant again has failed to come to grips with plaintiff's constructive discharge claim stemming from his August 19, 2016 decision to retire from the railroad. Plaintiff's retaliation claim based on that alleged constructive discharge, then, survives summary judgment because defendant has not met its initial burden of showing the absence of a genuine issue of material fact. Aside from a constructive discharge, plaintiff does not otherwise identify a specific employment action that might form the basis of a retaliation claim. He mentions "comments regarding plaintiff's retirement," but does not suggest that those comments were materially adverse. In any event, no reasonable jury could conclude that Mr. Buelt's sporadic comments about plaintiff's retirement plans were sufficient to constitute a materially adverse action in the absence of evidence that Mr. Buelt encouraged plaintiff to retire or somehow threatened plaintiff with consequences if he did not retire. *See Braxton v. Nortek Air Solutions, LLC*, 769 Fed. Appx. 600, 606 (10th Cir. Apr. 23, 2019) (supervisor's isolated comments were not "materially adverse" where there "no attendant consequences" stemming from comments).

---

*Walker v. United Parcel Serv., Inc*., 240 F.3d 1268, 1277-78 (10th Cir. 2001) (where plaintiff admittedly suffered no actual monetary losses as a result of alleged FMLA violation, summary judgment in favor of defendant was required because plaintiff had no grounds for relief under statute); *Oglesby v. Hy-Vee, Inc*., 402 F. Supp. 2d 1296 (D. Kan. 2005) (granting summary judgment in favor of defendant on ADEA harassment claim because plaintiff suffered no economic loss as a result of alleged harassment and could not recover compensatory damages on that claim).

The only remaining employment actions that might support plaintiff's retaliation claims are the August 2016 "Performance Expectations" letter along with the 2016 mid-year review.[7] While the court has already concluded that the "Performance Expectations" letter does not constitute an "adverse action" for purposes of Title VII, the court also concludes that the letter does not satisfy the lesser standard of *Burlington Northern*. The letter undisputedly had no impact on plaintiff's job duties, pay, benefits, job status or job prospects. The letter did not establish difficult or onerous requirements for plaintiff. It merely required plaintiff, as an exempt employee, to engage in respectful communications in the workplace and to maintain full, regular work hours. These requirements are not so oppressive or unreasonable that a reasonable employee would be discouraged from exercising his or her rights under Title VII. To the extent the letter cautioned plaintiff that further issues could result in termination, it is undisputed that plaintiff had already decided by that time to resign his employment as an exempt employee and that defendant took no further action against him. In such circumstances, the PIP does not qualify as a materially adverse action as defined by Burlington Northern. *See Payan v. United Parcel Service*, 905 F.3d 1162, 1173-74 (10th Cir. 2018) (placement on employee improvement plan did not qualify as a materially adverse action where there was nothing onerous, difficult or time-consuming about

---

[7] Defendant's decision to take away plaintiff's company-owned vehicle and his Procard cannot form the basis of a retaliation claim because those acts occurred before plaintiff's complaint of discrimination. *See Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1234-35 (10th Cir. 2000) (finding no retaliatory animus where the employer's decision to take adverse action pre-dated the employee's grievance). Moreover, as noted earlier, that decision as well as the June 2016 PIP occurred more than 300 days before plaintiff filed his charge and, thus, any claims based on those acts would be untimely. *See Jones v. UPS, Inc*., 502 F.3d 1176, 1186 (10th Cir. 2007) (each discrete incident of alleged discrimination or retaliation constitutes its own "unlawful employment practice" for which administrative remedies must be timely exhausted).

plan).  Lastly, plaintiff cannot establish that his 2016 mid-year review constitutes a materially adverse action under *Burlington Northern*.  There is no evidence that a mid-year review has any impact on compensation decisions generally or that the particular mid-year review received by plaintiff had any impact on any aspect of his employment.  Again, plaintiff identifies no consequence stemming from the mid-year review.  In such circumstances, no reasonable jury could conclude that the review would dissuade a reasonable person from exercising his or her rights under Title VII.

For the foregoing reasons, the court denies summary judgment on plaintiff's retaliation claim based on his alleged constructive discharge and grants summary judgment on all other retaliation claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 40) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 16th day of October, 2019, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge